**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| **Tre McPherson, Pattikate Williams-Void, John Doe, John Roe, and Thomas Caves, on behalf of themselves and all others similarly situated,** | : : : : : : | **Case No. 20-cv-534** |
| **Plaintiffs-Petitioners,** | : : : : | |
| **v.** | : : : | **April 20, 2020** |
| **Ned Lamont and Rollin Cook, in their official capacities,** | : : : : | **IMMEDIATE RELIEF SOUGHT** |
| **Defendants-Respondents.** | : | |

**CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF AND PETITION FOR WRITS OF HABEAS CORPUS**

## INTRODUCTION

1.      Plaintiffs-Petitioners ("Plaintiffs") are individuals held at Connecticut Department of Correction ("DOC") facilities, many of whom have a serious pre-existing medical condition or are in an age group which the United States Centers for Disease Control ("CDC") has determined puts them at significantly higher risk of severe disease and death if they contract Coronavirus Disease 19 ("COVID-19").  The conditions of confinement at DOC facilities across the state create a heightened and unreasonable risk of COVID-19 for any person confined at the jail and a substantial risk of severe illness or death for those who are older and/or medically vulnerable to COVID-19.  Plaintiffs bring this class action seeking immediate release of all individuals 50 and older and those with medical conditions that place them at heightened risk of severe illness or death from COVID-19.  These individuals are members of the "Medically Vulnerable Pre-adjudication Subclass" or the "Medically Vulnerable Post-adjudication Subclass."  Release will remove the Medically Vulnerable Subclasses from a life-threatening situation and allow Defendants-Respondents to implement social distancing measures and other CDC public-health guidelines for those remaining in DOC facilities.  Plaintiffs also seek injunctive relief on behalf of two classes that together comprise all individuals currently held in DOC facilities:  the Pre-adjudication Class of those incarcerated people held while awaiting adjudication of their charges, and the Post-adjudication Class of those incarcerated people who are serving a criminal sentence. Plaintiffs ask the Court to order Defendants-Respondents to comply with the safety and health guidelines that prevent or minimize the spread of the virus for those confined in DOC facilities.  It is unconscionable that Defendants-Respondents have not yet implemented CDC guidelines to maximize social distancing, increased hygiene, access to personal protective equipment ("PPE"), and appropriate medical treatment for those infected.  Indeed, Defendant-Respondent Cook's

response to the crisis has been to simply transfer members of the Classes who had tested positive for COVID-19 to isolation units in Northern Correctional Institution ("Northern"), a "supermax" prison not intended or designed to serve as a medical correctional facility.  He then failed to confirm that transferred class members would receive the level of care recommended by the CDC and failed to take steps to provide adequate hygiene, sanitation, or social distancing for the remaining incarcerated people in DOC facilities.

2.      Prisons and jails are quickly becoming the epicenter of COVID-19 in cities throughout the country, including New York, Chicago, and Philadelphia.  DOC is quickly joining these ignoble ranks due to the inherent congregate nature of its facilities, as exacerbated by its reactive, haphazard, and inconsistent approach to dealing with the virus.  As demonstrated by the exponential spread of COVID-19 throughout DOC facilities over the past three weeks, current conditions continue to create an extreme risk for rapid, uncontrollable spread of COVID-19 throughout the system with grave outcomes for both the incarcerated population and the surrounding communities.   Although in April, DOC began moving COVID-19-positive incarcerated people to Northern to isolate the positive cases from the rest of the incarcerated population, these efforts are insufficient.  Pervasive fear of Northern has deterred people from reporting symptoms; not all COVID-19-positive incarcerated people have been transferred; some have not been transferred immediately; others have been returned prematurely; and those left behind have not been screened, quarantined, or otherwise protected.  Meanwhile, people detained in other DOC facilities remain unable to comply with CDC guidelines to practice social distancing, maintain proper personal hygiene, frequently disinfect their spaces, or use appropriate PPE.  In fact, responsive measures within DOC continue to differ not only day by day, but facility by facility, building by building, and block by block.

3. A substantial number of people currently held at DOC facilities—members of the Medically Vulnerable Subclasses—face serious risks of life-threatening illness due to their age and/or underlying medical conditions. Plaintiffs seek writs of habeas corpus for members of the Medically Vulnerable Subclasses. Habeas relief is essential and proper to prevent unnecessary loss of life.

4. For all individuals held in DOC facilities—the Classes—Defendants-Respondents must substantially alter conditions to comply with the CDC guidelines for social distancing and enhanced sanitation and hygiene practices. Plaintiffs ask the Court to certify the Class and to order Defendants-Respondents to implement a plan that allows DOC facilities to comply with CDC guidelines for social distancing, hygiene and sanitation practices, PPE, and adequate medical care. To aid the Court in enforcing this order, Plaintiffs ask the Court to appoint a public-health expert to 1) evaluate the Defendants-Respondents' proposed program, and 2) to confirm that Defendants-Respondents properly identify and release members of the Medically Vulnerable Subclasses.

5. Accordingly, Plaintiffs, on behalf of the Classes and the Medically Vulnerable Subclasses, bring this action and request immediate release of all members of the Medically Vulnerable Subclasses. Plaintiffs and the Classes also ask this Court to order Defendants-Respondents to cure the unsafe conditions at DOC facilities by implementing procedures that comply with CDC guidelines. If this Court does not grant immediate release to the Medically Vulnerable Subclasses and injunctive relief to the Classes, Plaintiffs request a hearing as soon as possible. Given the rapid exponential spread of COVID-19, there is no time to spare.

## I.     JURISDICTION AND VENUE

6. Plaintiffs bring this putative class action pursuant to 22 U.S.C. § 2241, 42 U.S.C. § 1983, and 28 U.S.C. §§ 2201, 2202, for relief from both detention and conditions of confinement

that violate the Eighth and Fourteenth Amendments.

7.      This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. § 1343(a) (civil rights jurisdiction), and 28 U.S.C. § 1331 (federal question jurisdiction).

8.      This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in the District of Connecticut.

## II.        PARTIES

9.      Plaintiff Tre McPherson is a pretrial detainee at Bridgeport Correctional Center held for lack of a $5,100 bond.  Defendants-Respondents house him in an open dormitory with fifty-seven other men.  Many men in his dormitory have reported symptoms similar to a head cold, including Mr. McPherson, who recently also lost his sense of smell.  These are symptoms of COVID-19.  At least one other man was very sick and removed from the dormitory.

10.     Plaintiff Pattikate Williams-Void is a pretrial detainee at York Correctional Institute held for lack of a $75,000 bond.  She has hypertension and has been diagnosed as pre-diabetic.  These underlying medical conditions put Ms. Williams-Void at a high risk of life-threatening complications should she contract COVID-19.

11.     Plaintiff John Doe is above the age of 70 and is a prisoner serving a sentence of incarceration.  He has HIV and hepatitis C, and requires regular dialysis for kidney disease.  These underlying medical conditions put Mr. Doe at high risk of life-threatening complications should he contract COVID-19.  In disregard of these risk factors, Defendants-Respondents house Mr. Doe with a cellmate.

12.     Plaintiff John Roe is above the age of 50 and is a prisoner serving a sentence of incarceration.  He has HIV, which, along with his age, puts him at high risk of life-threatening complications should he contract COVID-19.  In disregard of these risk factors, Defendants-

Respondents house Mr. Roe in an open dormitory with more than ninety other people sleeping in bunkbeds in close proximity to one another.

13.     Plaintiff Thomas Caves is a prisoner serving a sentence of incarceration at Corrigan-Radgowski Correctional Institute.  Defendants-Respondents house him with a cellmate and his cell is not cleaned.  Mr. Caves shares showers, phones, and common space with more than eighty other men housed in his unit.  One person who contracted COVID-19 and fell ill in Mr. Caves' unit was simply locked in his cell, with his cellmate, for 15 days.

14.     Defendant-Respondent Ned Lamont is the governor of state of Connecticut.  He is sued in his official capacity.  Governor Lamont and the state of Connecticut control and operate the DOC facilities through Defendant-Respondent Commissioner Rollin Cook.  The state of Connecticut currently has immediate custody over Plaintiffs McPherson, Williams-Void, Doe, Roe, Caves, and all other putative class members.

15.     Defendant-Respondent Rollin Cook is the commissioner of the Connecticut Department of Correction.  Defendant-Respondent Cook currently has immediate custody over Plaintiffs-Petitioners McPherson, Williams-Void, Doe, Roe, Caves, and all other putative class members.  Defendant-Respondent Cook is a policymaker for the state of Connecticut.  Defendant-Respondent Cook is sued in his official capacity.

### III.     FACTUAL ALLEGATIONS

### A.     COVID-19 Poses a Significant Risk of Illness, Injury, and Death

16.     We are in the midst of the most significant pandemic in generations.[1]  The lethality

---

[1] John M. Barry, *The Single Most Important Lesson from the 1918 Influenza*, N.Y. TIMES (Mar. 17, 2020), https://cutt.ly/PtQ5uAZ (opinion piece by author of "The Great Influenza: The Story of the Deadliest

rate of COVID-19, the serious respiratory disease caused by this coronavirus, is estimated to be between 1 and 6%, about tenfold higher than that observed from a severe seasonal influenza that kills thousands a year.[2] As of 4 p.m. on April 20, 2020, there were 19,815 confirmed cases of COVID-19 in Connecticut and 1,331 COVID-19-related deaths.[3] The virus is spreading exponentially.[4] In fact, the number of confirmed COVID-19 cases in Connecticut jumped over 21% just between April 5 and April 6, 2020.[5]

17.    The virus is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.[6] There is no vaccine against COVID-19, and there is no known medication to prevent or treat infection.[7] Social distancing—deliberately keeping at least six feet of space between persons to avoid spreading illness[8]—and a vigilant hygiene regimen, including washing hands frequently and thoroughly with

---

Pandemic in History," noting comparison between current COVID-19 outbreak and the 1918 influenza outbreak widely considered one of the worst pandemics in history).

[2] As of April 20, 2020, there were 2,470,410 confirmed cases globally, with 169,595 deaths and 645,335 recoveries. Johns Hopkins University of Medicine, *Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering at Johns Hopkins University*, https://cutt.ly/StEyn2U; Exhibit A, Expert Declaration of Dr. Jonathan Louis Golob, M.D. ("Golob Decl."), ¶ 4. Dr. Golob is an Assistant Professor at the University of Michigan School of Medicine in Ann Arbor, Michigan, and a specialist in infectious diseases and internal medicine with a subspecialty in infections in immunocompromised patients.

[3]    *COVID-19 Update April 20, 2020,* available at https://portal.ct.gov/-/media/Coronavirus/CTDPHCOVID19summary4202020.pdf?la=en.

[4] *See* Golob Decl. ¶ 2.

[5] Alex Putterman and Eliza Fawcett, *Connecticut COVID-19 curve flatter than expected, but researchers predict 5,500 fatalities by August*, HARTFORD COURANT (Apr. 6, 2020), https://cutt.ly/2t3Cxau.

[6] Centers for Disease Control and Prevention, *Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings*, https://cutt.ly/ztRAo0X.

[7] World Health Organization, *Coronavirus,* https://cutt.ly/ztWyf7e ("At this time, there are no specific vaccines or treatments for COVID-19."); Declaration of Dr. Robert B. Greifinger, M.D., ¶ 8, *Dawnson v. Asher*, 20-cv-409 (W.D. Wash. Mar. 16, 2020), ECF No. 4 ("Social distancing and hand hygiene are the only known ways to prevent the rapid spread of COVID-19.").

[8] Johns Hopkins University, *Coronavirus, Social Distancing and Self-Quarantine*, https://cutt.ly/VtYYiDG.

soap and water, are the only known measures for protecting against transmission of COVID-19.[9] Because the coronavirus spreads among people who do not show symptoms, staying away from people is the best way to prevent infection.[10]   *Everyone*—including the staff at DOC facilities—has to act as if *everyone* has the disease.

18.     COVID-19 can cause severe damage to lung tissue, including a permanent loss of respiratory capacity, and it can damage tissue in other vital organs, such as the heart and liver.[11]

19.     People over the age of fifty face a greater risk of serious illness or death from COVID-19.[12]   In a February 29, 2020 preliminary report, individuals age 50-59 had an overall mortality rate of 1.3%; 60-69-year-olds had an overall 3.6% mortality rate, and those 70-79 years old had an 8% mortality rate.[13]

20.     People of any age also are at an elevated risk if they suffer from certain underlying medical conditions, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, or asthma.[14]   A report from

---

[9] Declaration of Dr. Jonathan Louis Golob, MD, ¶ 8, *Dawson v. Asher,* 20-cv-409 (W.D. Wash. Mar. 16, 2020), ECF No. 5.

[10] Exhibit B, Expert Declaration of Dr. Jonathan Giftos, M.D. ("Giftos Decl."), ¶¶ 8–9.  Dr. Giftos is the Medical Director of Addiction Medicine & Drug User Health at Project Renewal and a Clinical Assistant Professor in the Department of Medicine at Albert Einstein College of Medicine.  He is the former Attending Physician and the Clinical Director of Substance Use and Treatment for NYC Health & Hospitals, Division of Correctional Health Services at Rikers Island; Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. TIMES (Mar. 31, 2020), https://cutt.ly/6t4wchX.

[11] Golob Decl. ¶¶ 4, 9.

[12] Golob Decl. ¶ 14.

[13] *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths* Chart, https://cutt.ly/ytEimUQ (data analysis based on WHO China Joint Mission Report).

[14] Golob Decl. ¶¶ 3, 14.

the World Health Organization ("WHO") estimated the mortality rate of 13.2% for COVID-19 patients with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[15]

21.    In many people, COVID-19 causes fever, cough, and shortness of breath.[16]  Most people in high-risk categories who develop serious illness will need advanced support.[17]  This requires highly specialized equipment that are in limited supply, such as ventilators, and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians.[18]

22.    The need for care, including intensive care, and the risk of death, is much higher for COVID-19 infection than for influenza.[19]  According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.[20] For people in the highest-risk populations, the fatality rate of COVID-19 infection is about 15 percent.[21]  Patients who do not die from serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from neurologic damage, loss of digits, and loss of respiratory capacity.[22]

---

[15] *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization (Feb. 28, 2020), at 12, https://cutt.ly/xtEokCt.
[16] Golob Decl. ¶ 5.
[17] *Id.* at ¶ 8.
[18] *Id.*
[19] *Id.* at ¶ 4.
[20] *Id.  See also* Betsy McKay, *Coronavirus vs. Flu Which Virus is Deadlier*, WALL ST. J. (Mar. 10, 2020, 12:49 p.m.), https://cutt.ly/itEmi8j.
[21] Golob Decl. ¶ 4.
[22] *Id.*

**B.    The Release of Medically Vulnerable People is Necessary to Reduce the Grave and Immediate Danger that COVID-19 Will Result in Serious Harm or Death at DOC Facilities**

23.    People in congregate environments—places where people live, eat, and sleep in close proximity—face increased danger of coronavirus infection and COVID-19, as already evidenced by the rapid spread of the virus on cruise ships[23] and in nursing homes.[24] It is virtually impossible for people who are confined in prisons, jails, and detention centers to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission of the disease.[25]

24.    "Correctional settings increase the risk" of contracting COVID-19 because in prison, "there are high numbers of people with chronic, often untreated, illnesses housed in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, and no possibility of staying at a distance from others,"[26] such that "there are more people susceptible to getting infected congregated together in a context in which fighting the spread of an infection *is nearly impossible*."[27]

25.    This increased risk is present and apparent in the DOC facilities. As elsewhere,

---

[23] The CDC is currently recommending that travelers defer cruise ship travel worldwide. "Cruise ship passengers are at increased risk of person-to-person spread of infectious diseases, including COVID-19." *COVID and Cruise Ship Travel*, Centers for Disease Control and Prevention, https://cutt.ly/7tEEQvT.

[24] The CDC notes that long-term care facilities and nursing homes pose a particular risk because of "their congregate nature" and the residents served. *Preparing for COVID-19: Long-term Care Facilities, Nursing Homes*, Centers for Disease Control and Prevention, https://cutt.ly/7tEEIT; Golob Decl. ¶ 12.

[25] Exhibit C, Expert Declaration of Dr. Josiah Rich, M.D., MPH ("Rich Decl."), ¶¶ 8, 10. Dr. Rich, an infectious disease specialist, is a Professor of Medicine and Epidemiology at The Warren Alpert Medical School of Brown University and the Director and Co-founder of The Center for Prisoner Health and Human Rights at The Miriam Hospital; Golob Decl. ¶ 13.

[26] Giftos Decl. ¶ 12.

[27] *Id.* ¶ 13 (emphasis added). *See also* Letter from Johns Hopkins Faculty, *supra* note 8; Declaration of Dr. Jaimie Meyer, *Velesaca v. Decker*, 20-cv-1803 (S.D.N.Y. Mar. 16, 2020), ECF No. 42 (noting, *inter alia*, that jail environments have reduced prevention opportunities, increased susceptibility, and are often poorly equipped to diagnose and manage outbreaks of infection disease).

incarcerated people in Connecticut suffer from disproportionately high rates of chronic illness. Nationwide, about forty percent of incarcerated people have at least one chronic illness, and almost all chronic illnesses are more common among incarcerated populations.[28]  Many of these illnesses, such as hypertension (30.2% compared to 18.1% in the general population), other heart problems (9.8% compared to 2.9% in the general population), asthma (14.0% compared to 10.2% in the general population), and diabetes (9.0% compared to 6.5% in the general population),[29] are associated with more severe cases of COVID-19 and poorer outcomes.[30]  In Connecticut, DOC healthcare staff have reported that the housed population suffers high rates of infection leading to chronic illness, such as hepatitis C.[31]  In addition, in 2012, the most recent year for which data on HIV in Connecticut prisons is publicly available, the HIV infection rate was more than 3.5 times higher in incarcerated populations[32] than the HIV rate in the state as a whole.[33]

26.      In addition, Connecticut's prison population is aging.  Five hundred ninety-six of the people in state custody are 50 or older and therefore are at a higher risk for severe complications

---

[28] *See, e.g.*, The Center for Prisoner Health and Human Rights, *Chronic and Infectious Diseases in Justice-Involved Populations* (2020), https://cutt.ly/nt4uO2F; Vera Institute of Justice, *On Life Support: Public Health in the Age of Mass Incarceration* (2014), *available at* https://cutt.ly/Ft4uAIJ.

[29] Laura M. Maruschak & Marchus Berzofsky, *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-2012*, Dep't. of Justice: Bureau of Justice Statistics (Feb. 2015), https://cutt.ly/Lt4uG5a.

[30] Centers for Disease Control and Prevention, *People Who are at a Higher Risk for Severe Illness*, Coronavirus Disease 2019 (Mar. 2020), *available at* https://cutt.ly/jt3Cm4T.

[31] Josh Kovner, *Prison Doctors, Nurses Say Health Care Behind Bars Has Ruptured,* Hartford Courant, Sept. 18, 2020, https://cutt.ly/st3CWPc.

[32] *Compare* Laura M. Maruschak & Marchus Berzofsky, *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-2012*, Dept. of Justice: Bureau of Justice Statistics (Feb. 2015), at 16, *available at* https://cutt.ly/dt4uN7i, *with* U.S. Dep't of Justice, Prisoners in 2012, *Advance Counts* (Jul. 2013), at 3, *available at* https://cutt.ly/9t4u0T5.

[33] *Compare* Centers for Disease Control and Prevention, *Prevalence of Diagnosed and Undiagnosed HIV Infection—United States, 2008–2012* (June 26, 2015), *available at* https://cutt.ly/Lt4u3jq, *with* Connecticut Department of Public Health, *Estimated Populations in Connecticut as of July 1, 2012*, *available at* https://cutt.ly/8t3CRNB.

from a COVID-19 infection.[34]  These individuals pose the least risk to the public, yet are most at risk of serious illness or death.  At the same time, the high risk presented to older people by COVID-19 is "of particular concern for inmate populations, since prisoners' physiological age *averages 10 to 15 years older* than their chronological age."[35]

27.      Generally, it has proven difficult to implement CDC guidelines in a correctional setting, and incarcerated people already are dying nationwide as a result.[36]  This is demonstrated by dramatic outbreaks at Rikers Island in New York City and at the Cook County Jail in Chicago, where the transmission rate for COVID-19 is estimated to be the highest in the world.[37]  The CDC also warns of "community spread": where the virus spreads easily and sustainably within a community where the source of infection is unknown.[38]

28.      Flu outbreaks regularly occur in jails; during the H1N1 epidemic in 2009, jails and prisons had a disproportionately high number of cases.[39]

---

[34] *See* Exhibit D, Affidavit of Brie M. Williams, M.D. ("Williams Aff."), ¶ 7.  Dr. Williams is a Professor of Medical at the University of California, San Francisco ("UCSF") in the Geriatrics Division, Director of UCSF's Amend: Changing Correctional Culture Program, and the Director of UCSF's Criminal Justice & Health Program.

[35] *Id.*at ¶ 11 (emphasis in original).

[36] *See COVID-19 Coronavirus*, Federal Bureau of Prisons, https://cutt.ly/itRSDNH; *see also, e.g.*, Lara Salahi, *2nd Mass. Inmate Dies of Coronavirus*, NBC BOS. (Apr. 5, 2020); Josiah Bates, *New York's Rikers Island Jail Sees First Inmate Death From COVID-19*, TIME (Apr. 6, 2020); Megan Crepeau and Jason Meisner, *Cook County Jail detainee dies of COVID-19*, CHI. TRIB. (Apr. 7, 2020 6:30 a.m.).

[37] These numbers likely underestimate the infection rate on Rikers Island, as they do not include the number of people who contracted COVID-19 on Rikers Island but have already been released.  The rates of infection rely on publicly released data collected by the Legal Aid Society.  *See* Legal Aid Society, *Analysis of COVID-19 Infection Rate in NYC Jails* (last visited Apr. 8, 2020, 1:10 p.m.), https://cutt.ly/RtYTbWd.  *See also* Timothy Williams and Danielle Ivory, *Chicago's Jail Is Top U.S. Hot Spot as Virus Spreads Behind Bars*, N.Y. TIMES (Apr. 8, 2020 6:22 p.m.), https://cutt.ly/ot3CAuk; Golob Decl. ¶ 12.

[38] *How Coronavirus Spreads*, Centers for Disease Control and Prevention, https://cutt.ly/jtEE9vG.

[39] *See, e.g.*, Golob Decl., ¶ 13.  The H1N1 "swine flu" pandemic outbreak spread dramatically in jails and prisons in 2010, but that strain of virus had a low fatality rate because of the characteristics of the virus— COVID-19's fatality rate is far higher.  *See* David M. Reutter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few,* PRISON LEGAL NEWS (Feb. 15, 2010), https://cutt.ly/ytRSkuX.

29.     Numerous public health experts, including Dr. Golob,[40] Dr. Rich,[41] Dr. Gregg Gonsalves,[42] Ross MacDonald,[43] Dr. Marc Stern,[44] Dr. Oluwadamilola T. Oladeru and Adam Beckman,[45] Dr. Anne Spaulding,[46] Homer Venters,[47] and the faculty at Johns Hopkins schools of nursing, medicine, and public health,[48] have strongly cautioned that people booked into and held in jails likely will face serious harm due to the COVID-19 pandemic.

30.     Risk mitigation is the only viable strategy to combat the spread of COVID-19 and prevent serious harm or death to class members.[49]  Even with the most comprehensive plan to address the spread of COVID-19 in detention facilities, a key part of an effective risk mitigation strategy is the release of individuals at high risk of severe disease if infected with COVID-19. Immediate release of the medically vulnerable population not only protects them from transmission of COVID-19, but also mitigates risk for people in the DOC facilities.  A population decrease would allow for better social distancing and increased availability of hygiene products, PPE, and access to medical care for those who remain, all of which decreases the COVID-19 risks

---

[40] Golob Decl. ¶¶ 13–14.
[41] Rich Decl. ¶¶ 15–17.
[42] Kelan Lyons, *Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak,* CONN. MIRROR (Mar. 11, 2020), https://cutt.ly/BtRSxCF.
[43] Craig McCarthy and Natalie Musumeci, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* N.Y. POST (Mar. 19, 2020), https://cutt.ly/ptRSnVo.
[44] Marc F. Stern, MD, MPH, *Washington State Jails Coronavirus Management Suggestions in 3 "Buckets,"* Washington Assoc. of Sheriffs & Police Chiefs (Mar. 5, 2020), https://cutt.ly/EtRSm4R.
[45] Oluwadamilola T. Oladeru, et al., *What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind*, HEALTH AFFAIRS BLOG (Mar. 10, 2020), https://cutt.ly/QtRSYNA.
[46] Anne C. Spaulding, MD MPDH, *Coronavirus COVID-19 and the Correctional Jail,* EMORY CENTER FOR THE HEALTH OF INCARCERATED PERSONS (Mar. 9, 2020).
[47] Madison Pauly, *To Arrest the Spread of Coronavirus, Arrest Fewer People*, MOTHER JONES (Mar. 12, 2020), https://cutt.ly/jtRSPnk.
[48] Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Md., Mar. 25, 2020, https://cutt.ly/stERiXk.
[49] *See* Rich Decl. ¶ 13.

13

for the incarcerated and the facility staff.[50]

31.     Release of the most vulnerable people from custody also reduces the burden on the region's healthcare infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time.[51]

32.     In the United States, jail administrators in other jurisdictions have concluded that widespread jail release is a necessary and appropriate public health intervention, including Cuyahoga County, Ohio[52]; San Francisco, California[53]; Jefferson County, Colorado[54]; Montgomery, Alabama[55]; and the States of New Jersey[56] and Pennsylvania,[57] among others.

**C.     DOC's Reactive, Backwards-Looking Approach to Handling the Pandemic Has Exacerbated the Crisis**

33.     Even before the COVID-19 outbreak, Connecticut has long struggled to provide sufficient medical services to the people it incarcerates.

34.     First, DOC's medical arm is extremely short-staffed.  In July 2019, the *Connecticut Mirror* reported that DOC has 309 nurses on staff to serve 13,320 prisoners, or one nurse for every

---

[50] *Id.* at ¶ 27.

[51] Rich Decl. ¶ 17.

[52] Scott Noll, *Cuyahoga County Jail Releases Hundreds of Low-Level Offenders to Prepare for Coronavirus Pandemic,* (Mar. 20 2020 6:04 p.m.), https://cutt.ly/CtRSHkZ.

[53] Megan Cassidy, *Alameda County Releases 250 Jail Inmates Amid Coronavirus Concerns, SF to Release 26,* S.F. CHRONICLE (Mar. 20, 2020), https://cutt.ly/0tRSVmG.

[54] Jenna Carroll, *Inmates Being Released Early From JeffCo Detention Facility Amid Coronavirus Concerns*, KDVR COLO. (Mar. 19, 2020 2:29 pm.), https://cutt.ly/UtRS8LE.

[55] *See In Re: COVID-19 Pandemic Emergency Response,* Administrative Order No. 4, Montgomery County Circuit Court (Mar. 17, 2020).

[56] Erin Vogt, *Here's NJ's Plan for Releasing Up to 1,000 Inmates as COVID-19 Spreads* (Mar. 23, 2020), https://cutt.ly/QtRS53w.

[57] *See* Governor Tom Wolf, *Gov. Wolf: Department of Corrections to Establish Temporary Program to Reprieve Sentences of Incarceration* (Apr. 10, 2020), https://www.governor.pa.gov/newsroom/gov-wolf-department-of-corrections-to-establish-temporary-program-to-reprieve-sentences-of-incarceration/.

43 prisoners.[58]   For medical providers, including doctor and physician assistants, the DOC employs only one for every 579 prisoners.[59]

35.   Little has changed since that report.   In early 2020, Cheshire Correctional Institution and Corrigan-Radgowski Correctional Center reported employing 29 and 27 nurses, respectively, or 39 incarcerated people per nurse at Cheshire and 40 at Corrigan-Radgowski.   In February 2020, Defendant-Respondent Cook told members of the Black and Puerto Rican Legislative Caucus that there were 139 healthcare positions vacant out of 843 budgeted—or one out of six.[60]

36.   In March, with the threat of COVID-19 looming, a DOC spokesperson suggested that facilities can manage shortages by scheduling medical employees for twelve hours at a time in an emergency.[61]   However, the *Connecticut Mirror* reported that healthcare staff were already logging what would appear to be the maximum possible overtime *before* the pandemic, sometimes staying on shift for sixteen to twenty-four hours a day.[62]   And, as of early February, head nurses, nurses, and licensed nurse practitioners were among the twenty top wage earners in the DOC based on their overtime pay; at least three nursing staff were making twice their annual pay in overtime.[63]

37.   The fact that the DOC is short-staffed by nearly 140 people to provide ordinary healthcare needs at its facilities is alarming because retirees and medical students are already being

---

[58] Jenna Carlesso and Kelan Lyons, *One Year after DOC Took Over Inmate Healthcare, Troubles Persist,* CONN. MIRROR (July 2, 2019), https://cutt.ly/Wt3CL0Q.
[59] *Id.*
[60] Lisa Backus, *Staffing Shortage Creates 'Dangerous' Situation in CT Prisons*, CONN. POST (Feb. 3, 2020), https://cutt.ly/Mt3CXEm.
[61] Kelan Lyons, *supra* note 42.
[62] Jenna Carlesso and Kelan Lyons, *supra* note 58
[63] Lisa Backus, *supra* note 60.

called to aid overwhelmed medical staff in regions where COVID-19 is rampant.[64]  DOC medical staff have sounded the alarm about possible systemic failure.  Dr. Gerald Valletta, the primary physician at Garner and Manson Youth Institution in Cheshire, told the *Hartford Courant* that "[t]he more people get sick and call out [due to COVID-19 health concerns], the more burdened staff will be.  We were already facing a huge shortage."[65]  Debra Cruz, head nurse at Cheshire, expressed similar concerns, suggesting that even mandating 16-hour shifts, as permitted in the workers' contract, would not guarantee adequate healthcare.  She told the *Hartford Courant* on March 11 that, "[w]e're all just holding our breath and hoping this passes us by."[66]

38.     Initially, DOC's only plan to address COVID-19 was a repurposed 2007 policy for flu outbreaks.[67]  On March 11, spokesperson Karen Martucci doubled down on the outdated plan in a press interview.  "This isn't new for us.  We quarantine for the flu every year," she said.  "We didn't have to create a pandemic plan.  This was already created."[68]  When asked about prisoner releases in response to COVID-19, she responded, "Overcrowding is not a concern for our agency. We have space to use."[69]

39.     On March 20, the DOC drafted a COVID-specific COVID-19 Operational Response Plan Phase 1.[70]  On March 24, Governor Lamont refused to consider releasing anyone

---

[64] Selena Simmons Duffin, *States Get Creative to Find and Deploy More Workers in COVID-19 Fight*, NPR (Mar. 25, 2020), https://cutt.ly/Pt3CVlZ.

[65] Eliza Fawcett, *With COVID-19 Threat Looming, State Prisons and Jails are on Edge*, Hartford Courant (Mar. 28, 2020), https://cutt.ly/0t3CB3f.

[66] Kelan Lyons, *supra* note 42.

[67] *See* Conn. Dep't of Correction, *Pandemic Influenza Response Plan* (Feb. 14, 2007), *available at* https://cutt.ly/Qt3CMEy.

[68] Kelan Lyons, *supra* note 42.

[69] *Id.*

[70] *See* Conn. Dep't of Correction, *COVID-19 Operational Response Plan* 1 (Mar. 20, 2020), *available at* https://cutt.ly/Kt3C2m7.

in state custody but offered that "[w]e are going to do everything we can to make sure that anybody who may be at risk of being a carrier is segregated or quarantined in a separate area."[71]

40.     Despite these assurances, on March 30, 2020 the first incarcerated person at a DOC facility tested positive.[72]  By April 2, **16** DOC staff members and **8** incarcerated people had tested positive for COVID-19.  By April 6, both those numbers more than doubled, to **32** DOC staff members and **21** incarcerated people.  By April 7, these numbers had grown exponentially: **41** DOC staff members and **44** incarcerated people had tested positive, with **53** prisoner test results still pending.

41.     By April 8, the number of incarcerated people at DOC facilities who tested positive grew to **46** across 13 different DOC facilities.[73]  That day, in an abrupt about-face, Defendants-Respondents announced plans to transfer all incarcerated people who had tested positive for COVID-19 to Northern.[74]  The initial transfer involved 47 incarcerated people.

42.     Notwithstanding these transfers, the number of positive cases in DOC facilities has continued to rise exponentially.  As of April 13, 2020, they stood at **104** staff and **166** incarcerated people.[75]  That day marked a somber milestone: the first person in DOC custody to die from COVID-19.[76]  He was over 60 and had been serving a two-year sentence.[77]

---

[71] Kelan Lyons, *Lamont Says No Prison Releases Because of COVID-19 Despite Pressure From Advocates*, CONN. MIRROR (Mar. 24, 2020), https://cutt.ly/Jt3C8v8.

[72] Connecticut State Dep't of Correction, *First Department of Correction Offender Tests Positive for the COVID-19 Virus* (Mar. 30, 2020), *available at* https://cutt.ly/Xt3C4BD.

[73] *See* Connecticut State Dep't of Correction, Health Information and Advisories: Coronavirus Information, *available at* https://cutt.ly/Jt3C5Mj (accessed Apr. 8, 2020).

[74] *State Moving Coronavirus-Positive Inmates to Northern Correctional Institute*, NBC CONN. (Apr. 8, 2020), https://cutt.ly/pt3VqXT.

[75] *See* Connecticut Dep't of Correction, *Covid-19 Tracker*, https://cutt.ly/Nt3Ves2 (last visited Apr. 13, 2020).

[76] *First Conn. Inmate Dies of Coronavirus: DOC*, NBC CONN. (Apr. 13, 2020), https://cutt.ly/St3Vrbm.

[77] *Id.*

43.     The most recent figures DOC released, on April 20, 2020, showed **202** staff and **293** incarcerated people who have tested positive.  DOC's infection rate—considering incarcerated people only, not incarcerated people and staff—is multipliers higher than that of anywhere else in Connecticut, as seen below[78]:



---

[78] Incidence rates in DOC (for incarcerated people only) and each of Connecticut's 169 towns have been calculated using the following inputs: Connecticut State Dep't of Public Health, Estimated Populations in Connecticut as of July 1, 2018, *available at* https://cutt.ly/9ywmX9E (last accessed Apr. 20, 2020); Connecticut State Dep't of Public Health, COVID 19 Update April 17, 2020, https://cutt.ly/FywmVcm (last accessed Apr. 17, 2020); Connecticut State Dep't of Correction, Health Information and Advisories: Coronavirus Information, *available at* https://cutt.ly/Jt3C5Mj (last accessed Apr. 17, 2020); Connecticut State Dep't of Correction, Connecticut Correctional Facility Population Charts, https://cutt.ly/VywmNif (last accessed Apr. 17, 2020). Infection rate has been calculated as 100 x (number of cases/population).

44.     As these numbers illustrate, immediate release of the Medically Vulnerable Subclasses remains a necessary public health intervention[79] because DOC's plan for preventative measures are insufficient to minimize the spread of the virus.  For example, the DOC's plan permits recreation and programming to take place in groups of up to fifty incarcerated people, ten times the number of people permitted by the Governor's executive order.[80]  Most importantly, the DOC's plan does not—and cannot—account for the physical infrastructure of DOC facilities, where thousands of people continue to live in dormitory or double-celled settings that house up to 140 people in a single building, sharing phones, showers, tables, toilets, bunk beds, and cells, with no ability to socially distance.

45.     Similarly, the DOC's recent decision to transfer all COVID-19-positive incarcerated people to Northern is still insufficient to prevent the spread of coronavirus to the rest of the population in DOC facilities.[81]  Steven Wales, a correction officer at DOC facility Corrigan-Radgowski Correctional Center and union steward for Local 1565 of the American Federation of State, County and Municipal Employees, has stated that only incarcerated people who have tested positive are being moved; there are incarcerated people who are showing symptoms and are quarantined, but have not been tested yet.[82]  Mr. Wales still has concerns about the conditions at DOC facilities, and bluntly observed that the DOC has "a long way to go."[83]  Meanwhile, healthcare workers at DOC facilities have stated publicly that many aspects of DOC's handling of

---

[79] *See* Public Health Expert Declarations, *supra* notes 40–48.

[80] *Compare* Conn. Dep't of Correction, *COVID-19 Operational Response Plan* 1 (Mar. 20, 2020), *available at* https://cutt.ly/it3VtNr, *with* Lamont Exec. Order 7N at 4.

[81] State of Connecticut Dep't of Correction, *The Department of Correction transfers COVID-19 positive offenders to Northern CI* (Apr. 8, 2020), *available at* https://cutt.ly/st3VuQ2.

[82] Siobhan McGirl, *'Stressful'; CT Correction Officer Details Fight Against COVID-19 Inside Prison*, NBC CONN. (Apr. 8, 2020), https://cutt.ly/wt3ViVl.

[83] *Id.*

the pandemic—including moving incarcerated people frequently within facilities, and from facility to facility—has "blatantly go[ne] against what our medical advice was."[84]  Despite outbreaks at multiple low-level facilities, DOC has continued to transfer people from those facilities to other facilities, without testing for COVID-19 or attempting to trace exposure.

46.     Transfers also do not eliminate the risk of the virus spreading in all other DOC facilities.  Incarcerated people and staff members who are asymptomatic or pre-symptomatic can still infect others, especially while incarcerated people are unable to practice CDC-recommended social distancing and personal hygiene practices.  While DOC officials wait for a positive test, which takes days, members of the Classes are quarantined in their cells or in medical facilities that do not comply with the CDC guidelines; therefore, fellow class members are still subject to infection.  This continued risk is evidenced by the fact that the number of incarcerated people and DOC staff members testing positive continues to grow despite the transfer of most COVID-19-positive incarcerated people.[85]

47.     Further, the transfer of COVID-19-positive members of the Classes to Northern is only worsening the COVID-19 crisis in DOC facilities.  Northern is the polar opposite of a hospital setting.  Built in 1995 as Connecticut's first and only supermax prison, Northern formerly housed incarcerated people on death row before the state abolished the death penalty.  Since then, Northern has been used as a solitary confinement facility to "manage those inmates who have demonstrated

---

[84] Kelan Lyons, *Shifting Plans and a COVID-19 Outbreak at a Connecticut Prison*, CONN. MIRROR (Apr. 17, 2020), *available at* https://ctmirror.org/2020/04/17/shifting-plans-and-a-covid-19-outbreak-at-a-connecticut-prison/.

[85] On April 8, 2020, when the DOC started transferring COVID-19 positive incarcerated people, there were 46 incarcerated people and 52 staff members who tested positive.  On April 20, those numbers grew to 293 COVID-19 positive incarcerated people and 202 COVID-19 positive staff members. *See* Connecticut State Dep't of Correction, Health Information and Advisories: Coronavirus Information, *available at* https://cutt.ly/jt3Vo2O (last accessed Apr. 20, 2020).

a serious inability to adjust to confinement posing a threat to the safety and security of the community, staff, and other inmates."[86]  In August 2019, Chief Judge Stefan Underhill designated conditions of confinement for certain people held at Northern unconstitutional under the Eighth Amendment.[87]

48.    Northern's conditions of confinement are singularly oppressive.  Six units housing prisoners radiate outwards from a long, sloped, windowless corridor, meant to give the impression of walking underground.  Light and sound reverberate off the concrete walls and mirrored windows, which are purposefully arranged at irregular angles to create a disorienting kaleidoscopic effect.

49.    Each unit at Northern is identical in configuration, with two levels ("tiers") on which cells are located.  The cells at Northern are 7 feet by 12 feet.[88]  They are made of concrete, and are designed to exacerbate Northern's complete sensory deprivation.  The only daylight and view outdoors comes through a narrow 4-inch by 3-inch slot at the back of each cell, which cannot be opened.  The cell doors are solid steel, with a small "trap" through which Northern staff can shove food or cuff prisoners.  While the cells have intercoms, they frequently do not work or are ignored.

50.    Solitary confinement at Northern is not the same as the medical isolation recommended by the CDC.  By placing COVID-19-positive incarcerated people in solitary confinement behind steel doors, Defendants-Respondents are punishing these individuals and

---

[86] Connecticut Dep't of Corrections, Northern Correctional Institution, *available at* https://cutt.ly/Ot3VazX (last accessed on Apr. 17, 2020).
[87] *See Reynolds v. Arnone, et al.*, 402 F.Supp.3d 3 (D. Conn. 2019).
[88] *Id.* at 13.

depriving them of standard living conditions simply because they have fallen ill.[89]   It also

jeopardizes their wellbeing:  quarantining people in a non-medical restrictive housing unit such as

Northern "is particularly dangerous for those with COVID-19 infection since many patients with

COVID-19 descend suddenly and rapidly into respiratory distress."[90]

51.     Worse yet, fear of Northern is pervasive among the incarcerated population.

Sending people to Northern simply because they test positive for COVID-19 is thus dangerous, as

it deters others from reporting symptoms in an attempt to avoid the punitive conditions at

Northern.[91]  As public health experts attest, "[t]his avoidance of reporting symptoms or illness will

not only accelerate the spread of infection within facilities but also increase the likelihood of

prisoner deaths due to lack of treatment."[92]  This is especially so given that—notwithstanding its

current use as the designated COVID-19-positive facility—DOC also continues to use Northern

as a place for punishment.  As recently as April 4, 19 incarcerated people at DOC's Carl Robinson

Correctional Institution were transferred to Northern as punishment for protesting DOC's COVID-

19 response.[93]

52.     DOC has stated that it has just one dedicated medical provider (APRN level or

above) caring for the COVID-19 population at Northern, along with an unspecified number of

---

[89] Incarcerated people in solitary confinement are subjected to limited natural light, solid cell doors instead of barred walls, constraints on outside contact with family members, infrequent visits from security officers and medical staff, and frequent use of force.  Prisoners in DOC's general population are not subjected to these living conditions; therefore, the DOC is implementing punishment for incarcerated people that contract COVID-19.  *See* David Cloud, et al., *The Ethical Use of Medical Isolation*—Not Solitary Confinement—*to Reduce COVID-19 Transmission in Correctional Settings* (Apr. 9, 2020).

[90] Williams Aff. ¶ 14.

[91] David Cloud, et al., *supra* note 89; Rich Decl. ¶ 15.

[92] David Cloud, et al., *supra* note 89.

[93] *See* Don Stacom, *Unrest at Enfield prison leads to fight Saturday afternoon; guard punched and 105 incarcerated people get transferred*, HARTFORD COURANT (Apr. 4, 2020), https://cutt.ly/mt3VdFR; Lisa Backus, *Fight erupts amid coronavirus tension at CT prison*, CT POST (Apr. 6, 2020), https://cutt.ly/wt3Vf7f.

nursing staff.  As of April 20, that provider is responsible for 183 patients.

53.     Finally, some of those who are being transferred to Northern are being returned to their original facilities after a few days—so long as they are not febrile—without being retested for COVID-19 and without any accompanying quarantining or sanitation measures.

**D.     The Current Conditions of Confinement at DOC Facilities Exacerbate the Extreme and Imminent Danger Faced by Class Members of Contracting and Possibly Dying from COVID-19**

54.     Even in the best of times, DOC facilities, like many correctional settings, are beset with health problems and staffing challenges.  Ominously, however, officials have exacerbated and increased the risks to the health and life of members of the Classes during the current pandemic by maintaining unconstitutional conditions of confinement that increase the risk of COVID-19 cases at DOC facilities.

55.     Though everyone entering a Connecticut correctional facility is required to have a wellness screening, including a temperature check, recent data suggests that around 60% of COVID-19 cases are asymptomatic.[94]  As a result, fevers are not a reliable indicator of whether someone is a carrier.[95]  The prevalence of asymptomatic and pre-symptomatic COVID-19 carriers also belie Defendant-Respondent Governor Lamont's claim that moving prisoners around inside the same sealed buildings will prevent the spread of infection.

56.     Further, while DOC is transferring members of the Classes who test positive for COVID-19, there is a constant risk of transmission through DOC staff members.  "Prisons and jails are not actually isolated from our communities: hundreds of thousands of correctional officers

---

[94] Jane Qiu, *Covert Coronavirus Infections Could Be Seeding New Outbreaks*, NATURE (Mar. 20, 2020), *available at* https://cutt.ly/bt3VhFs.
[95] Rich Decl. ¶ 9.

and correctional healthcare workers enter these facilities every day, returning to their families and to our communities at the end of their shifts, bringing back and forth to their families and neighbors and to incarcerated patients any exposures they have had during the day."[96]  As of April 20, 2020, 202 DOC staff members have tested positive for COVID-19.[97]  DOC staff are further vectors of the virus: like incarcerated people, they may be asymptomatic but still contagious.  This presents a daily risk of coronavirus infection in DOC facilities.  Upon information and belief, DOC is taking staff members' temperature upon their entrance to the facilities, but the high rates of asymptomatic transmission means that monitoring fever is inadequate to identify all who may be infected and thereby reduce the risk of transmission.[98]  This also is true because not all individuals infected with COVID-19 present with fever in early stages of infection.[99]

57.    Similarly, DOC's plan to transfer members of the Classes who have tested positive to Northern does not mitigate the risk of the infection spreading further in the DOC facilities. There are still incarcerated people at other DOC facilities who are showing symptoms, but have not yet been tested.[100]  And given high rates of pre-symptomatic and asymptomatic transmission, it is impossible for DOC to transfer everyone to Northern quickly enough to prevent infection: once someone is symptomatic and/or tests positive, is it already too late.  The exponential growth of COVID-19 among the DOC population between March 30 and April 20, with no sign of

---

[96] Williams Aff. ¶ 4; *see also* Rich Decl. ¶ 9.

[97] The DOC website reports that 202 staff members have tested positive for COVID-19 while 293 incarcerated people have tested positive.  These staff members are employed in at least 13 different DOC facilities across Connecticut.  *See* Connecticut State Dep't of Correction: Health Information and Advisories, *available at* https://cutt.ly/4t3VldA.

[98] *See* State of Connecticut Dep't of Correction, *First Department of Correction Employee to Test Positive of COVID-19 Virus* (Mar. 23, 2020), *available at* https://cutt.ly/Ot3VzoN; Rich Decl. ¶ 9.

[99] Rich Decl. ¶ 9 ("While entry temperature checks may be effective screening mechanisms for symptomatic infections, they are ineffective with [COVID-19] due to high rates of asymptomatic or pre-symptomatic infection.").

[100] McGirl, *supra* note 82.

stopping, confirms that DOC's current approach is woefully insufficient to prevent the spread of the virus within the DOC facilities.

58.     Meanwhile, class members in DOC facilities—aside from those transferred to Northern—continue to live in dormitory or double-celled settings, where they sleep, eat, bathe, and recreate within inches of tens or hundreds of others.  Many continue to eat a foot apart.  They continue to use dayrooms alongside hundreds of other people.  They continue to share the same few phones.  They continue to share toilets, sinks, and showers.

59.     The sanitation practices inside DOC prisons continue to be lacking in light of the danger posed by COVID-19.[101]   Sanitation practices vary dramatically by facility, building, and unit.  Class members in certain facilities do not have adequate access to soap.  While some are being given credit card-sized bars of soap, others must purchase it through the commissary.  No cleaning supplies are available for purchase in the commissary.  Hand sanitizer is banned.

60.     Some class members are given supplies with which to disinfect their cells once a week.  Others are given none, and have attempted to clean their living quarters with bars of soap or shampoo.  In certain facilities, class members are given one bottle of bleach to last a 100-person dormitory for a week.  In others, class members are given only diluted bleach or diluted Lemonall.  Common areas and showers are shared by tens or hundreds of people and are being cleaned only once a day.  In certain facilities, handcuffs are used to move people out of cell.  Handcuffs are not sanitized between uses.

61.     When a class member tests positive for COVID-19 and is transferred, he is required to move his belongings to the facility's property unit.  No cleaning is done of his personal space

---

[101] Rich Decl. ¶ 10.

after he has been transferred.  Those who live around the COVID-19-positive person are not provided any special cleaning supplies.  Nor are they screened for COVID-19 symptoms.  No consistent temperature screening has been performed in any facility, even those that have experienced significant outbreaks of COVID-19.

62.     Class members in most DOC facilities were not given masks until April 1; others received them as late as April 10.  The masks are made of a cloth material.  They rip easily and are not replaced.  When laundered, they develop mildew.  Class members are punished if they attempt to fashion their own masks.  They are not given gloves.

63.     Some correctional officers wear masks or gloves, and others do not.  As recently as the beginning of April, some medical staff were not wearing gloves to hand out medication. Correctional staff have continued to state that they do not have proper protective equipment.[102]  In certain facilities, correctional staff continue to "shake down" units by going through peoples' personal belongings with their hands regularly.

64.     Even when carriers are successfully identified and quarantined, additional space within a facility does not address the threat of potentially airborne diseases within sealed buildings,[103] which is only exacerbated by the poor ventilation in DOC facilities.[104]

65.     Defendants-Respondents also fail to adequately treat and quarantine individuals presenting with COVID-19 symptoms.  Some members of the Classes have simply been locked in their cells for 14 days and not let out, even to shower or call relatives to say they are sick.

---

[102] Kelan Lyons, *Shifting Plans and a COVID-19 Outbreak at a Connecticut Prison*, CONN. MIRROR (Apr. 17, 2020), *available at* https://cutt.ly/BywQerQ.
[103] *See* Rich Decl. ¶¶ 7, 8, 15.
[104] *See also* U.S. Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report, *Prevention and Control of Tuberculosis in Correctional and Detention Facilities: Recommendations from CDC* (July 7, 2006), *available at* https://cutt.ly/Nt3Vc8L.

Individuals report infrequent visits and temperature checks from healthcare staff. When someone tests positive, there is no screening of others with whom that person is housed—that is, there are no daily temperature checks or other attempts to monitor symptoms.

66.     Finally, incarcerated people in Connecticut, like their counterparts nationwide, are given almost all of their medical treatment in the same facility in which they are housed, rather than in a dedicated medical facility such as a clinic or hospital. DOC has announced no special COVID-19 medical capabilities or staffing, other than the one dedicated provider at Northern. DOC's documented medical staffing shortages make it unlikely that any special or dedicated medical care is being provided.[105]

67.     Defendants-Respondents have failed to respond to and manage the continued risk of harm posed by the COVID-19 outbreak by following public health guidelines from the CDC.[106] To remedy these unsafe conditions and comply with CDC guidelines, Defendants-Respondents must implement a plan that allows DOC facilities to comply with CDC guidelines for social distancing, hygiene and sanitation practices, personal protective equipment ("PPE"), and adequate medical care.

68.     Members of the Medically Vulnerable Subclasses are at an increased risk of developing serious complications from coronavirus infection and COVID-19 due to their underlying medical conditions.[107] Release is necessary not only to prevent irreparable harm to members of the Medically Vulnerable Subclasses, but also to reduce the incarcerated population

---

[105] Giftos Decl. ¶ 12.
[106] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://cutt.ly/et4kBga.
[107] Rich Decl. ¶ 12.

at all DOC facilities enough to ensure proper social distancing, which will reduce the likelihood of infection for the Classes, staff at the DOC facilities, and the broader public.[108]

69.     In short, even if those who have tested positive are transferred to a separate facility, it is unrealistic to assume that "screening, social distancing, and quarantining measures can be sufficiently employed with correctional settings to combat the spread of COVID-19,"[109] because "[t]here are too many structural limitations, and correctional health care can only do so much."[110] "Decreasing the incarcerated population so there is more ability to physically distance within the facility, fewer people who can contract the virus inside the facility, and more medical care for those who need it is the only way to prevent the complications from surging."[111]

## IV.     CLASS ACTION ALLEGATIONS

70.     Plaintiffs McPherson, Williams-Void, Doe, Roe, and Caves bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated individuals.

71.     Plaintiffs McPherson and Williams-Void seek to represent a class of all people held in pretrial custody, including for alleged violations of probation or parole, at DOC facilities ("Pre-adjudication Class").  The Pre-adjudication Class includes a subclass of all persons who, by reason of age or medical condition, are particularly vulnerable to injury or death from COVID-19

---

[108] *Id* ¶¶ 16, 17 ("[U]rgent decarceration is imperative to flatten the curve of Covid-19 cases among incarcerated populations and to limit the impact of transmission both inside correctional facilities and in the community.").  Further, in the prison context, the American Bar Association (ABA) urges that, "Governmental authorities in all branches in a jurisdiction should take necessary steps to avoid crowding that… adversely affects the … protection of prisoners from harm, including the spread of disease."  ABA Standard on Treatment of Prisoners 23-3.1(b).

[109] Giftos Aff. ¶ 25.

[110] *Id.* ¶ 26.

[111] *Id.*

("Medically Vulnerable Pre-adjudication Subclass").  Plaintiff Williams-Void is a representative and member of the Medically Vulnerable Pre-adjudication Subclass.

72.     Plaintiffs Doe, Roe, and Caves seek to represent a class of all people held in post-adjudication custody in a DOC facility, including those serving a term of incarceration pursuant to an adjudicated violation of probation or parole, at DOC facilities ("Post-adjudication Class").  The Post-adjudication Class includes a subclass of persons who, by reason of age or medical condition, are particularly vulnerable to injury or death from COVID-19 ("Medically Vulnerable Post-adjudication Subclass").  Plaintiffs Doe and Roe also are representatives and members of the Medically Vulnerable Post-adjudication Subclass.

73.     The Medically Vulnerable Subclasses include all people 50 or older who are in custody at DOC facilities and all people in custody at DOC facilities who have been diagnosed with: (a) lung disease, including asthma, chronic obstructive pulmonary disease (e.g., bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure, and coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders (including sickle cell disease); (i) inherited metabolic disorders; (j) history of stroke; (k) a developmental disability; and/or (l) a current or recent (last two weeks) pregnancy.

74.     This action has been brought and may properly be maintained as a class action under Federal law.  It satisfies the numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

75.     Joinder is impracticable because (1) the classes are numerous; (2) the classes include unidentifiable future members; and (3) the class members are incarcerated, which limits their ability to file and pursue individual lawsuits, particularly in light of the cessation of legal visitation and court closures in the state of Connecticut.

76.     On information and belief, there are at least 11,840 people in the proposed Classes. The information as to the exact size of the Classes and Subclasses and the identity of the individuals therein are in the exclusive control of the Defendants-Respondents.

77.     Common questions of law and fact exist as to all members of the proposed Classes: all have the right to conditions of confinement that do not put them at increased risk of infection and complications from COVID-19.

78.     Plaintiffs' claims are typical of the members of the Classes because Plaintiffs and all class members are injured by the same wrongful acts, omissions, polices, and practices of Defendants-Respondents as described in this Complaint.  Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the class members, and are based on the same legal theories.

79.     Plaintiffs McPherson, Williams-Void, Doe, Roe, and Caves have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class.  They have no interests adverse to the interests of the proposed Classes.  They retained *pro bono* counsel with experience and success in the prosecution of civil rights litigation.  Counsel for Plaintiffs know of no conflicts among members of the Classes or between counsel and members of the Classes.

80.     Defendants-Respondents have acted on grounds generally applicable to all members of the Classes, and this action seeks declaratory and injunctive relief.  Plaintiffs therefore

30

seek class certification under Rule 23(b)(2).

81.     In the alternative, the requirements of Rule 23(b)(1) are satisfied, because prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of contact for the party opposing the proposed Classes.

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Unconstitutional Punishment in Violation of the
Fourteenth Amendment to the U.S. Constitution**
42 U.S.C. § 1983/28 U.S.C. § 2241
*Pre-adjudication Class versus All Defendants*

82.     The Fourteenth Amendment provides greater due process protections to persons in pretrial custody, and prohibits punishment as part of their detention. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979).  A defendant has punished plaintiffs when the conduct is either not rationally related to a legitimate, non-punitive governmental purpose or excessive in relation to that purpose.

83.     Even assuming that Defendants-Respondents' spacing and provision of medical services inside DOC facilities normally serve the legitimate, non-punitive purpose of health and safety of detained persons, the current operation of the DOC facilities during this pandemic establishes that Defendants-Respondents are unable to sufficiently comply with public health guidelines to prevent an outbreak of COVID-19.  Therefore, continuing to detain members of the Pre-adjudication Class under conditions of confinement that are inconsistent with COVID-19-specific guidance from public health experts is not rationally related to, and excessive in relation to, that purpose.

84.     Accordingly, Defendants-Respondents have violated the rights of the Pre-adjudication Class under the Fourteenth Amendment.

### SECOND CLAIM FOR RELIEF

**Unconstitutional Confinement in Violation of the
Fourteenth Amendment to the U.S. Constitution**
42 U.S.C. § 1983/28 U.S.C. § 2241
*Pre-adjudication Class versus All Defendants*

85.     Under the Fourteenth Amendment, corrections officials are required to provide for the reasonable health and safety of persons in pretrial custody.  *Youngberg v. Romeo*, 457 U.S. 307, 315–16, 324 (1982).  Correctional officials thus have an affirmative obligation to protect persons in their custody from infectious disease.  The protection due to detainees under the Fourteenth Amendment is even greater than the protection due to those incarcerated after adjudication, because pretrial detainees are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. at 321–22.  Thus, the "Fourteenth Amendment affords pretrial detainees protections 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'"  *Id.* (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

86.     The DOC has failed to comply with public health guidelines to manage an outbreak of COVID-19 and has not provided for the safety of the Pre-adjudication Class.  Defendants-Respondents' actions and inactions result in the confinement of members of the Pre-adjudication Class in facilities where they do not adequately test for, treat, or prevent COVID-19 outbreaks, which violates Plaintiffs' rights to treatment and adequate medical care.

87.     Accordingly, Defendants-Respondents have violated the rights of the Pre-Adjudication Class under the Fourteenth Amendment.

### THIRD CLAIM FOR RELIEF
**Unconstitutional Conditions of Confinement in Violation
of the Eighth Amendment to the U.S. Constitution**
42 U.S.C. § 1983/28 U.S.C. § 2241
*Post-adjudication Class versus All Defendants-Respondents*

88.     Officials violate incarcerated individuals' rights when they are deliberately indifferent to conditions of confinement that are likely to cause them serious illness and that pose an unreasonable risk of serious damage to their future health.  *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993).  The Supreme Court held in *Helling v. McKinney* that the government violates the Eighth Amendment when it crowds prisoners into cells with others who have "infectious maladies" or otherwise exposes prisoners "to a serious, communicable disease."  509 U.S. 25, 33 (1993) (citing *Hutto v. Finney,* 437 U.S. 678, 682 (1978)).  This is true "even though the possible infection might not affect all of those exposed."  *Id.*

89.     DOC facilities, as currently operated, are unable to comply with public health guidelines to prevent an outbreak of COVID-19, and Defendants-Respondents have not and cannot provide for the safety of the Post-adjudication Class.  This remains true despite DOC's recent transfer of COVID-19-positive incarcerated people to a separate facility, because Defendants-Respondents have not taken appropriate steps to test for, treat, and prevent further COVID-19 outbreaks, and Defendants-Respondents are unable to protect the Medically Vulnerable Post-adjudication Subclass from serious harm caused by COVID-19, in violation of their constitutional obligation to provide humane conditions of confinement.

90.     Accordingly, Defendants-Respondents have violated the rights of the Post-adjudication Class under the Eighth Amendment.

## VI.        REQUEST FOR RELIEF

91.     Plaintiffs McPherson, Williams-Void, Doe, Roe, Caves, and Class Members respectfully request that the Court order the following:

1. Certification of this Petition as a Class Action.

2. A preliminary injunction, permanent injunction, and/or writs of habeas corpus requiring Defendants-Respondents to identify all Medically Vulnerable Subclass Members in both the Pre-adjudication and Post-adjudication Classes within six (6) hours of the Court's order and release—within twenty-four (24) hours of submission of the list—all such persons absent proof of judicially-recorded findings by clear and convincing evidence that the individual poses such a serious risk of flight or danger to others that no other conditions can mitigate; and ordering that Defendants-Respondents provide these individuals with educational resources on COVID-19, including instructions that they should self-isolate for the CDC-recommended period of time (currently 14 days) following release.

3. Following immediate release of all Medically Vulnerable Subclass Members, a plan, to be submitted to the Court in three (3) days and overseen by a qualified public health expert agreed upon by the parties or ordered by the Court pursuant to Fed. R. Evid. 706, which outlines:

    a. Specific mitigation efforts, consistent with CDC guidelines, to significantly reduce the risk of COVID-19 for all class members who remain in DOC custody; and

    b. An evaluation of whether release of the members of the Medically Vulnerable Subclasses permits social distancing by those who remain in DOC custody, or whether DOC must release additional members of the Classes to be in compliance with CDC guidelines.

4. A preliminary injunction, permanent injunction, and/or writ of habeas corpus requiring Defendants-Respondents to:

    a. Continue to release via habeas or transfers to home confinement, all Medically

Vulnerable Subclass members absent proof of judicially-recorded findings by clear and convincing evidence that the individual poses such a serious risk of flight or danger to others that no other conditions can mitigate;

b. Report weekly on the population of persons in DOC facilities who are Medically Vulnerable as defined in this action;

c. Follow the terms of the public health expert plan submitted pursuant to Fed. R. Evid. 706;

d. Release via habeas, or transfer to home confinement, additional members of the Classes, including those not considered "Medically Vulnerable," as needed to ensure that all remaining persons incarcerated in DOC facilities are under conditions consistent with CDC and public health guidance to prevent the spread of COVID-19.[112]

5. If immediate release is not granted on the basis of this Petition alone, then expedited review of the Petition, including an evidentiary hearing and/or oral argument, via telephonic or videoconference if necessary.

6. A declaration that Defendants-Respondents' policies and actions have created unconstitutional conditions of confinement and punishment that violate the Eighth and Fourteenth Amendments.

7. An award of Plaintiffs' attorney fees and costs under 42 U.S.C. § 1988, 42 U.S.C. § 12205, and other applicable law.

---

[112] If, after granting habeas writs and/or transfer orders to home confinement as outlined above, additional release orders are required to comply with the public health expert plan submitted pursuant to Fed. R. Evid. 706, Plaintiffs would anticipate moving the Court to convene a three-judge panel pursuant to 18 U.S.C. § 326(a)(3).

8. Any further relief this Court deems just and appropriate.

Respectfully submitted,

Dan Barrett (# ct29816)
Elana Bildner (# ct30379)
**ACLU Foundation of Connecticut**
765 Asylum Avenue
Hartford, CT 06105
(860) 471-8471
e-filings@acluct.org

Will W. Sachse, Esq.*
**Dechert LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
T: (215) 994-2496
F: (215) 665-2496
will.sachse@dechert.com

Jenna C. Newmark*
Gabrielle N. Piper*
**Dechert LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
T: (212) 649-8723
F: (212) 314-0064
jenna.newmark@dechert.com
gabrielle.piper@dechert.com

Jonathan Tam*
**Dechert LLP**
One Bush Street, Suite 1600
San Francisco, CA 94104-4446
T: (415) 262-4518
F: (415) 262-4555
jonathan.tam@dechert.com

Brandon Buskey*
**American Civil Liberties Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 284-7364
bbuskey@aclu.org

*pro hac vice to be submitted*

*Attorneys for Plaintiffs-Petitioners*