**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| Tre McPherson, Pattikate Williams-Void, John Doe, John Roe, and Thomas Caves, *on behalf of themselves and all others similarly situated*, <br><br> *Plaintiffs-Petitioners*, <br><br> v. <br><br> Ned Lamont and Rollin Cook, *in their official capacities* <br><br> *Defendants-Respondents*. | Civil Action No. 20-cv-534 <br><br> **IMMEDIATE RELIEF SOUGHT** <br><br> April 27, 2020 |

**PLAINTIFFS-PETITIONERS' MOTION FOR TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ................................................................. 1

FACTUAL BACKGROUND .................................................................... 2

I.   COVID-19 POSES A GRAVE RISK OF SERIOUS INJURY AND DEATH
     TO THOSE INFECTED, ESPECIALLY INDIVIDUALS IN THE
     MEDICALLY VULNERABLE CLASSES. .................................................. 3

II.  THE CONDITIONS AT CORRECTIONAL FACILITIES PLACE ALL
     PERSONS AT AN EVEN GREATER AND IMMEDIATE RISK OF COVID-
     19 INFECTION THAN MEMBERS OF THE PUBLIC-AT-LARGE. ...................... 6

III. THE CURRENT CONDITIONS IN WHICH DEFENDANTS HAVE
     CONFINED PLAINTIFFS AND CLASS MEMBERS ONLY EXACERBATE
     THE ALREADY EXTREME AND IMMINENT DANGER THEY FACE OF
     CONTRACTING AND POSSIBLY DYING FROM COVID-19. ........................... 11

     A.   Defendants Have Taken Insufficient Steps to Limit the Spread Of COVID-
          19 in DOC Facilities. .................................................... 12

     B.   Defendants Maintain Dangerous, Unsanitary Conditions at DOC Facilities
          and Do Not Provide Appropriate Medical Care. ................................ 15

     C.   Defendants' Use of a Supermax Prison to House Those Who Have Tested
          Positive for COVID-19 Is "A Punitive Measure, Not a Public Health One."
          ........................................................................ 18

     D.   Defendants Do Not Properly Screen, Test, or Quarantine Persons with
          COVID-19 Exposure. ...................................................... 222

LEGAL STANDARD .......................................................................... 244

ARGUMENT ................................................................................. 255

I.   PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASSES ARE
     ENTITLED TO EQUITABLE RELIEF TO PROTECT THEM FROM THE
     RISK OF INFECTION, DEATH, OR OTHER SERIOUS
     COMPLICATIONS FROM COVID-19. ...................................................... 255

     A.   The Heightened Risk of Infection from a Potentially Lethal Virus with No
          Vaccine or Cure Constitutes Irreparable Harm ................................ 255

     B.   Plaintiffs are Substantially Likely to Prevail on Their Claim that the
          Government is Deliberately Indifferent to their Serious Medical Needs. .......... 28

     C.   By Refusing to Protect Class Members from COVID-19, the Defendants are
          Punishing the Pre-adjudication Class in Violation of Substantive Due
          Process. ................................................................ 311

     D.   Without a Viable Way to Safely Detain Plaintiffs, Injunctive Relief
          Releasing Medically Vulnerable Class Members Is the Only Option. ............. 333

E.      The Balance of Equities Favors Granting Relief to the Proposed Classes. ....... 344

F.      The Public Interest Is Best Served by Minimizing the Spread of COVID-19 through Social Distancing and Hygiene Practices, but Those Steps Are Difficult to Implement at DOC Facilities. ....................................................... 366

**CONCLUSION** ................................................................................................................. **39**

# TABLE OF AUTHORITIES

**CASES**

*Almighty Supreme Born Allah v. Milling*,
  876 F.3d 48 (2d Cir. 2017)...............................................................................34

*Amoco Production Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987).........................................................................................38

*Austin v. Altman*,
  332 F.2d 273 (2d Cir. 1964).............................................................................27

*Ball v. LeBlanc*,
  792 F.3d 584 (5th Cir. 2015) ...........................................................................33

*Basank v. Decker*,
  No. 20-2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020)................................28, 30, 36, 43

*Baur v. Veneman*,
  352 F.3d 625 (2d Cir. 2003).............................................................................28

*Bell v. Wolfish*,
  441 U.S. 520 (1979).........................................................................................34

*Brown v. Plata*,
  563 U.S. 493 (2011).........................................................................................27

*Castillo v. Barr*,
  No. 20-00605, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020)....................................36, 39, 43

*Charles v. Orange County*,
  925 F.3d 73 (2d Cir. 2019)...............................................................................30

*Coreas v. Bounds*,
  No. 20-0780, Dkt. No. 56 (D. Md. Apr. 3, 2020) ...............................................29

*Coronel v. Decker*,
  No. 20-2472, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020)...........................................30, 43

*Darnell v. Pineiro*,
  849 F.3d 17 (2d Cir. 2017)...............................................................................30, 31

*Doe v. Gonzales*,
  386 F. Supp. 2d 66 (D. Conn. 2005).................................................................39

*Doe v. Univ. of Connecticut*,
  No. 20-cv-92, 2020 WL 406356 (D. Conn. Jan. 23, 2020) ................................39

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
  559 F.3d 110 (2d Cir. 2009)..................................................................................28

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
  425 F.3d 158 (2d Cir. 2005)..............................................................................40, 41

*Helling v. McKinney*,
  509 U.S. 25 (1993)................................................................................................31

*Henrietta D. v. Giuliani*,
  119 F. Supp. 2d 191 (E.D.N.Y. 2000), *aff'd sub nom. Henrietta D. v.
  Bloomberg*, 331 F.3d 261 (2d Cir. 2003)..............................................................28

*Hernandez v. Wolf*,
  No. 20-00617, Slip. Op. at 17 (C.D. Cal. Apr. 1, 2020) .......................................36

*Hinojosa v. Livingston*,
  807 F.3d 657 (5th Cir. 2015) ................................................................................33

*Hutto v. Finney*,
  437 U.S. 678 (1978)..............................................................................................27

*Jones v. Wolf*,
  No. 20-361, 2020 WL 1643857 (W.D.N.Y. Apr. 2, 2020)....................................30

*Lewis v. Siwicki*,
  944 F.3d 427 (2d Cir. 2019)..................................................................................31

*Morgan v. Dzurenda*,
  No. 18-2888, 2020 WL 1870144 (2d Cir. Apr. 15, 2020) .....................................33

*North American Soccer League v. U.S. Soccer Fed'n*,
  883 F.3d 32 (2d Cir. 2018)...................................................................................27

*Padilla v. Immigration & Customs Enf't*,
  No. 19-35565, 2020 WL 1482393 (9th Cir. Mar. 27, 2020)..................................29

*Reynolds v. Arnone, et al.*,
  402 F.Supp.3d 3 (D. Conn. 2019).........................................................................21

*Sajous v. Decker*,
  2018 WL 2357266 (S.D.N.Y. May 23, 2018) .......................................................40

*Salahuddin v. Goord*,
  467 F.3d 263 (2d Cir. 2006)..................................................................................31

*Thakker v. Doll*,
  No. 20-cv-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020) .............................29, 35, 37, 43

*Trump v. Vance*,
   941 F.3d 631 (2d Cir. 2019).........................................................................27

*U.S. v. Bolston*,
   No. 18-00382, Dkt. No. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in
   part because "the danger inherent in his continued incarceration at the R.A.
   Deyton Detention Facility . . . during the COVID-19 outbreak".) .........................................37

*U.S. v. Harris*,
   No. 19-00356, Dkt. No. 36, 2020 WL 1503444 (D.D.C. Mar. 26, 2020) ..............................37

*U.S. v. Hector*,
   No. 20-04183 (4th Cir. Mar. 27, 2020).......................................................36

*U.S. v. Kennedy*,
   No. 18-20315, Dkt. No. 77 (E.D. Mich. Mar. 27, 2020) .........................................37

*U.S. v. Michaels*,
   No. 16-00076, Dkt. No. 1061 (C.D. Cal. Mar. 26, 2020) .......................................37

*United States v. Stephens*,
   No. 15-cr-95, 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) ..................................28

*Xochihua-Jaimes v. Barr*,
   No. 18-71460 (9th Cir. Mar. 23, 2020).......................................................36

## STATUTES

8 U.S.C. § 1252(b)(3)(B) ......................................................................36

28 U.S.C. § 1651(a) ...........................................................................36

Conn. Gen. Stat. § 28-9........................................................................33

## PRELIMINARY STATEMENT

We are living in truly extraordinary times.  There are almost three million confirmed cases of COVID-19 worldwide, and hundreds of thousands have died.  As a result, millions, perhaps billions, of people are under orders to practice "social distancing" to avoid spreading the disease. Jails in urban centers such as New York, Chicago, and Philadelphia have been overrun with infection and COVID-19 cases, and Connecticut Department of Correction ("DOC") facilities are no exception.  Indeed, DOC has already reported that **382** of the people in its custody (and **310** staff) have been infected with COVID-19 in the past month. Two people have died, and it is highly probable that more will follow.

Unlike the general population in Connecticut and other communities around the world, Plaintiffs-Petitioners ("Plaintiffs") and the classes they seek to represent have been subjected by Defendants-Respondents ("Defendants") to conditions of confinement that prevent them from availing themselves of the basic social distancing and other public health guidelines that are mandated or recommended for everyone else in society.  These conditions of confinement pose a serious and imminent threat of severe disease and death for Plaintiffs and others in Defendants' custody.  Judicial intervention is necessary to protect their health and their lives.

The conditions of confinement at DOC facilities are shockingly insufficient to protect Plaintiffs from infection, serious complications, or death from COVID-19.  Pandemic or no, people continue to live in crowded open dormitories and double-celled units.  The sanitation practices of Defendants in DOC facilities are inadequate; Defendants deny Plaintiffs and other prisoners even the most basic hygiene products; and they have not sufficiently complied with guidelines from the Centers for Disease Control and Prevention ("CDC") directing correctional institutions to implement mitigation efforts like social distancing and other best practices.  Instead, Defendants' primary response to the outbreak at DOC facilities has been to transfer members of the Classes

1

who have tested positive for COVID-19 to Northern Correctional Institution ("Northern"), a Level 5 prison designed exclusively to punish, not to serve as a medical facility. Not only has this move been roundly condemned by scores of public health experts—who say it will exacerbate, not mitigate, the virus's rampage through DOC facilities—but, tellingly, no other jurisdiction in the United States has resorted to putting people suffering from a novel, highly fatal illness in a supermax prison. And notwithstanding the use of Northern, many of those who show symptoms of COVID-19 simply continue to be denied medical care, or moved from facility to facility, meaning that Defendants recklessly expose those who are not symptomatic to those who are. At bottom, the conditions at DOC facilities have created a rapid, uncontrolled spread of COVID-19 with grave outcomes for both the incarcerated population and the surrounding communities.

The stakes here could not be higher: lives are on the line. Courts have acknowledged the gravity of the situation and relied on their equitable powers to protect people held at prisons and detention facilities during this once-in-a-lifetime pandemic. Indeed, given that large-scale outbreaks at DOC facilities are spilling over into the surrounding communities and spreading infection throughout Connecticut, Plaintiffs' requested preliminary relief is more than justified and would impose a minimal burden on Defendants and the public at large.

For these reasons and those discussed below, Plaintiffs seek emergency preliminary relief.

## FACTUAL BACKGROUND

The nation and the world are in the grips of the most significant pandemic in generations, caused by COVID-19—a fast-moving virus that has infected millions and upended life in every corner of the globe, country, and state.[1] This Court is doubtless aware of the devastating effects COVID-19 is having on the state of Connecticut.[2] As of April 27, 2020, 3,035,177 cases have

---

[1] Compl. ¶ 16.
[2] *Id.*

been confirmed globally, with 985,374 of those cases in the United States.[3]   Over 55,000 Americans have died.[4]   Connecticut alone has reported 25,269 cases of COVID-19, and 1,924 deaths.[5]   The virus continues to spread exponentially.   Without effective public health interventions, like those Plaintiffs request, the CDC projects approximately 200 million people in the United States could be infected over the course of the epidemic.[6]

## I.   COVID-19 POSES A GRAVE RISK OF SERIOUS INJURY AND DEATH TO THOSE INFECTED, ESPECIALLY INDIVIDUALS IN THE MEDICALLY VULNERABLE CLASSES.

COVID-19 is a serious and potentially fatal respiratory disease caused by a novel coronavirus.[7]   COVID-19 spreads from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.[8]   These droplets can travel up to six feet through the air to infect another person.[9]   The virus also spreads when people touch surfaces and objects contaminated by those same respiratory droplets and then touch their own mouth, nose, or eyes.[10]   Symptomatic persons spread the disease, but so too can asymptomatic

---

[3] *Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU)*, Coronavirus Resource Center, Johns Hopkins University & Medicine, (last updated Apr. 27, 2020, 4:31 p.m.), https://cutt.ly/4ysesvR (last visited Apr. 27, 2020).

[4] *Id.*

[5] Connecticut Open Data, *COVID-19 Data Resources: Connecticut Summary, available at* https://cutt.ly/2yse8YA (last visited Apr. 27, 2020).

[6] Declaration of Dr. Johnathan Louis Golob, Compl. Ex. A ¶ 11 ("Golob Decl."). Dr. Jonathan Golob is an Assistant Professor at the University of Michigan School of Medicine in Ann Arbor, Michigan, and a specialist in infectious diseases and internal medicine with a subspecialty in infections in immunocompromised patients. Golob Decl. ¶ 1.

[7] Declaration of Dr. Jonathan Giftos, Compl. Ex. B ¶ 6 ("Giftos Decl."). Dr. Jonathan Giftos is the Medical Director of Addition Medicine & Drug User Health at Project Renewal and a Clinical Assistant Professor in the Department of Medicine at Albert Einstein College of Medicine. Giftos Decl. ¶ 2. He is the former Attending Physician and the Clinical Director of Substance Use and Treatment for NYC Health & Hospitals, Division of Correctional Health Services at Rikers Island. *Id.* at ¶ 3.

[8] Giftos Decl. ¶ 6

[9] Centers for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19): Frequently Asked Questions*, https://cutt.ly/yyr45Xf.

[10] Giftos Decl. ¶ 6.

and pre-symptomatic persons.[11]   For this reason, the CDC has recommended persons wear masks any time they leave their homes.[12]

Symptoms of infection range from no or mild symptoms to respiratory failure and death.[13] COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity.[14]   It also may cause inflammation of the heart muscle (known as myocarditis), affecting the heart muscle and electrical system, and reducing the heart's ability to pump blood.[15]   This can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and even the ability to work.[16]  *Id.*   COVID-19 also can trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys (possibly leading to dialysis dependence) and even neurologic injury.[17]   These complications can develop at an alarming pace.[18]   Patients can show the first symptoms of infection within two days after exposure, and their condition can seriously deteriorate in five days or sooner.[19]

For persons over the age of 50 or with certain preexisting medical conditions, COVID-19 presents an even greater risk of serious symptoms and death.[20]   Persons with preexisting lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients),

---

[11] *Id.* ¶¶ 8–10.
[12] Centers for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19), Recommendation Regarding the Use of Cloth Face Coverings* (Apr. 3, 2020), https://cutt.ly/rysekak.
[13] Golob Decl. ¶¶ 4–5.
[14] *Id.* at ¶ 9.
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.* at ¶ 6.
[19] *Id.*
[20] Golob Decl. ¶ 3.

diabetes, compromised immune systems (such as from cancer, HIV, or other autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, and developmental delay all are at a heightened risk of serious illness and death from COVID-19.[21] Each Plaintiff in the Medically Vulnerable Subclasses has one or more of these conditions, and thus faces an increased risk of serious complications or death from COVID-19.

There is no known cure, vaccine, or treatment for COVID-19.[22]  The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 than from influenza.[23]  According to recent estimates, the fatality rate of people with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with effective health care systems.[24]  For people in the highest risk populations, the fatality rate of COVID-19 is about 15 percent.[25]  High-risk patients who survive should expect prolonged recovery, including the need for extensive rehabilitation for profound reconditioning, loss of digits, neurological damage, and loss of respiratory capacity.[26]

The most effective strategy for limiting the spread of the disease is social distancing—deliberately keeping at least six feet of space between persons to avoid spreading the illness—combined with a vigilant hygiene regimen, including washing hands frequently and thoroughly with soap and water, and constant disinfecting of surfaces.[27]  Following the recommendation of public health experts, government officials across the country have taken extraordinary measures to implement social distancing to minimize the spread of the disease, including shutting down

---

[21] *Id.*
[22] Giftos Decl. ¶ 7; Golob Decl. ¶ 10.
[23] Golob Decl. ¶ 4.
[24] *Id.*
[25] *Id.*
[26] Id.
[27] Giftos Decl. ¶ 7.

schools, non-essential businesses, and courts.  The goal of these efforts is to "flatten the curve" by spreading the rate of infection across a longer period of time to avoid overwhelming the healthcare system.

II.  **THE CONDITIONS AT CORRECTIONAL FACILITIES PLACE ALL PERSONS AT AN EVEN GREATER AND IMMEDIATE RISK OF COVID-19 INFECTION THAN MEMBERS OF THE PUBLIC-AT-LARGE.**

The state of Connecticut has not been spared from COVID-19, but Connecticut's DOC is unique for the dramatic pace at which the virus has overtaken its facilities, wreaking havoc and infecting hundreds of prisoners and staff alike.

In mid-March, public health experts in Connecticut experienced in correctional health began to express "grave concern that, absent immediate action, COVID-19 will overrun Connecticut's jails and prisons" and that "Connecticut has days, not weeks, to chart a different future."[29] They joined a growing chorus of infectious disease doctors, epidemiologists, and specialists in correctional health, all of whom warned that a virus like COVID-19 "create[s] a perfect storm for correctional settings" because of ease of transmission, lack of prevention opportunities, concentration of people with chronic health issues, and the fact that "despite being physically secure, jails and prison are not isolated from the community."[30]

Their warnings are now playing out in real-time. The first positive test of an incarcerated person at a DOC facility was announced on March 30.[31]  In less than a month, that number has

---

[29] Letter from Dr. Emily Wang et al. to Governor Lamont (attached as Exhibit A).

[30] Declaration of Dr. Josiah Rich, Compl. Ex. C ¶¶ 6, 8–12 ("Rich Decl.").  Dr. Josiah Rich, an infectious disease specialist, is a Professor of Medicine and Epidemiology at the Warren Alpert Medical School of Brown University and the Director and Co-founder of The Center for Prisoner Health and Human Rights at The Miriam Hospital.

[31] State of Conn. Dep't of Correction, *First Department of Correction Offender Tests Positive for the COVID-19 Virus* (Mar. 30, 2020), https://cutt.ly/iyr5GnD.

risen to 382 confirmed positive incarcerated people; 310 positive staff members;[32] and two deaths—a 60-year-old who had been serving a two-year sentence and had been approved for home release[33], and a 57-year-old who was scheduled for release in 2022.[34]

The speed at which COVID-19 has overtaken DOC is staggering. On April 2, three days after the first positive test, **16** DOC staff members and **8** incarcerated people had tested positive for COVID-19.  By April 6, both those numbers more than doubled, to **32** DOC staff members and **21** incarcerated people.  By April 7, they had grown exponentially: **41** DOC staff members and **44** incarcerated people, with **53** prisoner test results still pending.[35]

On April 8, DOC announced it had begun transferring people who had tested positive to Northern; as of that day, the number of incarcerated people at DOC facilities who tested positive had grown to **46** across 13 different DOC facilities.[36]  But DOC's use of Northern has in no way stopped the surge in positive cases.  As of April 13, they stood at **104** staff and **166** incarcerated people.[37]  That day, the first incarcerated person died of COVID-19; another person followed, and others have died immediately after being released from custody.[38]

As of this writing, April 27, **310** staff and **382** prisoners have tested positive for COVID-19—meaning that DOC has gone from one infected prisoner to nearly 700 people infected across

---

[32] *See* Connecticut State Department of Correction, *Health Information and Advisories: Coronavirus Information*, *available at* https://cutt.ly/xyr57np (last accessed Apr. 27, 2020).

[33] *First Conn. Inmate Dies of Coronavirus: DOC*, NBC CONN. (Apr. 13, 2020), https://www.nbcconnecticut.com/news/coronavirus/first-conn-inmate-dies-of-coronavirus-doc/2255025/.

[34] State of Conn. Dep't of Correction, *Second Department of Correction Offender dies from COVID-19 virus* (Apr. 25, 2020), https://cutt.ly/uystz8Y.

[35] *See* Conn. Dep't of Correction, *Covid-19 Tracker*, https://cutt.ly/nystnK0 (last accessed Apr. 14, 2020). All the numbers of positive cases referenced are derived from this tracker, as accessed on the cited dates.

[36] *See* Conn. Dep't of Correction, *The Department of Correction transfers COVID-19 positive offenders to Northern CI* (Apr. 8, 2020), https://cutt.ly/fystRMg; Conn. Dep't of Correction, Health Information and Advisories: Coronavirus Information, *available at* https://cutt.ly/nystnK0 (accessed Apr. 8, 2020).

[37] *First Conn. Inmate Dies of Coronavirus: DOC*, NBC CONN. (Apr. 13, 2020), https://cutt.ly/FystUzq.

[38] *See, e.g.*, Thomas Breen, *26-Year-Old Man Dies 2 Days After Release From Whalley Jail; Obit Points To Covid*, NEW HAVEN INDEP. (Apr. 22, 2020), https://cutt.ly/5ystI6K (pre-trial detainee held at New Haven Correctional Center died two days after his release).

the system less than a month.  Today, 158 people with COVID-19 are housed at Northern.  And

the DOC system's infection rate continues to vastly outpace that of every single locality in

Connecticut:  at 2.6, it is nearly five times higher than that of the state overall (.554), and nearly

double that of the next-highest locale, Stamford (1.57).



This is all the more alarming given that, while Connecticut's infection rate has grown at a

measured pace, the same is not necessarily true of DOC.



Unfortunately, Plaintiffs have experienced these troubling trends firsthand.  In just the few days since this lawsuit was filed, one Plaintiff, Mr. Roe, was confirmed positive for COVID-19, and has just been transferred to Northern.[39]

Defendants cannot claim to be caught unaware by these grim numbers.  As public health experts have said for weeks, correctional facilities like those run by DOC are the exact type of congregate environment—where people live, eat, bathe, and sleep in close proximity—in which COVID-19 infection thrives.[40]  This increased risk is present in every prison, given the nature of prison.[41]  People incarcerated in these facilities are forced into close contact with each other and prison staff, including corrections officers.[42]  They cannot achieve the requisite social distancing needed to effectively prevent the spread of COVID-19.[43]  They likely share or touch objects used often by others and cleaned infrequently.[44]  In addition to eating, sleeping, recreating, and living close to each other, they have to share bathroom facilities—showers, toilets, and sinks—without adequate cleaning between uses.[45]  Insufficient medical treatment capabilities also make it nearly impossible to treat infected people properly, let alone prevent the further spread of COVID-19 throughout the incarcerated population.[46]

Additionally, about 40 percent of incarcerated people nationally are estimated to have at least one chronic illness, including Plaintiffs Williams-Void, Doe, and Roe.[47]  Many of these

---

[39] Declaration of Jane Roe ¶ 4 (Apr. 23, 2020) ("Roe Decl."), attached hereto as Exhibit B.
[40] Giftos Decl. ¶ 13; Affirmation of Brie Williams, M.D., Compl. Ex. D ¶ 6 ("Williams Aff.")  Dr. Brie Williams is a Professor of Medicine at the University of California, San Francisco ("UCSF") in the Geriatrics Division, Director of UCSF's Amend: Changing Correctional Culture Program, and the Director of UCSF's Criminal Justice & Health Program.
[41] Giftos Decl. ¶¶ 12–14.
[42] *Id.* at ¶ 15–18.
[43] *Id.*
[44] *Id.*
[45] *Id*; Golob Decl ¶ 10.
[46] Giftos Decl. ¶¶ 19–20.
[47] *See* Compl. ¶¶ 10–12.

illnesses, such as hypertension, asthma, diabetes, and chronic kidney disease,[48] are associated with more severe cases of COVID-19, and poorer outcomes.[49]  Chronically ill people like those in the Medically Vulnerable Subclasses face a far greater risk of severe illness and death from COVID-19 than those with similar preexisting conditions who are free to isolate in their homes or avoid groups of people.[50]  And their risk is only compounded by the fact that DOC facilities (like most correctional facilities) lack sufficient medical care even in less exigent times.[51]

Public health experts across the country agree that correctional settings like those run by DOC create a tinderbox through which COVID-19 infections could burn before spilling over into the surrounding communities.[52]  They have been clear that the only way to avoid cruelly exposing prisoners—and by extension, staff and surrounding communities—to the pandemic is a combination of rapid de-densification measures, along with dramatically increased sanitation and medical care.[53]  To facilitate this, the CDC has issued COVID-19 guidance specifically for correctional facilities, which recommends, among other things, social distancing to increase space between incarcerated people to six feet.[54]  But some prisons have proven unwilling to abide by CDC recommendations, and incarcerated people are dying nationwide as a result.  The dramatic outbreaks in the Cook County Jail in Chicago and Rikers Island in New York City, where the transmission rate for COVID-19 is estimated to be the highest in the world, make this perfectly

---

[48] Laura M. Maruschak & Marchus Berzofsky, *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-2012*, Dep't. of Justice: Bureau of Justice Statistics (Feb. 2015), https://cutt.ly/nysyUlK.
[49] Centers for Disease Control and Prevention, *People Who are at a Higher Risk for Severe Illness*, Coronavirus Disease 2019 (Mar. 2020), *available at* https://cutt.ly/mysyIkT.
[50] Golob Decl. ¶¶ 3–4.
[51] Giftos Decl. ¶¶ 19–20.
[52] *See e.g.*, Williams Aff. ¶¶ 4, 17 (explaining that in a world-wide pandemic, "correctional health is public health," and thus, "The Entire Community is at Risk if Prison Populations Are Not Reduced").
[53] *See* Giftos Decl. ¶¶ 25–28; Williams Aff. ¶¶ 17–18; Rich Decl. ¶¶ 14–17;
[54] See also Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), available at https://cutt.ly/iysyJ9e.

clear.[55]  As DOC's troubling numbers indicate, it is no exception to this trend; yet Defendants

continue to exacerbate it.

## III.   THE CURRENT CONDITIONS IN WHICH DEFENDANTS HAVE CONFINED PLAINTIFFS AND CLASS MEMBERS ONLY EXACERBATE THE ALREADY EXTREME AND IMMINENT DANGER THEY FACE OF CONTRACTING AND POSSIBLY DYING FROM COVID-19.

As detailed in the Complaint, Defendants' response to the pandemic has been fatally

piecemeal and reactive.[56]  As of mid-March, DOC spokespeople were boldly proclaiming that

there was no need to plan specifically for COVID-19; the department could simply recycle a 2007

influenza outline.[57]  Even today, Defendants' response is neither uniform nor comprehensive, but

a grab-bag of aspirational half-measures that does not provide constitutionally adequate conditions

of confinement.   Declarations submitted in support of Plaintiffs' motion reveal a dangerous

combination of close proximity, conflicting and loose standards, and dire lack of sanitation and

medical resources—so much so that the DOC's own staff continues to issue urgent, public pleas

for assistance.[58]  The disparities between what the CDC recommends, the policies DOC has put in

place, and what is actually happening in prisons are stark.

The declarations from Plaintiffs and other incarcerated people that are attached to this

motion document the multiple ways Defendants defy CDC recommendations by continuing to

force those in their custody to sleep, eat, recreate, bathe, and use the phone in close proximity,

with minimal efforts to minimize the spread of COVID-19.[59]  These declarations also document

---

[55] Golob Decl. ¶ 12.

[56] *See* Compl. ¶¶ 12.

[57]  Kelan Lyons, *Elderly Prisoners in Connecticut Vulnerable to Potential Coronavirus Outbreak*, HARTFORD COURANT (Mar. 11, 2020), https://cutt.ly/4ysyKVY.

[58] Mike Savino, *DOC Workers Rally Outside Headquarters, Demanding Better Conditions*, EYEWITNESS NEWS 3 (WFSB) (Apr. 24, 2020), https://cutt.ly/OysyCvG (describing rally by DOC staff for more protective equipment, minimizing contact with prisoners, and ability to work remotely).

[59] *See generally* Declarations of Pattikate Williams-Void (Apr. 24, 2020) ("Williams-Void Decl."), attached hereto as Exhibit C; Thomas Caves (Apr. 17, 2020) ("Caves Decl."), attached hereto Exhibit D; William

the deleterious effect of Defendants' refusal to act in a coordinated, comprehensive, systematic fashion by revealing just how much pandemic response measures vary by facility, building, and even unit.  All told, they show that DOC is falling hopelessly short of expert recommendations and severely exacerbating the risk that Plaintiffs and the class members will contract COVID-19, which creates an imminent and immediate threat to their health and lives, especially for members of the Medically Vulnerable Subclasses.

### A.    Defendants Have Taken Insufficient Steps to Limit the Spread Of COVID-19 in DOC Facilities.

Defying public health experts' urgent recommendation that they take concerted, wide-scale action to de-densify DOC facilities, and notwithstanding the unprecedentedly dangerous nature of this global pandemic, Defendants have consistently refused to take steps to release anyone from their custody outside of routine, one-by-one mechanisms meant for a non-emergency context.[60]

---

Bruno (Apr. 14, 2020) ("Bruno Decl."), attached hereto as Exhibit E; Angel Caballero (Apr. 22, 2020) ("Caballero Decl."), attached hereto as Exhibit F; Marcus Champagne (Apr. 23, 2020) ("Champagne Decl."), attached hereto as Exhibit G; Alex Flemming (Apr. 21, 2020) ("Flemming Decl."), attached hereto as Exhibit H; Tyquwane Gilchrest (Apr. 23, 2020) ("Gilchrest Decl."), attached hereto as Exhibit I; Chaz Gulley (Apr. 8, 2020) ("Gulley Decl."), attached hereto as Exhibit J; Zain Hussain (Apr. 17, 2020) ("Hussain Decl."), attached hereto as Exhibit K; Roger Johnson (Apr. 17, 2020) ("Johnson Decl."), attached hereto as Exhibit L; Frank Kelly (Apr. 16, 2020) ("Kelly Decl."), attached hereto as Exhibit M; Austin Kerr (Apr. 20, 2020) ("Kerr Decl."), attached hereto as Exhibit N; Kezlyn Mendez (Apr. 15, 2020) ("Mendez Decl."), attached hereto as Exhibit O; Robert Miller (Apr. 20, 2020) ("Miller Decl."), attached hereto as Exhibit P; Luis Pagan (Apr. 8, 2020) ("Pagan Decl."), attached hereto as Exhibit Q; Jonathan Pape (Apr. 22, 2020) ("Pape Decl."), attached hereto as Exhibit R; Kyle Lamar Paschal-Barros (Apr. 17, 2020) ("Paschal-Barros Decl."), attached hereto as Exhibit S; Chad Petitpas (Apr. 22, 2020) ("Petitpas Decl."), attached hereto as Exhibit T; Ken Pierce (Apr. 15, 2020) ("Pierce Decl."), attached hereto as Exhibit U; Darien Rosario (Apr. 24, 2020) ("Rosario Decl."), attached hereto as Exhibit V; Christopher Russell (Apr. 22, 2020) ("Russell Decl."), attached hereto as Exhibit W; Tyrone Spence (Apr. 16, 2020) ("Spence Decl."), attached hereto as Exhibit X; Anthony Toscano (Apr. 14, 2020) ("Toscano Decl."), attached hereto as Exhibit Y; Joshua Wilcox (Apr. 23, 2020) ("Wilcox Decl."), attached hereto as Exhibit Z; Tre McPherson (Apr. 24, 2020) ("McPherson Decl."), attached hereto as Exhibit AA.

[60] DOC's touted numbers of releases are both incomplete and misleading.  For example, that the state's prison population was lower at the outset of this pandemic than in past years has nothing to do with whether DOC has released anyone because of the pandemic's dangers.  DOC has similarly glossed over whether recent releases have anything to do with the pandemic, rather than people maxing out on their sentences or fewer people entering the prison system.  *See* Kaitlyn Krasselt, *Data Shows Prison Coronavirus Reduction Plan Not What It Appears*, Conn. Post (Apr. 12, 2020), https://cutt.ly/cysiUyt.

As of April 27, there are a total of 11,168 people in DOC custody, 3,045 unsentenced and 8,123 sentenced.[61]  The most populous single-building facilities, Cheshire Correctional Institution, Robinson Correctional Institution, and Corrigan-Radgowski Correctional Center, where 19 incarcerated people and 7 correctional staff tested positive prior to DOC ceasing to report facility-by facility numbers,[62] each houses upwards of 1,000 people.  Hartford Correctional Center, which has seen outbreaks in nearly every building, houses 853 people.  Willard-Cybulski Correctional Institution, which has similarly seen mass outbreaks, houses 913 people.

Although Defendants now transfer people who test positive for COVID-19 to Northern,[63] Defendants have not leveraged the resulting additional capacity to implement recommended and necessary social distancing measures.  Notwithstanding seven weeks' worth of executive orders Defendant Lamont has issued to protect public health during the a once-in-a-lifetime pandemic— which repeatedly highlight the particular threat COVID-19 poses to institutional and congregate housing[64]—Defendants still force those in their custody to live and breathe "on top of one another," by the dozens or hundreds.[65]

Many DOC facilities have dormitory-style housing in which up to 120 people live side-by-side in one room.  Pandemic notwithstanding, these remain unchanged, with dozens or hundreds of people still sleeping on bunk beds a few feet apart.[66]

---

[61] Conn. Dep't of Correction, *Connecticut Correctional Facility Population Counts*, https://cjis-dashboard.ct.gov/CJPPD_Reports/rdPage.aspx?rdReport=Extracted_Data (last accessed Apr. 27, 2020).
[62] In early April, DOC stopped reporting facility-by-facility numbers of people who had tested positive.  It also stopped reporting the number of incarcerated people who have been tested for COVID-19.
[63] *See infra* Section III.C.
[64] *See* Lamont Exec. Order Nos. 7–7FF.
[65] Russell Decl. ¶ 4.
[66] *See, e.g.*, Toscano Decl. ¶ 2 (unit at Willard-Cybulski Correctional Institution holds about 100 people, sleeping two feet apart); Champagne Decl. ¶¶ 2, 5 (120 people housed in unit at Hartford Correctional Center who sleep 4 feet away from each other); McPherson Decl. ¶¶ 5–6 (unit at Bridgeport Correctional Center houses 48 people in bunkbeds who can "reach over and touch" next bed); Bruno Decl. ¶¶ 1, 3 (114 people in dormitory at Brooklyn Correctional Institution, sleeping 2 feet apart); Miller Decl. ¶ 1 (90 people in unit at Carl Robinson Correctional Institution).

Other DOC facilities hold incarcerated people two to a cell in close quarters. Social distancing in a cell is impossible: cellmates sleep in bunk beds and share a desk, a toilet, and a sink in each cell.[67]   And like their dormitory counterparts, DOC facilities with double cells hold upwards of 80 people in each unit.[68]   Any time people in double-celled units are out of their cells, they share each and every inch of physical space with their entire unit in common areas.

The risks of continuing to house a large number of people in a dormitory or double-celling people during a global pandemic are apparent and defy logic.   DOC's dormitories and cells are too small for people to stand inside and remain six feet away from each other, as the CDC has urged—if not ordered—hundreds of millions of Americans to do.   There simply is no way for someone to practice social distancing while confined to a dormitory or cell with other people.[69]

Defendants do not allow those in their custody any opportunity to practice social distancing even outside of their cells.   Multiple times a day, people receive their meals together and take them to sit "shoulder-to-shoulder and knee-to-knee" at tables in their unit's common areas.[70]   Needless to say, this is far more than the five-person limit Connecticut has placed for any congregation of persons.[71]   Even those who receive meals to eat on individual bunks or in cells are unable to avoid proximity to others, as they must stand "right next to each other in the line" to get them,[72] or their bunks are so close together that there are still "10 people within four feet of each" other.[73]

---

[67] *See, e.g.*, Pape Decl. ¶ 5 (he and his cellmate are "always bumping into each other when we walk[] around the cell at the same time"); Spence Decl. ¶ 4 (his cell is "cramped, and it is impossible to stay more than five feet away from one another").

[68] *See* Spence Decl. ¶ 2 (90 people housed in E dorm at Garner); Caves Decl. ¶ 1 (82 or 83 people housed in B pod at Corrigan); Rosario Decl. ¶ 2 (150 housed in E unit at Osborn).

[69] *See e.g.*, Hussain Decl. ¶ 11; Bruno Decl. ¶ 3; Russell Decl. ¶ 4.

[70] Petitpas Decl. ¶ 5; *see also* Russell Decl. ¶ 4; Hussain Decl. ¶ 11; Toscano Decl. ¶ 5; Spence Decl. ¶ 5; Mendez Decl. ¶ 5.

[71] *See* Lamont Exec. Order 7N at 4 (Mar. 28, 2020).

[72] Rosario Decl. ¶ 6.

[73] Pierce Decl. ¶ 4.

14

It is the same story with the communal phones.  Those in DOC custody share phones with their entire units.  Because visitors have been prohibited since mid-March, telephone calls are the only lifeline to friends and family.  As a result, the telephone bays frequently are crowded, and people must jam shoulder-to-shoulder next to each other.[74]  Phones are shared among tens or hundreds of people every day.[75]

Finally, all those in DOC custody share showers—and in dormitory settings, toilets and sinks—with their entire unit.[76]  Like phones, showers are sometimes sanitized and sometimes not.[77]  Given these conditions, incarcerated people have described themselves as "lab rat[s] trapped in a small place waiting to get sick."  *Id.* ¶ 12; *see also* Pierce ¶ 4 ("I feel like it is just a matter of time until we all get infected with the virus.").

**B.      Defendants Maintain Dangerous, Unsanitary Conditions at DOC Facilities and Do Not Provide Appropriate Medical Care.**

Defendants also do not use sanitary procedures sufficient to promote proper personal hygiene or ensure that common areas shared by many incarcerated people remain clean.  Many in DOC custody have observed no changes to cleaning protocols during the pandemic.[78]  For example, Defendants do not sanitize or clean the unit showers between uses, even though tens or hundreds of individuals share them.[79]  Most other routine items, such as "[h]andcuffs and shackles[,] are used repeatedly throughout the day, and are not sanitized between uses."[80]  Whether

---

[74] *See* Caves Decl. ¶ 6 (explaining "you're right next to the next person" when using phones).
[75] Toscano Decl. ¶ 7 (6 phones shared with 75 people); Rosario Decl. ¶¶ 2, 8 (4 phones shared with 150 people); McPherson Decl. ¶¶ 5, 8 (phones shared with 48 people); Pagan Decl. ¶¶ 2, 8 (4 phones shared with 40 people); Gulley Decl. ¶¶ 2, 6 (1 phone shared with 48 people).
[76] *See e.g.*, Toscano Decl. ¶ 7 (9 showers shared with 75 people); Rosario Decl. ¶¶ 2, 8 (4 showers with 150 people).  The only exception is those in medical units, which have in-room showers.  *See* Williams-Void Decl. ¶ 6 (medical unit room contains a shower).
[77] Champagne Decl. ¶ 7 (showers only "cleaned with hot water").
[78] Gilchrest Decl. ¶ 3 (no additional cleaning happening since the start of the pandemic).
[79] Pierce Decl. ¶ 6 (not cleaned after each use); Spence Decl. ¶ 7 (same); Petitpas Decl. ¶ 8 (same).
[80] Pagan Decl. ¶ 8; *see also* Gulley Decl. ¶ 6; Paschal-Barros Decl. ¶ 3.

a phone is disinfected or sanitized between the calls is anybody's guess: some are not,[81] and some are only as of late, and still not between each use.[82]

Defendants regularly deny prisoners cleaning materials necessary to engage in personal hygiene or to clean their cells or common areas. Although regular, frequent handwashing is vital for limiting the spread of COVID-19, and CDC guidance establishes that prisons should "[p]rovide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing," Defendants still have not provided many people in their custody with soap.[83] In that case, those who cannot afford soap do not clean their hands.[84] Some incarcerated people have been provided soap only when they complained,[85] while others have received small amounts only recently.[86] Notwithstanding the lack of soap, "alcohol based sanitizer," which Defendant Lamont and the CDC have concluded greatly reduces the spread of COVID-19,[87] is prohibited to prisoners in his custody.[88]

CDC guidance provides that doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones be cleaned "several times a day."[89] Yet in most facilities, Defendants have made no effort to increase cleaning of common spaces,

---

[81] *See* Spence Decl. ¶ 8

[82] Toscano Decl. ¶¶ 2, 7 (6 phones shared with 75 people, sanitized once per day); Rosario Decl. ¶¶ 2, 8 (4 phones shared with 150 people, wiped down once); Williams-Void Decl. ¶ 9 (wipes down shared phone with a personal rag because she does not think it has been cleaned); McPherson Decl. ¶¶ 5,8 (phones shared with 48 people and cleaned only between rec shifts); Kelly Decl. ¶ 6 (phones not cleaned between use).

[83] *See* Mendez Decl. ¶ 6; Flemming Decl. ¶ 10; Spence Decl. ¶ 6; Pierce Decl. ¶¶ 7, 9.

[84] Petitpas Decl. ¶ 10.

[85] Pierce Decl. ¶ 7 (one bar of soap since he complained).

[86] Caves Decl. ¶ 3 (one small bar a week ago); Champagne Decl. ¶ 5 (two bars of soap in past month); Toscano Decl. ¶ 6 (less than two weeks ago, staff started giving out soap consistently).

[87] Gov. Lamont Exec. Order No. 7N at 3; Centers for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19): How to Protect Yourself & Others*, https://cutt.ly/2yspjUp.

[88] Bruno Decl. ¶ 8; Kelly Decl. ¶ 4; Pierce Decl. ¶ 9; Spence Decl. ¶ 6.

[89] See also Centers for Disease Control & Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Mar. 23, 2020), available at https://cutt.ly/iysyJ9e.

while cells are cleaned *less frequently* since the pandemic began.[90]  Shockingly, at a time when incarcerated people are in need of cleaning supplies more than ever before, Defendants have refused to make these supplies available.[91]  At Hartford, the only cleaning supplies DOC provides are bars of soap, even though sleeping areas are not cleaned or sanitized by staff.[92]  Periodic cell cleanings occur only once a week with diluted cleaner at Garner,[93] where one prisoner is responsible for cleaning the entire housing unit and does not have time to sufficiently do so each day.[94]  At Brooklyn, the prisoners who clean the dormitory lack enough disinfectant to clean table tops.[95]  The employees at Robinson purchased disinfectant with their own money for prisoners to use, but doing so would require additional supervision and so prisoners are not actually permitted to use it.[96]  Defendants' refusal to act has thus left DOC facilities to fester, forcing those in their custody to make do by cleaning their cells with shampoo,[97] or to choose between using soap to clean their bodies or their physical space.[98]

Perhaps Defendants' most concerning failure is the utter lack of medical staffing at DOC facilities.[99]  In February 2020, Defendant Cook told members of the Black and Puerto Rican Legislative Caucus that there were 139 healthcare positions vacant out of 843 budgeted.[100]  As of March 2019, DOC had only one medical provider—a doctor or physician's assistant—for every

---

[90] *See, e.g.*, Caves Decl. ¶ 3 (provided one small cup of cleaner to clean out cell over past 16 days).
[91] Miller Decl. ¶ 2 (describing DOC's weeks-long refusal to provide prisoners with bleach or cleaning products); Pagan Decl. ¶ 12 (prisoners were refused cleaning supplies); Russell Decl. ¶ 5 (at Bridgeport, prisoners were refused spray bottles and paper towels to wipe down tables); McPherson Decl. ¶ 7 (they have access to bleach as of one week ago).
[92] Champagne Decl. ¶¶ 2, 5.
[93] Kelly Decl. ¶¶ 2, 4.
[94] *Id.* ¶ 7.
[95] Bruno Decl. ¶¶ 1, 7.
[96] Pierce Decl. ¶¶ 1, 5.
[97] Spence Decl. ¶ 4; Paschal-Barros Decl. ¶ 8.
[98] Miller Decl. ¶ 2.
[99] *See* Compl. ¶¶ 33–37.
[100] Lisa Backus, *Staffing Shortage Creates 'Dangerous' Situation in CT Prisons*, Conn. Post (Feb. 3, 2020), https://cutt.ly/lysdvkK.

579 prisoners, and only 309 nurses for the entire prison population.[101]  Staffing levels have plunged

in recent weeks as more than 300 DOC staff have tested positive for COVID-19, as well as untold

numbers who have been quarantined due to contact with infected colleagues or incarcerated

people.[102]  At Corrigan, for example, DOC's reckless mismanagement of the outbreak led to more

than half of the medical staff developing COVID-19 symptoms.[103]  As is common in prisons and

jails throughout the country, medical care at DOC facilities suffers from serious inadequacies

under normal circumstances.[104]  In this time of crisis, medical staff have not minced words: they

are utterly, dangerously overwhelmed.[105]

### C.   Defendants' Use of a Supermax Prison to House Those Who Have Tested Positive for COVID-19 Is "A Punitive Measure, Not a Public Health One."

On April 8, DOC started transferring incarcerated people who have tested positive for

COVID-19 to Northern Correctional Institution.[106]  No other state or jurisdiction in the country

has taken such a step: locking up sick people, sentenced and unsentenced, in a "supermax" prison.

---

[101] Jenna Carlesso and Kelan Lyons, *One Year after DOC Took Over Inmate Healthcare, Troubles Persist*, CONN. MIRROR (July 2, 2019), https://cutt.ly/hysdvSK.

[102] As of April 27, 310 DOC staff members have tested positive for COVID-19.  Information specific to healthcare staff has not been publicly reported. *See* Connecticut State Dep't of Correction, *Health Information and Advisories: Coronavirus Information*, *available at* https://cutt.ly/qysp3YP (last accessed Apr. 27, 2020).

[103] *See* Kelan Lyons, *Shifting plans and a COVID-19 outbreak at a Connecticut prison*, CONN. MIRROR (Apr. 17, 2020), https://cutt.ly/Mysp8i6 (per union head, "[t]he Department of Correction must turn this around 180 degrees or we'll see the same situation unfold at other facilities").

[104] Defendant Cook admitted that upon taking office, "he had never seen 'an organization that had as many lawsuits coming out of one unit,'" referring to the Department's medical operation.

[105] *See* Meera Shoaib, *UP CLOSE: Prisons hit by a pandemic*, Yale Daily News (Apr. 22, 2020), https://cutt.ly/cysdbca; *see also* Conn. State Dep't of Correction, *Covid-19 Operational Response Plan: Phase 1* (Mar. 20, 2020), *available at* https://cutt.ly/lysdbPW ("DOC COVID-19 Policies") (detailing minimum coverage and requesting the staff work 12-hour shifts with no days off).

[106] Conn. Dep't of Correction, *The Department of Correction transfers COVID-19 positive offenders to Northern CI* (Mar. 30, 2020), *available at* https://cutt.ly/gytyRKu (reporting that the population in DOC has decreased by 800 since March 1).

Northern is the state's only Level 5[107] facility, meaning it exists solely to "manage those inmates who have demonstrated a serious inability to adjust to confinement posing a threat to the safety and security of the community, staff, and other inmates."[108]   Northern's exceedingly punitive conditions are well-documented.[109]   Most recently, in February, the U.N. Special Rapporteur on Torture, Nils Melzer, condemned conditions at Northern as "purposefully inflicting severe pain or suffering, physical or mental, which may well amount to torture."[110]

Defendants' decision to use a maximum security prison as a de facto COVID-19 treatment facility astounded even DOC employees.[111]   DOC medical staff reported that they were left with their "mouths wide open" by DOC's lack of any "concrete plan," and that "staff at Northern were told to construct the COVID-19 unit just hours before sick individuals were set to arrive."[112]   Those who already were incarcerated at Northern began observing stacks of mattresses carried into the 2-West unit at Northern one afternoon, after which sick people "looking like they were hurting" began arriving throughout the night.[113]   There have been so many COVID-19 patients at Northern that staff had to open a second 100-person unit.[114] They are using both 2-West and 3-West.[115]

Northern is not a medical facility and its COVID-19 unit cannot and does not provide specialized medical care.[116]   According to the medical staff who work there, there are "only two

---

[107] DOC has five security levels: "level 5, maximum security; level 4, high security; level 3, medium security; level 2, minimum security," and level 1, community release. Conn. Dep't of Correction, https://portal.ct.gov/DOC/Org/Operations-Division (last accessed Apr. 27, 2020).
[108] Conn. Dep't of Correction, Northern Correctional Institution, *available at* https://cutt.ly/Ot3VazX (last accessed on Apr. 27, 2020).
[109] *See, e.g.*, *Reynolds v. Arnone*, 402 F. Supp. 3d 3 (D. Conn. 2019).
[110] U.N. Office of the High Commissioner, *United States: prolonged solitary confinement amounts to psychological torture, says UN expert*, Feb. 28, 2020, https://cutt.ly/rysp4c7 (last accessed Apr. 24, 2020).
[111] *See* Meera Shoaib, *supra* note 105 (interview with Ellen Durko, nurse working in the COVID-19 unit).
[112] *Id.*
[113] Miller Decl. ¶ 11.
[114] *Id*.
[115] Johnson Decl. ¶ 11; Paschal-Barros Decl. ¶ 20.
[116] Johnson Decl. ¶ 13.

nurses on staff every shift to care for the COVID-19 positive inmates at Northern"[118]—somewhere between 100 and 200 people.[119]   These nurses are currently working back-to-back shifts of 16 hours and have reported that they are so "utterly exhausted," they "feel like [they're] going to pass out when . . . doing the assessments."[120]  With limited and broken equipment, they are responsible for taking the vital signs of 60-70 people each per shift.[121]  To provide even this extremely minimal level of coverage at the COVID-19 units at Northern, entire other prisons are going without *any* medical coverage at all.[122]

The "treatment protocol" for people suffering from COVID-19 at Northern is simply to lock them in a solid concrete 7-by-12 cell for up to 14 days.[123]  They are unable to leave their cells for any reason, even to change clothes or take a shower.[124]  The cells are "disgusting and dirty," with "toilet paper with urine on it on the floor."[125]  They also are freezing cold,[126] so much so that people housed there are unable to sleep even while wearing every piece of clothing they own.[127] The two ventilation units in each cell are "never cleaned or sanitized, and they contain dust, grime, and mold."[128]   As they sit in their cells, those in the COVID-19 units watch others leave in wheelchairs, stretchers, and ambulances.[129]  Even though "many patients with COVID-19 descend

---

[118]  Meera Shoaib, *supra* note 105.

[119] *See* Conn. Dep't of Correction, *Health Information and Advisories: Coronavirus Information*, *available at*   https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Health-Information-and-Advisories (last accessed Apr. 27, 2020) (listing 158 people currently at Northern's COVID-19 units; on April 20, the number stood at 182).

[120] Meera Shoaib, *supra* note 105.

[121] *Id.*

[122] *Id.*

[123]  Johnson Decl. ¶¶ 13–14; Pascal-Barros Decl. ¶ 21 (cells in Northern COVID units identical other Northern cells).

[124] Johnson Decl. ¶¶ 13–14.

[125] Russell Decl. ¶ 16.

[126] *Id.* at ¶ 17

[127] Miller Decl. ¶ 13.

[128] Paschal-Barros Decl. ¶ 7.

[129] Johnson Decl. ¶ 12.

suddenly and rapidly into respiratory distress,"[130] intercoms in the cells at Northern—the only means of communication for those inside—routinely go unanswered.[131]

Incarcerated people in Northern's COVID-19 units do not have access to mail, recreation, commissary, or their property.[132] Some have had to beg for days just to be allowed to call family to let them know they were sick.[133] Others have been allowed only 30 minutes to make two phone calls.[134] As one person stated, "I feel like they are punishing us for having COVID-19."[135]

Public health experts have universally condemned Defendants' use of Northern to hold those with COVID-19, stating that "isolation of sick patients in Northern C.I. is a punitive measure, not a public health one."[136] Fifty-eight faculty members from the Yale Schools of Medicine, Public Health, and Nursing have warned that "the decision to utilize Northern Correctional Institution--itself a maximum-security facility--to isolate patients who test positive for SARS-CoV-2 is particularly concerning," given that the "inherently punitive nature of confinement associated with Northern C.I. may ultimately de-incentivize individuals from reporting if they become symptomatic."[137] In fact, this is exactly what is happening. Rather than seek treatment, incarcerated people desperately try to hide symptoms because they are terrified of being sent to Northern.[138] Defendants' use of Northern thus exacerbates the risks to Plaintiffs and the Class Members. As Dr. Williams has attested: "This avoidance of reporting symptoms or illness will

---

[130] Williams Aff. ¶ 14,
[131] Flemming Decl. ¶ 17.
[132] Russell Decl. ¶ 13.
[133] Johnson Decl. ¶ 14.
[134] Russell Decl. ¶ 12.
[135] *Id.* ¶ 13.
[136] *See* April 20, 2020 Letter to Governor Lamont from Faculty of Yale Medical School, Yale School of Public Health, and Yale School of Nursing, attached hereto as Exhibit BB.
[137] *Id.*
[138] Johnson Decl. ¶¶ 18–19; Petitpas Decl. ¶¶ 13–14; Caves Decl. ¶ 9.

not only accelerate the spread of infection within facilities but also increase the likelihood of prisoner deaths due to lack of treatment."[139]

Finally, the use of Northern for COVID-19 patients is particularly egregious given that the facility continues to be used as a place for punishment, including for those who have attempted to protest DOC's COVID-19 response.[140]

### D.   Defendants Do Not Properly Screen, Test, or Quarantine Persons with COVID-19 Exposure.

Even considering their use of Northern, Defendants' measures to screen, test, and quarantine are woefully inadequate. Not only do symptomatic people wait days for medical care, but Defendants have made no efforts to identify and isolate individuals at high risk for serious illness, those with potential exposure to the virus, or those with symptoms consistent with COVID-19. To the contrary—and notwithstanding high rates of asymptomatic and pre-symptomatic transmission—they recklessly transfer those who have been exposed to COVID-19 to other populations and facilities.

Most troubling is the abject failure to treat symptomatic individuals. People are kept in their congregate housing units for days or even weeks after reporting COVID-19 symptoms and requesting medical care.[141] Some are refused medical care altogether.[142] The first prisoner to die

---

[139] David Cloud, et al., *The Ethical Use of Medical Isolation—Not Solitary Confinement—to Reduce COVID-19 Transmission in Correctional Settings* (Apr. 9, 2020).

[140] See Miller Decl. ¶¶ 5–9 (detailing how he was transferred to Northern after refusing a meal in order to protest lack of cleaning supplies and sanitation and hygiene measures).

[141] Rosario Decl. ¶ 10 (symptomatic people only quarantined after four days); Gilchrest Decl. ¶ 5 (symptomatic for two weeks "before anyone did anything," despite requests to staff).

[142] Champagne Decl. ¶ 10 (person asked repeatedly to go to medical but refused, though two others were taken).

from COVID-19 in custody had reportedly had a fever of 101 degrees and been begging to be seen before he finally was transferred to a hospital.[143]

Defendants also have recklessly moved people from place to place, including those exposed to COVID-19.[144]  Officials at Osborn, for example, reintegrated quarantined inmates into the broader facility.[145]  People who seek to be tested are kept alongside those who are ill, even before they themselves test positive.[146]  One person who felt ill was kept in a cell at Bridgeport with three other people who had tested positive, though he himself was never tested.[147]  He was unable to make phone calls or shower, and he was not given sheets, so he slept on a bare mattress.[148]  The staff with whom he interacted during this time were not wearing masks.  After four days of being housed with three people who had tested positive for COVID-19, he was abruptly moved back into general population.[149]

Despite rampant outbreaks at many facilities, Defendants have not instituted widespread temperature checks of incarcerated people or other screening processes to determine exposure or to control the spread of the virus.[155]  After people who are sick leave a unit, staff make no effort

---

[143] Amber Diaz, *I'm going to die in here': CT inmate granted early release dies from coronavirus, family says DOC ignored his cries for help*, WTNH (Apr. 21, 2020), https://cutt.ly/EysaTQe.
[144] Mendez Decl. ¶ 13 (people moved into unit from open dormitory where they lived with someone who tested positive); Flemming Decl. ¶ 3 (40-50 people transferred to his unit in early April).
[145] Eliza Fawcett & Steven Goode, *State Department of Correction Moves Inmates with COVID-19 to Northern Correctional Institution, Though Quarantine Questions Persist*, HARTFORD COURANT (Apr. 10, 2020), https://cutt.ly/VysaP2E.
[146] Hussain Decl. ¶ 7 (to get tested, he would be quarantined with those who are sick).
[147] Gilchrest Decl. ¶ 7.
[148] *Id.* ¶ 8.
[149] *Id.* ¶¶ 7, 11.
[151] Kerr Decl. ¶¶ 7–14; *see also* Caves Decl. ¶ 8.
[152] *Id.* at ¶¶ 8, 9; 13 ("The worst part was I couldn't call my family.  I could have died in there without anyone knowing.").
[153] Johnson Decl. ¶ 15.
[155] McPherson Decl. ¶ 13 (despite multiple people being removed from unit because they were sick, no screening of those remaining).

to clean their areas, nor do they allow prisoners to do so.[156]  Those leaving Northern's COVID-19

units do not get another COVID-19 test before being returned to their previous housing.[157]  Some

people are sent to Northern for only a few days before returning to their facilities.[158]

Finally, DOC is not testing all of its employees and staff for COVID-19 despite the very

real possibility that some employees are carriers who will continue bringing the virus inside.[159]

This failure is alarming, especially where over 300 staff have already tested positive.[160]  As

recently as mid-April, correctional staff were wearing masks around their necks,[161] or not at all[162].

And in every facility, there is a dire lack of personal protective equipment for DOC personnel and

prisoners alike.[163]

## LEGAL STANDARD

The differences between a temporary restraining order and a preliminary injunction are

minor; the difference lies in the duration and notice to the opposing party.[164]  In either instance,

the movant seeking immediate relief altering the status quo must show (1) irreparable harm in the

absence of immediate relief, (2) that relief is in the public interest, and (3) either a substantial

---

[156] Toscano Decl. ¶ 10; Champagne Decl. ¶ 10 (staff sprayed area with water).

[157] Johnson Decl. ¶ 15.

[158] Champagne Decl. ¶ 11; Gilchrest Decl. ¶ 12; Hussain Decl. ¶ 9.

[159] *See* Conn. Dep't of Correction, *Five Department of Correction Offender Tests Positive for the COVID-19 Virus* (Apr. 1, 2020), *available at* https://cutt.ly/0ytul2s (noting that anyone entering the building is subjected to a "wellness check").

[160] As of April 27, 2020, 310 DOC staff members have tested positive for COVID-19.  *See* Conn. State Dep't of Correction, *Health Information and Advisories: Coronavirus Information*, *available at* https://cutt.ly/SysaD7G (last accessed Apr. 27, 2020).

[161] Russell Decl. ¶ 6

[162] Petitpas Decl. ¶ 12

[163] *See* Kelan Lyons, *Shifting plans and a COVID-19 outbreak at a Connecticut prison*, Conn. Mirror (Apr. 17, 2020), https://cutt.ly/AysaFTl  ("The Department of Correction must turn this around 180 degrees or we'll see the same situation unfold at other facilities").

[164] *Austin v. Altman*, 332 F.2d 273, 275 (2d Cir. 1964).

likelihood of success on the merits, or, that there are sufficiently serious questions on the merits rendering them fair for litigation and a balance of hardships decidedly pointing toward relief.[165]

Courts have broad power to fashion equitable remedies to address constitutional violations in prisons,[166] including, "[w]hen necessary to ensure compliance with a constitutional mandate," orders "placing limits on a prison's population."[167] Courts "must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners" and "may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."[168]

## ARGUMENT

I.   **PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASSES ARE ENTITLED TO EQUITABLE RELIEF TO PROTECT THEM FROM THE RISK OF INFECTION, DEATH, OR OTHER SERIOUS COMPLICATIONS FROM COVID-19.**

A.   **The Heightened Risk of Infection from a Potentially Lethal Virus with No Vaccine or Cure Constitutes Irreparable Harm.**

The risk of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction."[169]  Plaintiffs are irreparably harmed because they "face imminent risk to their health, safety, and lives."[170]

With nearly all DOC facilities having incarcerated people symptomatic of, or testing positive for, COVID-19, the imminent risk to Plaintiffs represents irreparable harm of the gravest

---

[165] *See e.g.*, *Trump v. Vance*, 941 F.3d 631, 639 (2d Cir. 2019); *North American Soccer League v. U.S. Soccer Fed'n*, 883 F.3d 32, 36–37 (2d Cir. 2018).

[166] *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978).

[167] *Brown v. Plata*, 563 U.S. 493, 511 (2011).

[168] *Id.* (citations and quotation marks omitted).

[169] *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation omitted).

[170] *Henrietta D. v. Giuliani*, 119 F. Supp. 2d 191, 214 (E.D.N.Y. 2000), *aff'd sub nom. Henrietta D. v. Bloomberg*, 331 F.3d 261, 290 (2d Cir. 2003); *see also Baur v. Veneman*, 352 F.3d 625, 633 n.7 (2d Cir. 2003) (collecting conditions of confinement precedent and explaining that "the Supreme Court has decided cases in which it appears to assume that enhanced risk may cause real injury").

magnitude.  Plaintiffs and the Proposed Classes (including the Medically Vulnerable Subclasses) will face the immediate, serious, and apparent risk of severe illness and possible death unless the Court intervenes.[171]  This is not a speculative harm.  Cases of COVID-19 are growing exponentially.  As of the time of this filing, 985,374 cases have been reported in the United States, with 25,269 cases and 1,924 deaths in Connecticut.  More than 600 of these cases and two deaths are attributable to Defendants Lamont and Cook's failures.

Given the serious and often lethal nature of this disease, and the overwhelming strain it has caused to our healthcare system, Plaintiffs and the Proposed Classes have established a serious risk that, without the requested relief, they will be infected by coronavirus and develop COVID-19.  Members of the Medically Vulnerable Subclasses may die if not released.  Even those Plaintiffs and Proposed Class members who get infected and survive still face the prospect of a prolonged and painful recovery, including the need for extensive rehabilitation for profound reconditioning, loss of digits, neurological damage, and the loss of respiratory capacity.[174]  The risks here are all the more extreme, given that DOC does not provide conditions of basic health and safety sufficient to protect Plaintiffs, the Proposed Classes as a whole, or members of the Medically Vulnerable Subclasses, who face the most significant risk of all.[175]

---

[171] *See, e.g.*, *Basank v. Decker*, No. 20-2518, 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020) (recognizing "the threat that COVID-19 poses to individuals held in jails and other facilities" and citing cases recognizing the same); *United States v. Stephens*, No. 15-cr-95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) (explaining that incarcerated people face "a heightened risk of contracting COVID-19 should an outbreak develop").

[174] Compl. ¶ 22; *see also supra* Section I.

[175] Compl. ¶¶ 23–70; *see also supra* at Section I.  *See also Padilla v. Immigration & Customs Enf't*, No. 19-35565, 2020 WL 1482393, at *9 (9th Cir. Mar. 27, 2020) (affirming grant of preliminary injunction, agreeing "Plaintiffs would suffer irreparable harm in the form of substandard physical conditions" and "low standards of medical care," among other things); *Thakker v. Doll,* No. 20-cv-480, 2020 WL 1671563, at *3-4 (M.D. Pa. Mar. 31, 2020) (finding Plaintiffs' claim "rooted in imminent, irreparable harm," given they "face the inexorable progression of a global pandemic creeping across the nation—a pandemic to which they are particularly vulnerable due to age and underlying medical conditions").

Courts have not hesitated to find that the life-and-death stakes implicated by the possibility of contracting COVID-19 while in detention establishes irreparable injury.  Earlier this month, the District of Maryland recognized that "once COVID-19 is introduced into a detention facility, it spreads like wildfire," creating "a high likelihood of irreparable health consequences" for incarcerated people "that could not be alleviated without release."[176]  The court explained that placing incarcerated people with COVID-19 symptoms in isolation "does not remove the risk that the virus will spread quickly once inside the facility," which creates an increased "risk of death or serious illness" for "high-risk detainees," like those members of the Medically Vulnerable Subclasses.[177]

This risk is even more apparent when, as here, correctional settings have not adopted the mitigation efforts recommended by the CDC.  For instance, the Western District of New York observed that when facilities do not "isolate higher risk individuals," do not test "all incoming detainees or the staff that comes and goes" for COVID-19, do not provide prisoners with masks or other PPE, and allow prisoners to "eat their meals in communal settings and share bathing facilities," the "imminent risk" to prisoners' "health, safety, and lives" constitutes irreparable harm.[178]  Courts around the country agree.[179]  Immediate action from this Court is necessary to protect Plaintiffs, the Proposed Classes, and the members of the Medically Vulnerable Subclasses.

---

[176] Mem. Op. at 30, *Coreas v. Bounds*, No. 20-0780, Dkt. No. 56 (D. Md. Apr. 3, 2020) (hereafter "*Coreas* Slip Op.").

[177] *Id.* at 6, 30.

[178] *Jones v. Wolf*, No. 20-361, 2020 WL 1643857, at *11, 13 (W.D.N.Y. Apr. 2, 2020).

[179] *See, e.g.*, *Coronel v. Decker*, No. 20-2472, 2020 WL 1487274, at *3 (S.D.N.Y. Mar. 27, 2020) (the "imminent risk to [Plaintiffs'] health, safety, and lives" of contracting COVID-19 while in detention constituted irreparable harm warranting a TRO); *Basank*, 2020 WL 1481503 at *4-5 ("The risk that Plaintiffs will face a severe, and quite possibly fatal, infection if they remain in immigration detention constitutes irreparable harm warranting a TRO.").

**B.      Plaintiffs are Substantially Likely to Prevail on Their Claim that the Government is Deliberately Indifferent to their Serious Medical Needs.**

The Post-adjudication Class' claim in Count 3 of the Complaint presents the Court with the question of whether a failure to take medically necessary steps to prevent widespread COVID-19 infection in Connecticut prisons constitutes deliberate indifference to serious medical need. The evidence demonstrates that Plaintiffs will prevail.

"[W]hen the state takes a person into custody" pursuant to a sentence of incarceration, thus "severely limiting his ability to care for himself, and then is deliberately indifferent to his medical needs, the Eighth Amendment's proscription against the unnecessary and wanton infliction of pain is violated."[180]   The same constitutional right exists for pretrial detainees and civil detainees, although their protection springs from the Fourteenth Amendment and does not depend on a defendant's awareness of the danger's existence.[181]

In the case of either class of incarcerated people, a plaintiff "must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health."[182]   The unreasonable risk is actionable whether it results in damage occurring at the time of pleading, or, whether it will "cause serious illness and needless suffering the next week or month or year."[183] The existence of an unreasonable risk of harm depends "not on the officials' perception of the risk of harm, but solely on whether the facts . . . show that the risk of serious harm was substantial."[184]

---

[180] *Charles v. Orange County*, 925 F.3d 73, 85 (2d Cir. 2019).

[181] *See e.g.*, *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (pretrial detainees); *Charles*, 925 F.3d at 85 (civil detainees).

[182] *Darnell*, 849 F.3d at 30 (internal quotations and citations omitted).

[183] *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (declining to hold "that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms").

[184] *Lewis v. Siwicki*, 944 F.3d 427, 431–32 (2d Cir. 2019).

The Post-adjudication Class must proceed further and demonstrate "that the charged official act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result," an inquiry in which "proof of awareness of a substantial risk of the harm suffices."[185] The Pre-adjudication Class need not make such a showing, as the Fourteenth Amendment is violated even when a defendant has no subjective awareness that their failures have caused a substantial risk of harm.[186]

### 1. COVID-19 is a Lethal Threat to Human Health, as are the Pathogenic Breeding Conditions in the Defendants' Prisons and Jails.

First, Defendants cannot traverse the objective inquiry common to both Classes: that COVID infection poses an unreasonable risk of serious harm to health. Plaintiffs' medical evidence, and common sense, demonstrate that the risk that Plaintiffs seek to avoid "is not one that today's society chooses to tolerate."[187]

Medical experts are in unanimous agreement that COVID-19 is an unprecedented, and unprecedentedly dangerous, mix of contagious and fatal, and doubly so for those locked inside cells.[188] Further, there is no question, as Dr. Golob attests, that medically vulnerable people or those over age 50 "are at grave risk of severe illness and death from COVID-19."[189] Not surprisingly, then, the seriousness of the risk presented by COVID-19 to incarcerated or detained people has been instantly recognized by both federal and state courts.[190]

---

[185] *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (internal quotation omitted).
[186] *Darnell*, 849 F.3d at 35.
[187] *Helling*, 509 U.S. at 36.
[188] Rich Decl. ¶¶ 6, 8-16.
[189] Golob Decl. ¶ 14.
[190] *See, e.g.*, *Wilson v. Williams*, No. 4:20-CV-00794, 2020 WL 1940882, at *8 (N.D. Ohio Apr. 22, 2020) ("The objective component of the test requires the existence of a 'sufficiently serious medical need. Petitioners obviously satisfy this component.") (internal citation omitted); *Savino v. Souza*, No. CV 20-10617-WGY, 2020 WL 1703844, at *4 (D. Mass. Apr. 8, 2020) ("In this moment of worldwide peril from a highly contagious pathogen, the government cannot credibly argue that the Detainees face no "substantial risk" of harm (if not "certainly impending") from being confined in close quarters in defiance of the sound medical advice that all other segments of society now scrupulously observe."); *People of the*

Given the uniform agreement of courts, medical science, and public health experts as to the danger coronavirus poses to humans, the attendant risks incurred by Defendants' failure to account for the pathogen's rapid spread constitutes a serious risk to health.  For the Pre-adjudication Class, the ineluctable conclusion that the virus-breeding conditions within the Defendants' prisons and jails constitutes an objective risk of serious harm is all they need to show in order to prevail, and so relief should enter in their favor.

> ### 2. Having Been on Actual Notice of the Pandemic since Early March, the Defendants Have Shown Deliberate Indifference to the Medical Needs of Post-adjudication Class Members.

For the Post-adjudication Class, a further inquiry is necessary: whether Defendants Cook and Lamont "know[] of" and are "disregard[ing] an excessive risk to inmate health."[191]  Where a danger has been "expressly noted by prison officials in the past," this Court may conclude that the officials "had actual knowledge of the risk" and thus knew of and disregarded it.[192]  The Court also may "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."[193]

There can be no serious argument here that the novel coronavirus is an obvious, dangerous threat to human health; Defendant Lamont reached that conclusion long ago and used it as the basis to trigger a provision of Connecticut law arrogating most of the state's legislative powers to his office.[194]  And Defendant Lamont similarly has conceded that the pathogen "spreads easily

---

*State of New York ex rel. Stoughton v. Brann*, No. 45107/82020, 2020 WL 1679209, at *2 (N.Y. Sup. Ct. Apr. 6, 2020) ("There can be no doubt that the presence of a communicable disease in a prison can constitute a serious, medically threatening condition. The point need not be belabored in this case.").

[191] *Morgan v. Dzurenda*, No. 18-2888, 2020 WL 1870144, at *3 (2d Cir. Apr. 15, 2020) (internal quotation omitted).

[192] *Id.*

[193] *Ball v. LeBlanc*, 792 F.3d 584, 594 (5th Cir. 2015); *accord Hinojosa v. Livingston*, 807 F.3d 657, 667 (5th Cir. 2015) ("open and obvious nature" of dangerous prison conditions supported an inference of deliberate indifference).

[194] *See* Gov. Lamont, Letter to the Secretary of the State (Mar. 10, 2020) (declaring a dual public health and civil preparedness emergency via Conn. Gen. Stat. § 28-9), *available at* https://cutt.ly/jyssyFE.

from person to person and may result in serious illness or death,"[195] that the "risk of severe illness and death . . . appears to be higher for individuals who are 60 years of age or older and for those who have chronic health conditions,"[196] that "there is an increased risk of rapid spread of COVID-19 among persons who are living in congregate settings,"[197] that Connecticut would "take measures to reduce density within homeless shelters and other congregate housing situations."[198] He has further described  close-quarters living arrangements in nursing homes a "petri dish" for the spread of COVID-19.[199]

Given that Defendants have rearranged most daily activities of their respective offices to account for the spread of the deadly virus, there is no conclusion other than that they have, and have had since early March, actual knowledge of its dangers.  Their failure to take the medically necessary steps identified by Plaintiffs' declarants therefore is deliberate indifference that violates the Eighth Amendment.

### C. By Refusing to Protect Class Members from COVID-19, the Defendants are Punishing the Pre-adjudication Class in Violation of Substantive Due Process.

Lastly, the Pre-adjudication Class raises in Counts 1 and 2 of the Complaint, and has amply demonstrated, that Defendants' inaction in the face of the pandemic constitutes punishment to which they—as pretrial detainees—may not be subjected.

The Substantive Due Process Clause guarantees that "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."[200]  When deciding whether

---

[195] Gov. Lamont Exec. Order No. 7 at 1.

[196] *Id.*

[197] *Id.*

[198] Lamont Exec. Order No. 7P at 2.

[199] Patrick Skahill, *Connecticut Tracks COVID-19 Cases But Doesn't Keep Nursing Home Tally*, WNPR (Mar. 27, 2020), https://cutt.ly/myssiio.

[200] *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *see id.* at n.16 (pretrial detainees retain greater protections than convicted counterparts).

challenged conditions of confinement amount to punishment, courts ask "whether the [restriction] is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose."[201]  If a restriction or condition is not reasonably related to a legitimate goal, the court "may infer that the purpose of the government action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees."[202]

Here, the conditions of confinement imposed on Plaintiffs and other pretrial detainees at DOC facilities amount to punishment because the conditions place those detainees at a significantly increased risk of COVID-19 and are not reasonably related to any legitimate government objective.  As discussed above, DOC facilities place detainees at an even greater and immediate risk of contracting COVID-19 than members of the public-at-large.  Yet, the current conditions of confinement fail to protect Plaintiffs and pretrial detainees from this risk.  Defendants have not implemented sufficient social distancing practices at of the DOC facilities, and maintain dangerous, unsanitary conditions.  Most disturbingly, Defendants do not quarantine or provide the medical care necessary to protect detainees from the threat of COVID-19 spreading further in DOC facilities across the state.

As was the case in *Thakker*, a recent decision from the Middle District of Pennsylvania that ordered the immediate release of civil detainees, the conditions of confinement at DOC facilities have "no rational relationship between a legitimate government objective" and keeping Plaintiffs and pretrial detainees in the Proposed Pre-adjudication Class "detained in unsanitary, tightly-packed environments."[206]  Rather, doing so clearly constitutes unconstitutional punishment that violates the Fourteenth Amendment rights of all pretrial detainees in the Proposed Class.[207]

---

[201] *Almighty Supreme Born Allah v. Milling*, 876 F.3d 48, 55 (2d Cir. 2017).
[202] *Id.*
[206] 2020 WL 1671563, at *8.
[207] *See id.* at *7–8.

*Thakker* comports with recent decisions from courts around the country holding that detainees suffer unconstitutional punishment when held in conditions that increase their exposure to COVID-19 and that protection is necessary in order to avoid constitutional violations.[208]

Simply put, there is "no rational relationship between a legitimate government objective and keeping [Plaintiffs and other pretrial incarcerated people] detained in unsanitary, tightly-packed environments—doing so would constitute a punishment to Plaintiffs."[209]

### D.    Without a Viable Way to Safely Detain Plaintiffs, Injunctive Relief Releasing Medically Vulnerable Class Members Is the Only Option.

As outlined in both the Giftos and Rich declarations, the medical standard of care to reduce the risk of death from COVID-19 to vulnerable people is the transfer of the Medically Vulnerable Subclasses and additional Class Members to alternative custody such as home confinement.  Such remediation also creates physical distancing for those remaining in prisons.[210]  In addition to the

---

[208] *See  Basank*, 2020 WL 1481503, at *1, 5 (S.D.N.Y. Mar. 26, 2020) (concluding that plaintiffs who suffer from chronic conditions "face[] an imminent risk of death or serious injury in immigration detention if exposed" to the pathogen); Order, *Hernandez v. Wolf*, No. 20-00617, Slip. Op. at 17 (C.D. Cal. Apr. 1, 2020) (holding that the plaintiff had not been protected where he could not keep beyond six feet of others and was "forced to touch surfaces touched by other detainees"); Order, *United States v. Hector*, No. 20-04183 (4th Cir. Mar. 27, 2020) (reversing denial of release pending appeal and ordering the district court to "consider the severity of the risk that the COVID-19 virus poses to appellant given her existing medical conditions"), *on remand*, Order, No. 18-002, Dkt. 748 (W.D. Va. Mar. 27, 2020) (granting release pending sentencing; Order, *Xochihua-Jaimes v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (ordering *sua sponte* release "[i]n light of the rapidly escalating public health crisis); Order, *United States v. Bolston*, No. 18-00382, Dkt. No. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in part because "the danger inherent in his continued incarceration. . . during the COVID-19 outbreak".); Order, *United States v. Kennedy*, No. 18-20315, Dkt. No. 77 (E.D. Mich. Mar. 27, 2020) (same); Order, *United States v. Michaels*, No. 16-00076, Dkt. No. 1061 (C.D. Cal. Mar. 26, 2020) (granting temporary release because the pathogen constitutes a compelling reason not to detain people); Order, *United States v. Harris*, No. 19-00356, Dkt. No. 36, 2020 WL 1503444 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions.").

[209] *Thakker*, 2020 WL 1671563, at *8.

[210] Giftos Decl. ¶¶ 26–28 ("There are too many structural limitations [in correctional facilities to keep people safe], and correctional health care can only do so much.  Decreasing the incarcerated population . . . is the only way to prevent the complications from surging."); Rich Decl. ¶¶ 16–17 ("It is my strong opinion that urgent decarceration is imperative to flatten the curve of Covid-19 cases among incarcerated populations.").

immediate release of all Medically Vulnerable Subclass Members, the DOC must provide the additional conditions outlined by the CDC (e.g., physical distancing, quarantine, hygiene, medical care, personal protective equipment, public health information, etc.); including granting further release for additional class members to ensure sufficient physical distancing, if public health expertise so requires.

With more than 11,000 incarcerated people in DOC facilities across the state, over 300 DOC employees already infected, the general unavailability of personal protective equipment and hygienic supplies for both staff and incarcerated people, and the difficulty implementing social and physical distancing for incarcerated people and employees, DOC cannot do the things necessary to protect incarcerated people, employees, and the larger Connecticut community against the racing spread of COVID-19. Thus, (1) immediate release of the most medically vulnerable persons, followed by (2) frequent reporting, improved health protocols, and—if public health still mandates—(3) further release of additional Class Members, are the necessary and least intrusive means of vindicating Class Members' constitutional rights and preventing grave irreparable harm for the proposed Classes and the greater Connecticut community.

Despite the unquestionable risk posed by COVID-19 to Plaintiffs, Class Members, and by extension, the public at large and its healthcare providers who will be required to care for more and more incarcerated people who become seriously ill from COVID-19, Defendants have not taken such steps. These facts easily support "an inference of deliberate indifference."

### E.   The Balance of Equities Favors Granting Relief to the Proposed Classes.

When weighing the balance of equities, this Court "must consider the effect on each party of the granting or withholding of the requested relief."[211]   In this dispute, the balance of equities

---

[211] *Amoco Production Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987).

weighs heavily in favor of granting Plaintiffs relief, as an injunction in their favor will not "substantially injure other interested parties."[212]

Rather, given the nature of the circumstances here and the COVID-19 pandemic in general, *not* issuing preliminary relief would cause significant injury to the parties and the general public. Beyond the fact that "[t]he balance of the equities tips sharply" in favor of Plaintiffs and the Proposed Classes, especially given that they face "irreparable harm to their constitutional rights and health,"[213] the public interest clearly favors granting preliminary relief because Connecticut as a whole escapes further COVID-19 spread by stamping out each infection hotspot wherever it may occur.

By contrast, Defendants' countervailing interest in indefinitely detaining Plaintiffs and the Proposed Classes in obviously dangerous conditions is weak, at best.  State officials already have shown a willingness to release other prisoners in an effort to stem the spread of coronavirus.  There is no compelling or even rational reason to deny the same treatment to these incarcerated people, particularly members of the Medically Vulnerable Subclasses, who are at the highest risk of COVID-19.  Indeed, Defendants could undertake a particularized inquiry to identify and release those who are at increased risk of serious complications from COVID-19, and to the extent countervailing penal interests favor continued incarceration for certain at-risk individuals, Defendants could release other individuals to reduce population at DOC facilities and allow those who remain to comply with CDC guidelines.[214]  Further, other than the administrative burden of

---

[212] *Doe v. Gonzales*, 386 F. Supp. 2d 66, 82 (D. Conn. 2005).  *See Doe v. Univ. of Connecticut*, No. 20-cv-92, 2020 WL 406356, at *5 (D. Conn. Jan. 23, 2020) (finding balance of equities in plaintiff's favor where injunction's beneficial effect on the plaintiff "outweighs any harm to [the defendant] or anyone else").
[213] *Castillo*, 2020 WL 1502864, at *6.
[214] To this end, Plaintiffs seek release of all members of the Medically Vulnerable Subclasses.  If Defendants seek to retain individual class members in custody for a purported penal interest, the Court should require Defendants to offer proof of judicially-recorded findings—by clear and convincing evidence—that the individual poses such a serious risk of flight or danger to others that no conditions of release can mitigate.

enacting requested policies to mitigate the spread of COVID-19 throughout DOC—which, frankly, Defendants should already be doing—there is no other "harm" to Defendants should this Court issue preliminary relief.

Any burden on Defendants is far outweighed by what is at stake for Plaintiffs, the Proposed Classes, and the public-at-large should preliminary relief be denied.  People are dying.  This Court should do its part to help prevent Plaintiffs and the Proposed Classes from becoming another statistic in this horrific chapter of our nation's history.

### F.     The Public Interest Is Best Served by Minimizing the Spread of COVID-19 through Social Distancing and Hygiene Practices, but Those Steps Are Difficult to Implement at DOC Facilities.

Finally, the public's interest weighs in favor of granting Plaintiffs' injunction.  As in this case, where Plaintiffs have demonstrated that Defendants have violated their and the Proposed Classes' constitutional rights, injunctive relief always is in the public interest.[215]  That interest— faithful enforcement of the Constitution—alone justifies the requested injunctive relief.  Moreover, plainly here, the public and Plaintiffs' interests overlap: both benefit from ensuring community and individual health and safety.[216]  And on the facts here, that independently sufficient interest is buttressed by the undeniable public interest in minimizing the already unprecedented spread of COVID-19 throughout the nation, generally, and at DOC facilities, specifically.[217]

---

[215] *See Sajous v. Decker*, 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018) ("The public interest is best served by ensuring the constitutional rights of persons within the United States are upheld.") (citing *Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984)).

[216] *See Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (referring to "public health" and a "significant public interest"); *Barkman*, 2020 U.S. Dist. LEXIS 45628, at *4 (identifying risk of individuals carrying the virus into jails and noting that "[t]he men and women incarcerated at Washoe County Detention Facility are a part of our community and all reasonable measure must be taken to protect their health and safety").

[217] *See  Grand River*, 425 F.3d at 169 (recognizing that "public health" is a "significant public interest"); *Barkman,* 2020 U.S. Dist. LEXIS 45628, at *4.

*First*, COVID-19 is highly contagious. With no vaccine or cure, each new infection breeds exponentially more infected persons. Healthcare professionals accordingly agree that the most critical actions that can be taken are preventive measures such as self-isolating, maintaining a distance of six feet from other persons, and frequent disinfection. These measures are lacking at DOC facilities, as detailed above, thus warranting immediate action from this Court. But even with the best intentions, high-risk persons like members of the Medically Vulnerable Subclasses cannot avoid the risk of infection. The only viable mitigation tactic for those incarcerated people is release.

The virus is spreading throughout the incarcerated population and cannot be contained within DOC's walls. COVID-19 has already spread across DOC staff members who have contact with communities outside of the DOC.[222] Cases of infected staff members will only increase while the contagion sweeps throughout the prisoner population. DOC staff has and will continue to, perhaps unknowingly, spread infection among the surrounding communities. The only certain way to significantly hinder further spread of the virus within DOC facilities—and then from DOC facilities to the greater Connecticut community, and further on—is for this Court to immediately order that Defendants impose necessary mitigation efforts throughout DOC facilities, and order the immediate release of its most at-risk prisoners.

*Second*, there is a strong public interest in minimizing the spread and thus the impact of COVID-19 on the local, state, and national health care system. Recent data show that in the most likely infection scenarios, Connecticut hospitals will face a critical bed shortage in a matter of weeks.[223] A large-scale infection at DOC will cause spillover into supporting hospitals, not to

---

[222] *See* Compl. ¶ 43.

[223] Alex Putterman & Emily Brindley, *Connecticut's COVID-19 Peak Could be Two Weeks Away; The State Won't Have Enough Hospital Beds or ICU Options When That Happens, Model Predicts*, HARTFORD COURANT (Apr. 3, 2020), available at https://bit.ly/3a2e6Ji.

mention increase the number of sick individuals in the community needing prompt and critical medical care.[224]  The public interest is best served by taking all necessary steps to reduce infection, slow the spread of the virus, and provide all necessary and available support to prevent the collapse of the Connecticut hospital network.

*Finally*, it cannot be overstated that the public interest is served by protecting those at elevated risk and with particular medical vulnerabilities from the ruthless nature of the virus.  On the whole, populations like those detained at DOC face heightened risk of exposure and infection because of overcrowding and other problems existing at every detention facility across the country; such risks are even higher for the Medically Vulnerable Subclasses.  And the risk is not limited only to incarcerated people, given the close proximity with which DOC staff members interact with DOC population.  The release of individuals most vulnerable to COVID-19 thus reduces the overall health risk for DOC prisoners and staff alike.  By decreasing the number of prisoners, DOC can institute greater and safer social distancing practices and prevent the need for increased numbers of staff on a given shift.  Immediate release of the Medically Vulnerable Subclasses thus not only imposes minimal harm to the government, it also furthers the public interest in maintaining a healthy and orderly environment throughout this crisis.

Unsurprisingly, courts acknowledge the weighty public interest when granting injunctive relief where incarcerated people face similarly grave threats to their health.  At bottom, "[t]he public has a critical interest in preventing the further spread of the coronavirus."[229]  Further outbreak at DOC facilities, like the detention center in *Castillo*, would "endanger all of us—[the

---

[224] *See* Williams Aff. ¶ 4, 17 (explaining that in a world-wide pandemic, "correctional health is public health," and thus, "The Entire Community is at Risk if Prison Populations Are Not Reduced").
[229] *Castillo v. Barr*, No. 20-00605, 2020 WL 1502864, at *6 (C.D. Cal. Mar. 27, 2020); *see also Thakker*, 2020 WL 1671643, at *9 (concluding "[e]fforts to stop the spread of COVID-19 and promote public health are clearly in the public's best interest").

facility] detainees, [the facility] employees, residents [of the surrounding community], residents of the State . . . , and our nation as a whole,"[230] and would "quickly overwhelm the already strained health infrastructure within the facility," given the drastic health staff vacancies, "which would then place strain on the surrounding community hospitals."[231]   Decreasing the DOC's population—particularly by ordering immediate release of the Medically Vulnerable Subclasses— would mean that "the tinderbox scenario of a large cohort of people getting sick all at once is less likely to occur, and the peak volume of patients hitting the community hospital would level out."[232] This Court should follow suit and take immediate action to minimize the spread of COVID-19 throughout the DOC and the Connecticut community.

### CONCLUSION

For the foregoing reasons, this Court should grant the proposed Classes' Petition for writs of habeas corpus and grant the proposed Classes' request for an injunction against Defendants:

1. Requiring Defendants to identify all Medically Vulnerable Subclass Members in both the Pre-adjudication and Post-adjudication Classes within six (6) hours of the Court's order and release—within twenty-four hours of submission of the list—all such persons absent proof of judicially-recorded findings by clear and convincing evidence that the individual poses such a serious risk of flight or danger to others that no other conditions can mitigate; and ordering that Defendants provide these individuals with educational resources on COVID-19, including instructions that they should self-isolate for the CDC-recommended period of time (currently 14 days) following release.

---

[230] *Id.* at *6.
[231] *Coronel*, 2020 WL 1487274, at *7.
[232] *Id.*; *see also Basank*, 2020 WL 1481503 at *6 (explaining that in light of COVID-19 pandemic, "public health and safety are served best by rapidly decreasing the number of individuals detained in confined, unsafe spaces").

2.  Requiring a plan to be submitted to the Court in three days and overseen by a qualified public health expert agreed upon by the parties or ordered by the Court pursuant to Fed. R. Evid. 706, outlining:

    a.  Specific mitigation efforts, consistent with CDC guidelines, to significantly reduce the risk of COVID-19 for all class members who remain in DOC custody; and

    b.  An evaluation of whether release of the members of the Medically Vulnerable Subclasses permits social distancing by those who remain in DOC custody, or whether DOC must release additional members of the Classes to be in compliance with CDC guidelines; and

3.  Reporting weekly on the population of persons in DOC facilities who are Medically Vulnerable.

Dan Barrett (# ct29816)
Elana Bildner (# ct30379)
**ACLU Foundation of Connecticut**
765 Asylum Avenue
Hartford, CT 06105
(860) 471-8471
e-filings@acluct.org

Will W. Sachse, Esq.*
**Dechert LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
T: (215) 994-2496
F: (215) 665-2496
will.sachse@dechert.com

Jenna C. Newmark*
Gabrielle N. Piper*
**Dechert LLP**

Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
T: (212) 649-8723
F: (212) 314-0064
jenna.newmark@dechert.com
gabrielle.piper@dechert.com

Jonathan Tam*
**Dechert LLP**
One Bush Street, Suite 1600
San Francisco, CA 94104-4446
T: (415) 262-4518
F: (415) 262-4555
jonathan.tam@dechert.com

Brandon Buskey**
**American Civil Liberties Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 284-7364
bbuskey@aclu.org

*pro hac vice*

** *motion for admission pro hac vice forthcoming*

*Attorneys for Plaintiffs-Petitioners*