# EXHIBIT 1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

TRE MCPHERSON *ET AL*

vs.                                    CRIMINAL NO. 3:20-CV-534 (JBA)

NED LAMONT ET AL                       May 2, 2020

**PROPOSED BRIEF OF AMICUS CURIAE OFFICE OF THE FEDERAL DEFENDER IN SUPPORT OF PETITIONERS' EIGHTH AMENDMENT CLAIMS, USE OF 28 U.S.C. §2241 HABEAS, AND FEDERAL JURISDICTION**

Unprecedented times pose unique challenges to systems that operate on precedent. The COVID-19 pandemic poses just such a challenge to the legal system. Throngs of people are incarcerated in our state, district, and nation. Many are at heightened risk of death because of preexisting medical conditions and the fact of their confinement. This poses a fundamental question: is the risk posed to those individuals a mere incident of their incarceration or does the Eighth Amendment require consideration of these facts in assessing the lawfulness of their custody? The proposed *amici*, the Office of the Federal Defender, represents scores of clients potentially affected by the answer to this question and therefore address this Court on this and related issues as *amicus curiae*.

The proposed amicus aim to share a pragmatic and practice tested view of the law and the pendant crisis with the Court. *See United Staets v. Mullet*, 868 F.Supp.2d 618, 624 (N. Dist. Oh., 2012)("the purpose of an amicus brief is to assist the court in resolving issues of law by explaining or amplifying the issues the parties raised"). Though the State of Connecticut, rather than the federal system, is clearly the genesis of this matter, it nonetheless raises constitutional

1

questions that are binding upon state and federal inmates alike, *Hutto v. Finney*, 437 U.S. 678, 685 (1978)("Eighth Amendment's ban on cruel and unusual punishments, made applicable to the State by the Fourteenth Amendment."), as well as federalism questions that courts have, customarily, applied to federal, as well as state, inmates on comity grounds. *See Carmona v. United States Bureau of Prisons*, 243 F.3d 629, 633 (2d Cir., 2001)("Even though a collateral challenge to a federal conviction under § 2255 [as opposed to a § 2254] does not implicate federalism issues, we have held that the interests of finality, accuracy, integrity of prior proceedings, and judicial economy justify a district court's refusal to entertain a § 2255 action containing a procedurally barred claim, absent a showing of cause and prejudice"). The dimensions of the claims asserted in this petition transcend geography and jurisdiction. Accordingly, the *amici* use this opportunity to address three areas of the law.[1] First, the substance and correct standard of review for this rapidly developing area of Eighth Amendment jurisprudence and the challenging line drawing exercises it necessarily entails. Second, they address why habeas corpus is the correct procedural vehicle for this claim as opposed to the customary use of 42 U.S.C. §1983 that delivers Eighth Amendment claims to federal courts. Finally, they address issues of exhaustion and contend that the cause and prejudice standard set forth in *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977) should apply and excuse exhaustion and procedural default in these circumstances. They address each *seriatim*.

---

[1] Specifically, the *amici* write in support of petitioners' contention that they are likely to succeed on the merits (*Petitioner's Motion For Temporary Restraining* Order, Doc No. 15 at 28-31) with respect to the their Eighth Amendment and habeas corpus arguments; and that there is irreparable harm (*id*. at 25-28) with respect to exhaustion of state remedies and satisfaction of the cause and prejudice standard. Similarly, the *amici* offer these arguments in support of the petitioners should the respondent move to dismiss for failure to state a claim pursuant to Fed. R. Civ. Pro. 12(b)(6) or on exhaustion or procedural default grounds. *See Anthony A. v. Commissioner of Corrections*, 159 Conn. App. 226, 238 n. 13 (2015)(finding federal due process law a construed in §1983 cases "instructive" in "evaluating…petitioner's due process claim in…habeas action").

I.    **THE PETITIONERS HAVE STATED A COGNIZABLE EIGHTH AMENDMENT VIOLATION THAT EXIST WELL WITHIN THE SCOPE OF CLEARLY ESTABLISHED PRECEDENT AND THEIR LIKELIHOOD OF SUCCESS ON THE MERITS IS SUBSTANTIAL.**

The problem the petitioners identify is real. The *amici* themselves have received scores of calls from current and former clients revealing all types of medical issues. Some were known prior to the COVID-19 pandemic—the issues being serious unto themselves—and some were not relevant prior to the pandemic; the possibility of contracting COVID-19 places those conditions in a far more serious light. The *amici* have organized as quickly as possible to address these issues.

*Amici* has thus far addressed their clients' COVID19 by way of conventional statutory remedies. They have sought release for pre-trial detainees pursuant to the Bail Reform Act of 1984 specifically relying upon 18 U.S.C. §3142(g)(3)(A)(court should, in detention hearing, consider, *inter alia*, physical state of defendant. *See e.g. United States v. Hawkins*, 3:19-cr-229(AWT), Doc. Nos. 21, 22, & 23 (moving for and granting release of defendant with sarcoidosis); *United States v. Fellela*, 3:19-cr-79(JAM) Doc Nos. 74, 75, & 80 (moving for and granting release for defendant over the age of 60 with diabetes who had previously entered guilty plea). Similarly, they have sought release for sentenced inmates pursuant to the Compassionate Release provision of the First Step Act, 18 U.S.C. § 3582(c)(1)(A), which grants courts authority to reduce the sentence of inmates where they demonstrate "extraordinary and compelling" circumstances.[2] *See, e.g., United States v. Ramon Sanchez*, 3:18-cr-140(VLB)(granting compassionate release to inmate serving drug sentence with lupus); *United States v. Gagne*,

---

[2] These are similar or analogous to statutory remedies available in state court but eligibility and mechanism of operation differ sometimes in significant ways. *See e.g. Connnecticut Practice Book*, §38-4 (bond and arraignment); Conn. Gen. Stat. §53a-39 (sentence modification); Conn. Gen. Stat. §54-131k (compassionate parole).

3:18-cr-242(VLB)(denying compassionate release to defendant with multiple sclerosis). There is

no shortage of efforts to deploy statutory and administrative tools as the relief of first resort.

Very real individuals have received very real relief by way of the Bail Reform Act

release and First Step Act compassionate release statutes. However, the *amici* are concerned

there are individuals who fall beyond the scope of statutory relief for whom Eighth Amendment

habeas relief is appropriate.

### A. There are a significant number of individuals who do not qualify for statutory or discretionary relief but are nonetheless subject to grave danger.

The *amici* are concerned about the significant number of people who are ineligible for

statutory forms of relief or for whom federal release is academic because they are subject to both

state and federal detainers. First—in the federal context, Congress has directed courts to ask

particular questions in determining whether to release defendants (or inmates). In the Bail

Reform Act context, Courts ask whether a person (i) presents a danger to the community; (ii)

presents a flight risk; and (iii) whether any condition or combination of conditions will assure his

appearance in court and the safety of the community. *See United States v. Salerno*, 481 U.S. 739,

742 (1987) (citing 18 U.S.C. § 3142(f)). In the compassionate release context, 18 U.S.C. §

3582(c)(1)(A) permits courts to ask whether "extraordinary and compelling" reasons warrant a

reduction in sentence and exercise their discretion in doing so. Neither asks whether continued

confinement of an inmate in a place where he cannot protect himself from imminent harm or

death is appropriate in light of the allegations, or even judgment, against him. That is the crux of

the issue many face.

The second group is not only conceptually related to the legal questions the petitioners

pose but has an actual nexus to the operative facts of this case: federal defendants who are

subject to concurrent state prosecutions or detainers (adoption cases). It is well known amongst defense attorneys that the United States Attorney's Office "adopts" many cases from the State of Connecticut and, therefore, many federal defendants are in primary state custody. *See, e.g., United State v. Murphy*, 942 F.2d 73, 78 (2d Cir. 2019)(defendant plead guilty in Connecticut Superior Court and District of Connecticut for same conduct). Judge Shea recently observed the "thorny" problem this presented a federal inmate serving concurrent state (of Connecticut) and federal sentences for the same act:

> The State of Connecticut's detainer poses another obstacle for the defendant, and casts further doubt on his ability to show that there are 'compelling' reasons to grant the requested sentence reduction. As noted above, after this Court sentenced him, the defendant was sentenced in Connecticut state court to a total of eleven years' incarceration for illegal sexual contact in violation of Conn. Gen. Stat. §53a-21(a)(2) and violation of a protective order under Conn. Gen. State §53a-223. On April 12, 2017, Connecticut lodged a detainer with the BOP, which states that if the BOP releases the defendant before April 9, 2028, the BOP should notify that State 'at least 60 days in advance of his release so that [the State of Connecticut] can assume custody of him.' (ECF No. 79-1 at 1.) The detainer raises a host of issues.

> The Government argues that the defendant's proposed release plan is 'impossible' because if this Court were to grant the motion directing the BOP to release the defendant from federal custody, the State of Connecticut would assume custody. (ECF No. 79-1 at 15). The defendant responds that the detainer is not a bar to granting his motion. According to the defendant, the detainer merely requires the BOP to give the State of Connecticut notice of his release and it is not clear that the State would take him into custody. Defense counsel represent that in the event the State did pursue custody, the defendant has separate counsel who is exploring avenues for release from the Connecticut Department of Correction in state court—including a habeas corpus petition. (It does not appear that the defendant would meet the requirements of Connecticut's compassionate release statute, Conn. Gen. Stat. § 54-131k(a). Because of the uncertainties presented by the detainer, the defendant requests that the Court grant his § 3582 motion by stay the order until the State of Connecticut determines how to proceed regarding the detainer. In other words, the defendant asks the Court to find "compelling" reasons warranting release when it is not, in fact, clear that an order by this Court reducing the defendant's sentence would result in his release. However, because I find, independently of the thorny issues raised by the detainer, that the requested reduction is not warranted, I need not resolve those issues.

*United States v. Nathaniel Smith*, 3:16-cr-48(MPS) Doc No. 82 at 8 n.7 (4/17/20). While Judge

Shea avoided this question, it is clearly more than hypothetical. Not only are there individuals

who may fall outside of statutory forms of relief, there are individuals for whom there may be

"compelling and extraordinary" circumstances in federal court that are mooted for similar or less

serious offenses in state court. Similarly, the *amici* have clients who are incarcerated at Hartford

Correctional Center, New Haven Correctional Center, Bridgeport Correctional Center, and

Cheshire Correctional Institution, all Connecticut Department of Corrections facilities, that are

directly affected by respondents' policies and choices. Some are there exclusively in federal,

officially, custody but housed by way of United States Marshal's Service agreements with the

state. Others are there because the United States Attorney's Office has adopted state prosecutions

and defendants are held because of state and federal charges for the same act. In any event, the

issues presented concern the *amici's* client in a multitude of ways.

> **B. Those individuals should fall within the ambit of Eighth Amendment protections where no legislative scheme contemplates nor suffices for the present circumstances.**

There is one solution to these "thorny" problems: the Eighth Amendment. Clearly, the

state, much like the federal system, has various forms of statutory relief. *See e.g.* Conn. Gen.

Stat. §54-131k(a)(compassionate medical release); Conn. Gen. State. §53a-39(sentence

modification statute). But the *amici's* understanding—based upon research and working with

clients and their state counterparts—is that these remedies are far more limited in scope, as

observed in *Smith*, than the federal Compassionate Release statute. Similarly, to the extent those

statutory remedies might, hypothetically, be sufficient, would-be petitioners are burdened by the

limited functionality of Connecticut Courts.[3] In any event, Eighth Amendment is the only source of law robust and consistent enough to address this widespread humanitarian problem. None of these statutory schemes, neither state nor federal, fully address the scope of the problem many prisoners face.

First, few of the statutory schemes addressed permit a court to reduce or alter a sentence below a statutory mandatory minimum. *See, e.g.,* Conn. Gen. Stat. § 53a-39(c)(no sentence modifications below mandatory minimum sentence). Consider the hypothetical case of two similarly situated thirty-year old inmates, both morbidly obese, both with diabetes, both with COPD, and both serving five year sentences. The case for each's release is equally strong. However, suppose one was serving a five year mandatory minimum sentence and the other a judge set sentence of five years with no mandatory minimum. At thirty years' old, clearly the law contemplates that both inmates would be rehabilitated and neither sentence was intended to be a death sentence nor anything like it. *See, e.g., Graham v. Florida*, 560 U.S. 48, 75 (2010)(Eight amendment requires some opportunity for juvenile offenders to demonstrate rehabilitation and maturity for non-homicide offenses). However, none of the statutory schemes listed offer the possibility of release for the inmate serving the mandatory minimum sentence where the risk of death as a result of incarceration is equal and the penological justification for such an outcome nonexistent.

---

[3] As of March 12, 2020, "[u]nder the terms and provisions of the Judicial Branch's Continuity of Operations Plan (COOP), the courts will schedule and hear only those matters identified as 'Priority 1 Business Functions' until further notice. *COVID-19 Information From The Connecticut Judicial Branch*, March 12, 2020 entry, available at https://jud.ct.gov/COVID19.htm (accessed 5/2/2020). None of those functions appear to include sentence modifications, parole review or, critically state habeas corpus matters. Significantly, the state closed the courthouse for Geographical Area 19 at Rockville on March 26, 2020 habeas corpus matters are heard. *Id.*

Second, where some statutory forms of relief may moot Eighth Amendment claims (where statutory relief is granted) it is not clear that they provide a complete bulwark against total violations. First, no statutory form of relief, of which the *amici* are aware poses the fundamental question the Eighth Amendment does: is there a penological justification to confining a person and exposing him to the grave risk presented by COVID-19? Extreme and compelling circumstances warrant a sentence *reduction*, considering 18 U.S.C §3553(a) factors, which can avoid but does not, necessarily, answer this fundamental question. Second, in the case of state remedies, they are entirely discretionary and there is no evidence they contemplate Eighth Amendment harm. To the extent statutory remedies relieve Eighth Amendment concerns they are commendable, but to the extent they do not fully contemplate the Eighth Amendment threat, there needs to remain a viable constitutional vehicle for release.

C.  **The present circumstances constitute clear violations of the Eighth Amendment under clearly established precedent.**

That vehicle is the Eighth Amendment. "The Eighth Amendment's ban on inflicting cruel and unusual punishments, made applicable to the States by the Fourteenth Amendment, '[proscribes] more than physically barbarous punishments.'… It prohibits penalties that are grossly disproportionate to the offense,…as well as those that transgress today's 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'" *Hutto v. Finney*, 437 U.S. 678, 685 (1978)(internal cites omitted). The petitioners' custody precludes them from taking the essential precaution against COVID-19, social distancing, and therefore violates the Eighth Amendment. For many there is no penological justification for custody in these circumstances: where specific deterrence does not require detaining an inmate, none of the other purposes of sentencing justify detaining and exposing him to COVID-19.

The Supreme Court has defined the standard for Eighth Amendment violations. "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,'…proscribed by the Eight Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)(concluding that inmate could state a cognizable Eighth Amendment claim under 42 U.S.C. §1983 for inadequate medical care). The *mens rea* and temporal requirements for proof of an Eighth Amendment claim are also settled. First, "an express intent to inflict unnecessary pain is not required…" *Id*. (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)("deliberate indifference" to a prisoner's serious medical needs is cruel and unusual punishment)). However, prison officials must be "subjectively aware" of the risk posed. *Farmer v. Brennan*, 511 U.S. 825 (1994). Second, there is also a subject element to the standard: in *Whitley v. Albers*, 475 U.S. 312 (1986), the Court considered an inmate who was shot by a guard during a riot and, retaining the deliberate indifference standard, said, "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock."[4] *Id.* at 319. Similarly, in *Wilson v. Seiter*, 501 U.S. 294, 302-03

---

[4] The Court went on to distinguish the circumstances presented by medical claims and force claims arising out of prison security actions:

> The general requirement that an Eighth Amendment claimant allege and prove the unnecessary and wanton infliction of pain should also be applied with due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged. The deliberate indifference standard articulated in *Estelle* was appropriate in the context presented in that case because the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities. Consequently, "deliberate indifference to a prisoner's serious illness or injury," *Estelle, supra*, at 105, can typically be established or disproved without the necessity of balancing competing institutional concerns for the safety of prison staff or other inmates. But, in making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take

(1991), the court "determined that Eighth Amendment claims based on official conduct that does

not purport to be the penalty formally imposed[5] for a crime require inquiry into state of mind"

and "[w]hether one characterizes the treatment received by [the prisoner] as inhumane conditions

of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate

to apply the 'deliberate indifference' standard articulated in *Estelle."* In *Farmer v. Brennan*,

*supra*, 511 U.S. at 828-29, the Court *Wilson* and concluded a "deliberate indifference to a

substantial risk of serious harm to an inmate" requires "a showing that the official was

subjectively aware of the risk." Last, in *Helling v. McKinney*, 509 U.S. 25, 33 (1993), the

---

> into account the very real threats the unrest presents to inmates and prison officials alike,
> in addition to the possible harms to inmates against whom force might be used. As we
> said in *Hudson* v. *Palmer*, 468 U.S. 517, 526-527 (1984), prison administrators are
> charged with the responsibility of ensuring the safety of the prison staff, administrative
> personnel, and visitors, as well as the "obligation to take reasonable measures to
> guarantee the safety of the inmates themselves." In this setting, a deliberate indifference
> standard does not adequately capture the importance of such competing obligations, or
> convey the appropriate hesitancy to critique in hindsight decisions necessarily made in
> haste, under pressure, and frequently without the luxury of a second chance.

*Whitley v. Albers*, *supra*, 475 U.S. at 320.

[5] *Amici* note that the distinction made by numerous Eighth Amendment dissents, between
punishments imposed and events incident to that punishment, do does not necessarily apply in
this case. For example, one such dissent reads:

> I adhere to my belief, expressed in *Hudson* and *Helling*[] that 'judges or juries—but not
> jailers—impose 'punishment.'…'Punishment,' from the time of the Founding through the
> present day, 'has always meant a 'fine, penalty, or *confinement* inflicted upon a person by
> the authority of the law and the judgment and sentence of a court, for some crime or
> offense committed by him.' Conditions of confinement are not punishment in any
> recognized sense of the terms, *unless imposed as part of a sentence*. As an original
> matter, therefore, this case would be an easy one for me: Because the unfortunate attack
> that befell the petitioner was not part of his sentence, it did not constitute 'punishment'
> under the Eighth Amendment.

*Farmer*, *supra*, 511 U.S. at 825 (emphasis added/internal cites omitted) *Thomas, J.*, dissenting.
In this case the petitioners do not challenge, in their §2241 petition, something that happened to
them in confinement—being assaulted by another inmate or a guard, the constitutionally
offensive condition is custody itself. Custody is the punishment and physical separation is the
only remedy to the COVID-19 threat. *See infra* _-_(addressing why §2241 rather than §1983 is
the appropriate vehicle for custody issues). Therefore, the habeas portion of their claims is
consistent with this early understanding of the Eighth Amendment as well.

Supreme Court recognized that the *future prospect of harm* could constitute an Eighth Amendment violation and "that a remedy for unsafe conditions need not await a tragic event." The petitioners' circumstance make a strong *prima facie* showing of satisfying these precedents.

The petitioners' custody places them at imminent risk of contracting a fatal contagious illness and, therefore, falls squarely within well-established Eight Amendment jurisprudence. Deprivation of access to sufficient medical care and the volume of inmate housing is at the core of the Supreme Court's Eighth Amendment jurisprudence. The Court established in *Estelle v. Gamble*, *supra*, 429 U.S. 97, that an inmate who alleged he was denied access to adequate medical attention in prison validly stated an Eighth Amendment claim when he could show that prison officials acted with deliberate indifference to his condition (even though the facts alleged failed to meet the deliberate indifference standard the court articulated). *See also Ziglar v. Abbasi*, _ U.S. _, 137 S. Ct. 1843, 1864-65 (2017) quoting *Estelle*, *supra*, 429 U.S. at 104 ("The Court has long made clear the standard for claims alleging failure to provide medical treatment to a prisoner—'deliberate indifference to serious medical needs'"). In *Hutto v. Finney*, *supra*, 437 U.S. 678, 686-87 (1978), the Court addressed punitive solitary confinement and stated that, "[a] filthy, overcrowded cell and a diet of "grue" might be tolerable for a few days and intolerably cruel for weeks or months." In *Rhodes v. Chapman*, 452 U.S. 337 (1981), the court considered the constitutionality of "double celling" inmates as a result of growing prison populations. It held that housing multiple inmates in a single cell was *not* cruel and unusual punishment in light of the circumstances presented. *Id*. at 347-53. Critically, however, "the double celling made necessary by the unanticipated increase in prison population *did not lead to deprivations of essential food, medical care, or sanitation*." *Id*. at 348 (emphasis added). In *Whitley v. Albers*, *supra*, 475 U.S. 320, the Court noted that the same standard applies to both

medical deprivation claims and claims of assault by guards and other inmates but noted that

medical claims did not involve split second decisions or balancing institutional concerns. [6] *Id.* at

319. In *Helling v. McKinney*, *supra*, 504 U.S. at 33, the Supreme Court has also recognized the

danger that second-hand smoke posed to inmates in confined spaces. The adequacy of medical

care and hygienic space, free from medical threats are the distinguishing features of Eighth

Amendment precedent.

    The COVID-19 pandemic presents a grave threat of which everyone, certainly prison

officials, are objectively and subjectively aware. Many inmates, such, as the petitioners are at

grave risk of contracting COVID-19 as a result of their total inability to distance themselves

from other inmates and guards. The fundamental issue is whether this danger is necessary to any

penological purpose.

---

[6] The Court distinguished the circumstances presented by medical claims and force claims arising out of prison security actions:

> The general requirement that an Eighth Amendment claimant allege and prove the unnecessary and wanton infliction of pain should also be applied with due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged. The deliberate indifference standard articulated in *Estelle* was appropriate in the context presented in that case because the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities. Consequently, "deliberate indifference to a prisoner's serious illness or injury," *Estelle, supra*, at 105, can typically be established or disproved without the necessity of balancing competing institutional concerns for the safety of prison staff or other inmates. But, in making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used. As we said in *Hudson* v. *Palmer*, 468 U.S. 517, 526-527 (1984), prison administrators are charged with the responsibility of ensuring the safety of the prison staff, administrative personnel, and visitors, as well as the "obligation to take reasonable measures to guarantee the safety of the inmates themselves." In this setting, a deliberate indifference standard does not adequately capture the importance of such competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance.

*Whitley v. Albers*, *supra*, 475 U.S. at 320.

> **D. The Eighth Amendment violation is established by settled precedent but in the event application of the evolving standards of decency test is warranted, it militates in favor of an Eighth Amendment claim as well.**

The petitioners' Eighth Amendment claim is clearly established by settled precedent. However, assuming the Court were to find, *arguendo*, that there are novel elements to the claim, the *amici* briefly address the "evolving standards of decency" test in an abundance of caution. "There is no static test for determining whether conditions of confinement are cruel and unusual…The Eighth Amendment must 'draw its meaning from the evolving standards of decency that mark the progress of a maturing society.'" *McNatt v. Parker*, 2000 U.S. Dist. LEXIS 20468, 10 (D. Conn., 2000) (quoting *Rhodes*, *supra*, 452 U.S. at 346). This is the rare case that does not require a detailed elaboration of that test: nearly every institution in our society, including the Court, has weighed in on the threat posed by COVID-19 the expectations of decent people in addressing the threat. The fundamental expectation is that decent people socially distance themselves. Importantly, the primary criticism, or concern about judges construing evolving constitutional rights is that: "[a]nswering questions like that [about changing societal expectations] calls for the exercise of raw political will belonging to legislatures, not the legal judgment proper to court." *Carpenter v. United States*, _ U.S. _, 138 S. Ct. 2206, 2266 (2018) *Gorcush, J*., dissenting (criticizing *Katz* reasonable expectation of privacy test); *see also Kennedy v. Louisianna*, 554 U.S. 407, 448 (2008) *Alito, J*., dissenting ("the Court claims to have identified 'a national consensus' that the death penalty is never acceptable for the rape of a child" and that justification is not sound). However, those concerns are arguably least forceful when there multiple manifestations of society's expectations across nearly every single democratic institution in the country, from the proverbial dog catcher's office to the Oval Office. For example Justice Gorsuch wrote: "[m]y concerns about [the *Katz* reasonable expectation of

privacy test come with a caveat. *Sometimes*, I accept, judges may be able to discern and describe existing societal norms….That is particularly true the judge looks to positive law rather than intuition for guidance on social norms. *Carpenter*, *supra*, 138 U.S. at 2265, *Gorsuch, J.*, dissenting. There is no shortage of positive law on this subject and it points inexorably to one conclusion about decency: it is dangerous and indecent to confine immune compromised people close to one another in these circumstances. The petitioners satisfy the evolving standards of decency test as well.

### E.  This threat is just as real for pretrial detainees.

The purpose of pretrial detention is not punitive, it is to assure the safety of the community and a defendant's appearance in court. However, to the average person, pre-trial detention looks in practice conspicuously like the incarceration of sentenced inmates. The risks to the defendant are the same as those posed to the sentenced inmate. It would, similarly, constitute excessive bail in violation of the Eighth Amendment for a potentially innocent defendant to perish in these circumstances. Many judges have recognized this. *See Hawkins*, *supra*. However, *amici* are concerned that respondent's cash bail system fails to adequately account for this danger and unnecessarily places detainees at risk.

The essence of a cash bail system is that it balances the various factors a court must consider and places a price on the value of the defendant's appearance in court and danger to the community. The challenge here is that the threat to defendants' health defies pricing. Therefore, *amici* are concerned about their clients who have plausible cases for release pursuant to the Bail Reform Act but are subject to state cash bonds for *exactly the same* conduct. In the case of a defendant who has $400,000 bond reduced to a $200,000 bond on COVID-19 grounds, it still does him little, if any good, when he is indigent. The *amici* are concerned that cash bail does not

adequately account this important factor and there not a rule *requiring* consideration of this threat and conditions that make release realistic.

### F. The court should deem custody unlawful when the gravity of the threat posed to the inmate outweighs the common law purposes of sentencing.

The fundamental question is whether it is "necessary" in a just and lawful society to expose inmates to any of these dangers. *See Estelle*, 429 U.S. at 104 ("unnecessary and wanton infliction of pain"). The *amici* do not suggest that the Court simply throw open the jailhouse doors. *C.f. McClesky v. Kemp*, 481 U.S. 279, 314-19 (1987)(declining to find racial disparities in capital sentencing unconstitutional on the grounds it would call into question too many sentences where similar levels of arbitrariness were evident). Instead, they urge that the standard of review be that custody is unlawful when the gravity of danger to the inmate exceeds the importance of the common law purposes of sentencing.[7] Where an inmate's sentence contemplates rehabilitation, and has specifically deterred him, there is little penological value in exposing him to grave danger for the purposes of general deterrence and retribution; nor would such exposure meaningfully serve the purpose of general deterrence. Precluding an inmate from social distancing is not *necessary* to general deterrence: no person will commit a crime on the off chance a once in a century pandemic will free him from the consequences of his actions. Precluding a person from social distancing is not a legitimate form of retribution, and not, therefore, not *necessary* to serve that purpose. Similarly, precluding a person from social distancing is not *necessary* (and in fact antithetical to) rehabilitation. The only instance in which

---

[7] And they agree with the petitioners' request for relief at page 39, paragraph 1 of their Motion for Temporary Restraining Order.

society must assume, or require inmates to assume, the risks posed by COVID-19 is an inmate for whom incarceration is required to specifically deter him from committing more crimes.[8]

Accordingly, *amici* urge the court to seriously consider that custody is unlawful unless there is reason to believe incarceration is necessary for the particular purpose of specifically deterring a petitioner.

### G. Conclusion.

The present circumstances are akin to a tsunami coming ashore and asking who gets to run for their lives. The threat to the petitioners is a direct consequence of their custody: they can only run or swim so far within the prison walls. Put differently, the threat is not what happens to them in custody, the threat is what happens *because* of custody. There is no penological purpose to denying many inmates the right of self-preservation: that fate is not an incident of prison life but a function of deliberate indifference, within the meaning of *Estelle*, to their wellbeing during this historic crisis.

## II.     HABEAS CORPUS IS THE APPROPRIATE VEHICLE FOR THEIR CLAIMS.

Habeas corpus is the correct procedural vehicle for the petitioners' claims because the offending condition of confinement is custody itself. Therefore, their custody is unlawful. The essential prophylactic measure in the era of COVID-19 is social distancing; the essential element of incarceration is confinement. Confinement as a condition unto itself is antithetical to the condition essential to salubrity. The two are mutually exclusive.

Eighth Amendment claims have customarily been brought by way of 42 U.S.C. § 1983. However, the contours of the present case transcends that traditional distinction because the issue

---

[8] Notably, *amici* are not aware of a doctrine that says finality is a purpose of sentencing or incarceration.

is custody itself, not the conditions incident to confinement. The *amici* address the relevant dicta from the Supreme Court, pragmatic concerns, and the historical dimensions of the writ of habeas corpus. All point the conclusion that custody and release by way of habeas, rather than civil damages, are the proper mechanisms of redress.

**A.  Dicta of the Supreme Court and pragmatic considerations.**

This reality that custody is the issue may confound the traditional distinctions between habeas corpus and §1983 law. Traditionally, habeas challenges the fact or duration of a prisoner's custody—custody being an essential jurisdictional predicate to habeas—and conditions of confinement are challenged by civil rights suits. *See, e.g.,  Bell v. Wolfish,* 441 U. S. 520, 526, n. 6 (1979)("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement"); *see also Preiser v. Rodriguez*, 411 U. S. 475, 499 (1973). In 2004, the Supreme Court observed:

> Section 1983 authorizes a "suit in equity, or other proper proceeding for redress" against any person who, under color of state law, "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution." Petitioner's complaint states such a claim. *Despite its literal applicability, however, § 1983 must yield to the more specific federal habeas statute*, with its attendant procedural and exhaustion requirements, where an inmate seeks injunctive relief challenging the fact of his conviction or the duration of his sentence. *See Preiser* v. *Rodriguez*, 411 U.S. 475, 489 (1973). Such claims fall within the "core" of habeas corpus and are thus not cognizable when brought pursuant to § 1983. *Ibid.* By contrast, constitutional claims that merely challenge the conditions of a prisoner's confinement, whether the inmate seeks monetary or injunctive relief, fall outside of that core and may be brought pursuant to § 1983 in the first instance.[9]

---

[9] Notably, in the State of Connecticut, conditions of confinement challenges must be brought by way of the state's habeas corpus statute. *State v. Campbell*, 328 Conn. 444, 465-66 (2018)("It is well established that the proper vehicle by which a defendant may challenge his conditions of confinement is a petition for a writ of habeas corpus"); *State v. Roskowski*, 329 Conn. 554, 562, (2019). In 1990 the Connecticut Supreme Court wrote:  "we await a more suitable occasion to decide whether the scope of habeas corpus should be broadened to include challenges to conditions of confinement when §1983 may be a viable alternative for presenting the petitioner's claims." *Sanchez v. Warden, State Prison*, 214 Conn. 23, 34-35 (1990). While it does not appear that a suitable opportunity to explicitly address this issue ever arose, it now appears

See *Muhammad* v. *Close*, 540 U.S. _____, _____, 540 U.S. 749, 158 L. Ed. 2d 32, 124 S. Ct. 1303 (2004) *(per curiam)*; *Preiser*, *supra*, at 498-499, 36 L. Ed. 2d 439, 93 S. Ct. 1827.

We have not yet had occasion to consider whether civil rights suits seeking to enjoin the use of a particular method of execution--*e.g.*, lethal injection or electrocution--fall within the core of federal habeas corpus or, rather, whether they are properly viewed as challenges to the conditions of a condemned inmate's death sentence. Neither the "conditions" nor the "fact or duration" label is particularly apt. A suit seeking to enjoin a particular means of effectuating a sentence of death does not directly call into question the "fact" or "validity" of the sentence itself--by simply altering its method of execution, the State can go forward with the sentence. [10]

*Nelson v. Campbell*, 541 U.S. 647, 643-44 (2004)(considering challenge to methods of execution as § 1983 challenge where *respondent* state conceded issue and characterized as a conditions claim). However, the Supreme Court has recently commented favorably on the use of habeas corpus to challenge mass arrests of persons with foreign contacts and exposure to harsh conditions following another *sui generis* historical event, the September 11 attacks of 2001.

*Ziglar v. Abasi*, _ U.S. _, 137 S.Ct. 1843, 1863 (2017). Those challengers brought claims pursuant to *Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971) and 42 U.S.C. § 1985. The *Zigler* court said:

Indeed, the habeas remedy, if necessity required its use, would have provided a faster and more direct route to relief than a suit for money damages. *A successful habeas petition would have required officials to place respondents in less-restrictive conditions immediately; yet this damages suit remains unresolved some 15 years later.* (As in Bell and Preiser, the Court need not determine the scope or availability of the habeas corpus remedy, a question that is not before the Court and has not been briefed or argued.) In sum, respondents had available to them "'other alternative forms of judicial relief.'" Minneci, 565 U. S., at 124, 132 S. Ct. 617, 181 L. Ed. 2d 606. And when alternative methods of relief are available, a Bivens remedy usually is not. See Bush, 462 U. S., at 386-388, 103 S. Ct. 2404, 76 L. Ed. 2d 648; Schweiker, *supra*, at 425-426, 108 S. Ct.

---

Connecticut's courts regularly treat conditions of confinement claims as habeas corpus issues. *See e.g. Fowler v. Commissioner of Corrections*, 2018 Conn.Super.LEXIS 758 (CT Superior Court, 2018).

[10] More recently, other challenges to death penalty protocols have proceed as § 1983 claims. *See Glossip v. Gross*, _ U.S. _ 135 S. Ct. 2726 (2015)(multiple inmates seeking preliminary injunction against lethal injection protocol).

2460, 101 L. Ed. 2d 370; Malesko, 534 U. S., at 73-74, 122 S. Ct. 515, 151 L. Ed. 2d
456; Minneci, *supra*, at 125-126, 132 S. Ct. 617, 181 L. Ed. 2d 606.

137 S. Ct. at 1863 (emphasis added). This statement is prescient in the present case. The proper

remedy is not damages years from now—damages that may never be enjoyed if awarded—the

proper remedy is immediate release from the offending conditions.

Similarly, habeas corpus permits the proper procedural mechanisms for addressing these

claims. The federal habeas statutes provide for expedited and summary procedures for disposing

of petitions. *See* 28 U.S.C. §§2243, 2246. This stands in contradiction to the full procedures used

in more traditional civil rights cases. Notably, one of the cases at issues in *Brown v. Plata*, 563

U.S. 493 (2011), an 18 U.S.C. §3626(a) prison conditions cases, took nearly forty days to try and

one took 21 years before it was decided by the Supreme Court. Here, where time is of the

essence, habeas is the practical procedural vehicle.

> **B.  The historical dimensions of the writ of habeas corpus suggest that its use is
> appropriate at this time and consistent with original, common law
> understandings of the writ.**

This case is consistent with the historical purposes of habeas corpus. The writ of habeas

corpus exists to permit courts to inquire into the lawfulness of individuals' detention. It is

"perhaps the most important writ known to the constitutional law of England, affording as it does

a remedy in *all cases of illegal restraint or confinement*." *Williams v. Kaiser*, 323 U.S. 471, 484

n.2 (1945)(emphasis added). The writ "is one of the remedies for the enforcement of the right to

personal freedom…." *In re Fredrich*, 149 U.S. 70, 75-78 (1893). "Executive imprisonment has

been considered oppressive and lawless since John, at Runnymeade, pledged that no free man

should be imprisoned, dispossessed, outlawed, or exiled save by judgment of his peers or by the

law of the land. The *judges* of England developed the writ of habeas corpus largely to preserve

these immunities from executive restraint." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S.

206, 218 (1953)(emphasis added) *Black, J.*, dissenting. Importantly, "[t]he historic purpose of the writ has been to relieve detention by executive authorities without judicial trial." This is such a case and the petitioners' application of the writ is consistent with its historical uses.

Two remarkable aspects of the history of the writ of habeas corpus stand out as applied to this historic crisis. First, this use is consistent with the original common law understandings of the writ. Second, the writ is flexible by design and intended to respond to evolving crisis of executive detention. The petitioner's address each *seriatim*.

First, the writ of habeas corpus was ratified into our Constitution in 1790 against nearly against a half-millennia of English common law. The writ "appeared in English law several centuries ago, became 'an integral part of our common-law heritage' by the time the Colonies achieved independence…" *Rasul v. Bush*, 542 U.S. 466, 473-44 (2004) quoting *Preiser v. Rodriguez*, 411 U.S. 475, 485 (1973). Blackstone famously referred to England's Habeas Corpus Act of 1679, 31 Car. 2, c. 2, "as a 'second magna carta, and stable bulwark of our liberties.'" *Hamdi v. Rumsfeld*, 542 U.S. 507, 558 (2004) *Scalia, J*., dissenting, quoting 1 Blackstone 133. Alexander Hamilton, *in arguing against a Bill of Rights*, exalted "the establishment of the *writ of habeas corpus*" to protect against "the practice of arbitrary imprisonments…in all ages, [one of] the favorite and most formidable instruments of tyranny." The Federalist No. 84, available at https://www.congress.gov/resources/display/content/The+Federalist+Papers#TheFederalistPapers-84 (accessed 4/29/2020). He similarly argued in Federalist 83 that the availability of habeas corpus, supplemented by the jury trial right in Art. III, §2, cl.3) made specific enumeration of procedural protections by a bill of rights unnecessary. The Federalist No. 83 available at https://www.congress.gov/resources/display/content/The+Federalist+Papers#TheFederalistPapers-83 (accessed 4/30/2020)("And both of these are provided for, in the most ample manner, in the

plan of the convention"). Clearly, many in the founding era viewed habeas corpus as the bulwark

of civil liberties in the American experiment.

This is also consistent with the history of the habeas corpus statute at issue, 28 U.S.C.

§2241. The Supreme Court observed in *Rasul* that,

> Congress has granted federal district courts, "within their respective jurisdictions," the
> authority to hear applications for habeas corpus by any person who claims to be held "in
> custody in violation of the Constitution or laws or treaties of the United States." 28
> U.S.C. §§ 2241(a), (c)(3) [28 USCS §§ 2241(a), (c)(3)]. The statute traces its ancestry to
> the first grant of federal-court jurisdiction: Section 14 of the Judiciary Act of 1789
> authorized federal courts to issue the writ of habeas corpus to prisoners who are "in
> custody, under or by colour of the authority of the United States, or are committed for
> trial before some court of the same." Act of Sept. 24, 1789, ch. 20, § 14, 1 Stat. 82. In
> 1867, Congress extended the protections of the writ to "all cases where any person may
> be restrained of his or her liberty in violation of the constitution, or of any treaty or law of
> the United States." Act of Feb. 5, 1867, ch. 28, 14 Stat. 385. See *Felker* v. *Turpin,* 518
> U.S. 651, 659-660, 135 L. Ed. 2d 827, 116 S. Ct. 2333 (1996).

542 U.S at 473. It also noted that, "[h]abeas corpus is, however, 'a writ antecedent to

statute,…throwing its root deep into the genius of our common law." *Williams v. Kaiser*, 323

U.S. 471, 484 n.2 (1945).  In both the Founding and Reconstruction eras, Congress enacted the

§2241 habeas remedy against the historical backdrop of diverse uses of the writ of habeas

corpus.

Present era understandings of the writ of habeas corpus similarly support petitioners'

invocation of its use. "As it has evolved over the past two centuries, the habeas statutes clearly

has expanded habeas corpus 'beyond the limits that obtained during the 17th and 18th centuries.'"

*Rasul*, *supra*, 542 U.S. at 475 quoting *Swain v. Pressley*, 430 U.S. 372, 380 n. 13 (1977). In

*Johnson v. Zerbst*, 304 U.S. 458, 465-67 (1938) the court examined the scope of the writ and

noted principles that are now the basis of the procedural default rule in the §§ 2254 and 2255

context—that habeas is not an opportunity to re-litigate procedural errors not raised at trial.

However, it noted that:

these principles, however, must be construed and applied so as to preserve -- not destroy -- constitutional safeguards of human life and liberty. The scope of inquiry in *habeas corpus* proceedings has been broadened -- not narrowed -- since the adoption of the Sixth Amendment. In such a proceeding, "it would be clearly erroneous to confine the inquiry to the proceedings and judgment of the trial court" and the petitioned court has "power to inquire with regard to the jurisdiction of the inferior court, either in respect to the subject matter or to the person, even if such inquiry . . . [involves] an examination of facts outside of, but not inconsistent with, the record." Congress has expanded the rights of a petitioner for *habeas corpus* and the " . . . effect is to substitute for the bare legal review that seems to have been the limit of judicial authority under the common-law practice, and under the Act of 31 Car. II, c. 2, a more searching investigation, in which the applicant is put upon his oath to set forth the truth of the matter respecting the causes of his detention, and the court, upon determining the actual facts, is to 'dispose of the party as law and justice require.'

304 U.S. at 465-66. Clearly, the grandeur and scope of the writ only grew in the twentieth century.

The writ of habeas court was designed to meet the historical moment when crises of detention arise: there is no reason it cannot meet the present moment. It is inherently flexible and designed to meet the civil rights challenges of each epoch. The writ "has through the ages been jealously maintained by Courts of Law…." *Williams*, *supra*, 323 U.S. at 484 n.2. It should be maintained with equal jealousy—and deployed—as we enter this new age.

**C. Conclusion.**

The petitioners' use of §2241 habeas corpus is appropriate to the unique *custodial* challenge these circumstances present. It is pragmatic and efficient with a focus on fundamental fairness in time sensitive circumstances. Finally, it is consistent with the historical purposes of the writ.

**III.    THE CAUSE AND PREJUDICE STANDARD SHOULD APPLY AND BE DEEMED SATISFIED: FUNDAMENTAL FAIRNESS AND MANIFEST INJUSTICE ARE AT STAKE.**

The *amici* agree with the petitioners that they face irreparable harm. That harm is inextricably connected to the principles of jurisdiction, federalism, and comity that customarily

mark habeas corpus proceedings because time is of the essence. Most habeas corpus

proceedings—particular those in the federal courts of last resort—must address issues of

exhaustion and procedural default. The Supreme Court has observed:

> "The exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings.…Under our federal system, the federal and state 'courts [are] equally bound to guard and protect rights secured by the Constitution.'…Because 'it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation,' federal courts apply the doctrine of comity, which 'teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter.' …

*Coleman v. Thomson*, 501 U.S. 722, 731-32 (1991)(internal cites omitted).[11] While this appears

rooted in the allocation of power between the state and federal courts, the Second Circuit has

---

[11] This come from a more comprehensive explanation of the rationale for the various iterations of exhaustion:

> When the independent and adequate state ground supporting a habeas petitioner's custody is a state procedural default, an additional concern comes into play. This Court has long held that a state prisoner's federal habeas petition should be dismissed if the prisoner has not exhausted available state remedies as to any of his federal claims. …This exhaustion requirement is also grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights. As we explained in [a prior case]:

> "The exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings.…Under our federal system, the federal and state 'courts [are] equally bound to guard and protect rights secured by the Constitution.'…Because 'it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation,' federal courts apply the doctrine of comity, which 'teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter.' …

> These same concerns apply to federal claims that have been procedurally defaulted in state court. Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address

stated: "Even though a collateral challenge to a federal conviction under § 2255 does not

implicate federalism issues, we have held that the interests of finality, accuracy, integrity of prior

proceedings, and judicial economy justify a district court's refusal to entertain a § 2255 action

containing a procedurally barred claim, absent a showing of cause and prejudice." *Carmona v.*

*United States Bureau of Prisons*, 243 F.3d 629, 633 (2d Cir., 2001) citing *Campino v. United*

*States*, 968 F.2d 187, 190 (2d Cir., 1992). Accordingly, in the context of a federal prisoner

pursuing a §2241 habeas, "[t]he principles articulated in *Campino*[, *supra*,] and our other

procedural default precedents control."[12] *Id*. at 634. In spite of their genesis as bulwarks of

federalism, the exhaustion and procedural default similarly bind state and federal inmates.

   The Supreme Court, however, has long recognized that there are circumstances in which

the immediate needs of the inmate and exigent circumstances should subordinate theories of

federalism. These are precisely those circumstances. The Supreme Court recognized this in

*Wainwright v. Sykes*, 433 U.S. 72, 90-91 (1977) and adopted the "cause and prejudice" exception

to the exhaustion requirement. "The 'cause—and—prejudice' exception [to the exhaustion and

procedural default rules] will afford an adequate guarantee, we think, that the rule will not

prevent a federal habeas court from adjudicating for the first time the federal constitutional claim

of a defendant who in the absence of such an adjudication will be the victim of a miscarriage of

---

those claims in the first instance. A habeas petitioner who has defaulted his federal claims
in state court meets the technical requirements for exhaustion; there are no state remedies
any longer "available" to him….In the absence of the independent and adequate state
ground doctrine in federal habeas, habeas petitioners would be able to avoid the
exhaustion requirement by defaulting their federal claims in state court. The independent
and adequate state ground doctrine ensures that the States' interest in correcting their own
mistakes is respected in all federal habeas cases.
*Coleman v. Thompson*, *supra*, at 731-32(internal cites omitted).

[12] The *Carmona* court also, however, noted that §2241 exhaustion is rooted in the decisional law
of exhaustion and not the statutory exhaustion requirement of the Prison Litigation Reform Act
42 U.S.C. §1997e(a) because "habeas proceedings are not civil actions." 243 F.3d at 634.

justice." *Wainwright v. Sykes*, 433 U.S. 72, 90-91 (1977); *see also Carmona*, *supra*, (adopting cause and prejudice as exception to exhaustion requirement for §2241 habeas). "The cause and prejudice standard requirement shows due regard for States' finality and comity interests while ensuring that 'fundamental fairness [remains] the central concern of the writ of habeas corpus.'" *Dretke v. Haley*, 541 U.S. 386, 393 (2004) quoting *Strickland v. Washington*, 466 U.S. 688, 697 (1984). Accordingly, "[a] state prisoner may overcome the prohibition on reviewing procedurally defaulted claims if he can show 'cause' to excuse his failure to comply with the state procedural rule and 'actual prejudice resulting from the alleged constitutional violation.'" *Davila v. Davis*, _ U.S. _, 137 S. Ct. 2063, 2064-65 (2017) quoting *Wainwright*, *supra*, 433 U.S. at 84.

The raft of courthouse closures, limitations on cases heard, and medically limited time for action constitutes good cause for excuse any failure to exhaust. Importantly, the Supreme Court has noted that the "cause" must be objective, external, and not fairly attributed to the petitioner. *Davila*, *supra*, 137 S. Ct. at 2065. The present circumstances meet that criteria. This is consistent with Supreme Court precedent on cause and prejudice. For example:

> In *Martinez* v. *Ryan*, 566 U.S. 1…(2012), and *Trevino* v. *Thaler*, 569 U.S. 413…(2013), th[e] Court announced a narrow exception to *Coleman*'s[, *supra*] general rule [barring review of procedurally defaulted claims]. That exception treats ineffective assistance by a prisoner's state postconviction counsel as cause to overcome the default of a single claim—ineffective assistance of trial counsel—in a single context—where the State effectively requires a defendant to bring that claim in state postconviction proceedings rather than on direct appeal.

*Davila v. Davis*, *supra*, 137 S. Ct. 2063, 2061 (2017) *see also Maples v. Thomas*, 565 U.S. 266 (2012)(finding cause and prejudice to excuse default where defendant was abandoned by attorneys without notice). It is well settled in the ineffective assistance of counsel context,

> "[t]hat a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command. The Sixth Amendment recognizes the right to the assistance of counsel because it envisions

counsel's playing a role that is critical to the ability of the adversarial system to produce just results.

*Strickland v. Washington*, 466 U.S. 668, 685 (1984).[13] Similarly, "an attorney's errors during an appeal on direct review may provide cause to excuse a procedural default; for if the attorney appointed by the State to pursue the direct appeal is ineffective, *the prisoner has been denied fair process and the opportunity to comply with the State's procedures and obtain an adjudication on the merits of his claims*." *Martinez*, *supra*, 566 U.S. at 11 (emphasis added), citing *Coleman*, *supra*, 501 U.S. at 754. In other words, the Supreme Court recognizes "cause" where a person has a proceeding but, effectively, no lawyer to ensure its fairness. In this case, people frequently have lawyers but no proceedings for them to attend. The effect is the same: a constitutionally inadequate forum in which to present their federal claims; state court are not denied a meaningful opportunity to opine because petitioners never have a meaningful opportunity to present. Thus, the failure to present the claim is excused: there is cause.

There is also "cause" because these circumstances fall in the narrow class of cases in which the customary process would require the litigant to suffer the very prejudice he seeks to avoid. In this sense, the Supreme Court's collateral order (or interlocutory appeal) line of cases, where "observance of [the final judgment rule in 28 U.S.C. §1291] would practically defeat the right to any review at all." *Cobbledick v. United States*, 309 U.S. 323, 324-25 (1940). For example, the Court has held that the denial of a motion to dismiss an indictment on Double Jeopardy grounds is an appealable collateral order because the prohibition on double jeopardy "is more than the right not to be convicted in a second prosecution for an offense: it is the right not

---

[13] The court has also applied found cause and prejudice with respect to errors in the capital sentencing process, *Sawyer v. Whitley*, 505 U.S. 333 (1992), but was statutorily overruled aby AEDPA. *Hope v. United States*, 108 F.3d 119, 120 (7th Cir. 1997).

to be 'placed in jeopardy'--that is, not to be tried for the offense." *Flanagan v. United States*, 465

U.S. 259, 266 (1984) quoting *Abney v. United States*, 431 U.S. 651 (1977). Similarly, bail is

immediately appealable because it is the right to pretrial release lost upon a conviction. *Stack v.*

*Boyle*, 342 U.S. 1 (1951). Last, the denial of the dismissal of an indictment pursuant to the

speech and debate clause, Article I, §6, c.5, is immediately appealable because "it is more than

the right not to be convicted for certain legislative activities: it is the right not to 'be questioned'

about them—that is, not to be tried for them." *Flanagan*, *supra*, 465 U.S. at 266 quoting

*Helstoki v. Manor*, 442 U.S. 500 (1979). Where important constitutional rights would be

swallowed by the wait for review, there is good cause to hear cases immediately.

　　Second, the petitioners would suffer prejudice were they denied review or required to

wait longer for it. The factual prejudice they would suffer is nearly axiomatic at this point:

petitioners could contract COVID-19 and perish while waiting for review of the very claims that

could spare them this fate. That is well established in the public record and the petition.

However, significant legal prejudice (which admittedly may be secondary to a deceased person

but is nonetheless important) could result as well. Custody is the core jurisdictional requirement

of habeas corpus—damages are not available in a habeas. Were petitioners to perish, they would

no longer be in custody and their claims would be moot. *See Avila-Ramos v. Kammerzell*, 2017

U.S.Dist.LEXIS 18670, 2 (D. Co., 2017)(staying extradition pending appeal where even with

nearly no chance of success on appeal, extradition would moot petitioner's §2241 habeas

because she would no longer be in custody constitutes irreparable harm) *Artukovic v. Rison*, 784

F.2d 1354, 1356 (9th Cir., 1986); *Salix v. United States Forest Serv*., 995 F.Supp.2d 1148, 1152

(D.Mt, 2014). This is not merely hypothetical: it has happened before in the §2241 extradition

context. *See Lindstrom v. Graber*, 203 F.3d 470, 474 (7th Cir., 2000)(where fugitive was

surrendered to Norway *in violation of an emergency stay* "[t]he appeal is indeed moot"). The issues in this case should be decided while they can serve people effected. However, in light of the fast moving and deadly nature of CVOID-19, there is a chance the claims could escape review altogether which constitutes prejudice unto itself.

The exhaustion and procedural default doctrines are rooted in the concept that it is "'unseemly'" for federal court to deny a state court or administrative agency the opportunity to pass on a federal constitutional issue. *Coleman v. Thompson*, 501 U.S. 722, 731 (1991) quoting *Dunbar v. Burford*, 339 U.S. 200, 204 (1950). It would be more unseemly, however, for *two* courts of competent jurisdiction to decline review of the petitioners' Eighth Amendment rights—letting the petitioners, and their right, perish. It would so unseemly as to be fundamentally unfair and constitute a miscarriage of justice. That is precisely what cause and prejudice recognizes and review of these important Eighth Amendment issues is, therefore, warranted.

## IV. CONCLUSION.

The harm about to be visited upon the petitioners is not *necessary* to any legitimate government interest. They, therefore, make a strong *prima facie* case that their custody is unlawful because it is beyond what the Eighth Amendment permits. Have the petitioners any other forums to go to with their claims, they do not have time to do so. Accordingly, writs of habeas corpus—a writ with a history worthy of the scope of this crisis—should issue for their release. The *amici* respectfully support the petitioners' request for relief in paragraph one, page 39 of their Motion For Temporary Restraining insofar as it establishes an Eighth Amendment pathway to release for those unprotected by conventional remedies.

Respectfully submitted,

TERENCE WARD
FEDERAL DEFENDER

28

Dated May 2, 2020

/s/Daniel M. Erwin/s/
By Daniel M. Erwin (ct28947)
FEDERAL DEFENDER'S OFFICE
Assistant Federal Defender
10 Columbus Boulevard, 6th Floor
Hartford, CT 06106
Tel: (860) 493-6260
Fax: (860) 493-6269
Email: Daniel_Erwin@fd.org

## CERTIFICATION OF SERVICE

This is to certify that on May 2, 2020, a copy of the forgoing was filed electronically via the Court's CM/ECF system, and by that system, counsel for the Government has been provided with a copy of the forgoing.

/s/Daniel M. Erwin/s/
Daniel M. Erwin