UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| TRE MCPHERSON, PATTIKATE WILLIAMS-VOID, JOHN DOE, JOHN ROE, and THOMAS CAVES, *on behalf of themselves and all others similarly situated*, | Civil No. 3:20cv534 (JBA) |
| *Plaintiffs*, | May 6, 2020 |
| *v.* | |
| NED LAMONT and ROLLIN COOK, *in their official capacities*, | |
| *Defendants.* | |

## RULING DENYING DEFENDANTS' MOTION TO DISMISS

Plaintiffs, who are being held in Connecticut Department of Correction facilities, seek relief under 28 U.S.C. § 2241 and 42 U.S.C. § 1983 on behalf of themselves and all others similarly situated. They brought this action on April 20, 2020, claiming the ongoing COVID-19 pandemic places them at unreasonable risk of infection. Defendants move to dismiss Plaintiffs' complaint for lack of subject-matter jurisdiction. For the reasons that follow, Defendants' Motion to Dismiss [Doc. # 26] is denied.

### I.  Background

### A.  COVID-19 Pandemic

Because the existence and rapid spread of the ongoing global COVID-19 pandemic is well known, the Court will discuss only those facts most relevant to the motion to dismiss. As of May 5, 2020, there have been 29,973 reported cases of COVID-19 in the state of Connecticut, and 2,556 deaths. CASES IN THE U.S., Centers for Disease Control and Prevention ("CDC"), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed May 6, 2020).

"COVID-19 is thought to spread mainly through close contact from person-to-person in respiratory droplets from someone who is infected. People who are infected often have symptoms of illness," but "[s]ome people without symptoms may be able to spread virus."

How COVID-19 Spreads, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last accessed May 5, 2020). It also "may be possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes." *Id.* "The virus that causes COVID-19 is spreading very easily and sustainably between people." *Id.*

"The best way to prevent illness is to avoid being exposed to this virus." How to Protect Yourself & Others, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last accessed May 5, 2020). To avoid contracting COVID-19, the CDC recommends taking certain precautions, including 1) "[w]ash[ing] your hands often with soap and water for at least 20 seconds especially after you have been in a public place"; 2) "[a]void[ing] close contact with people who are sick, even inside your home"; 3) "[p]ut[ting] distance between yourself and other people outside your home," including "[s]tay[ing] at least 6 feet (about 2 arms' length) from other people," avoiding "gather[ing] in groups," and "[s]tay[ing] out of crowded places and avoid[ing] mass gatherings"; 4) using a "cloth face cover" whenever you "have to go out in public," although such a cover is "not a substitute for social distancing"; 5) "cover[ing] your mouth and nose with a tissue when you cough or sneeze" and immediately "wash[ing] hands with soap and water for at least 20 seconds"; and 6) "[c]lean[ing] AND disinfect[ing] frequently touched surfaces daily," including "tables, doorknobs, light switches, countertops, handles, desks, phones, keyboards, toilets, faucets, and sinks." *Id.*

"Keeping distance from others is especially important for people who are at higher risk of getting very sick." *Id.* "Older adults and people who have severe underlying medical conditions like heart or lung disease or diabetes" are believed to be at "higher risk for developing serious complications from COVID-19 illness," based on currently available information and clinical expertise. *Id.* According to the CDC, "those at high-risk for severe

2

illness from COVID-19" include: 1) "People 65 years and older"; 2) "People who live in a nursing home or long-term care facility"; and 3) "People of all ages with underlying medical conditions, particularly if not well controlled." (*Id.*) Such underlying medical conditions include "chronic lung disease or moderate to severe asthma[,] . . . serious heart conditions[,] . . . severe obesity[,] . . . diabetes[,] . . . chronic kidney disease undergoing dialysis[,] . . . liver disease," and "[p]eople who are immunocompromised," from a variety of conditions "including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications." PEOPLE WHO ARE AT HIGHER RISK FOR SEVERE ILLNESS, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed May 5, 2020).

As of May 6, 2020, the Connecticut Department of Correction ("DOC") reports that 358 of its staff members and 478 of its inmates have contracted COVID-19. COVID-19 TRACKER, Connecticut State Department of Correction, https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Health-Information-and-Advisories (last accessed May 6, 2020). There are 100 inmates who have tested positive for COVID-19 currently housed at Northern Correctional Institution ("Northern CI"), to which DOC has been moving inmates who test positive, and 336 inmates have already been "medically cleared" and returned to their original facility. *Id.*[1] Six inmates have died from COVID-19. *Id.* Plaintiffs allege that Defendants have taken insufficient steps to limit the spread of COVID-19 in DOC facilities and have deprived them of means to self-protect.

---

[1] At the May 4, 2020 oral argument, Defense Counsel represented that, as of that date, 116 inmates were undergoing medical quarantine at Northern CI and another eight inmates had been hospitalized.

**B. Connecticut State Courts During COVID-19 Pandemic**

The parties dispute the degree to which the Connecticut state courts remain open and available during the COVID-19 pandemic. Six Connecticut Superior Court courthouses remain open in some capacity during the pandemic. LIST OF COURTHOUSES WHERE PRIORITY LEVEL I BUSINESS FUNCTIONS WILL BE HANDLED DURING THE COVID-19 PANDEMIC, State of Connecticut Judicial Branch, https://jud.ct.gov/HomePDFs/CourthousesOpened.pdf?v4 (last accessed May 5, 2020). Those six courthouses are open only on Mondays, Wednesdays, and Fridays. REDUCED DAYS OF OPERATION AT STATE COURTHOUSES, State of Connecticut Judicial Branch, https://jud.ct.gov/HomePDFs/Reduced_Days_Courthouses.pdf (last accessed May 5, 2020). The courts which are open are hearing only "Priority 1 Business Functions," which includes "Criminal arraignments of defendants held in lieu of bond and all arraignments involving domestic violence cases" but apparently does not include other criminal matters or civil habeas petitions. COVID-19 INFORMATION FROM THE CONNECTICUT JUDICIAL BRANCH, State of Connecticut Judicial Branch, https://jud.ct.gov/COVID19.htm (last accessed May 5, 2020).

Plaintiffs assert that "all hearing dates for criminal cases in which the defendant is incarcerated have been continued *en masse* from when the pandemic began in March to the end of May or beginning of June" and that "sentence modification hearings simply are not happening during this pandemic." (Pls.' Opp. to Mot. to Dismiss [Doc. # 34] at 7.) Defendants cite three habeas petitions which were "opened" on April 29, 2020 and two emergency motions filed in existing habeas petitions which were ruled on during the pandemic, (Defs.' Mem. Supp. Mot. to Dismiss [Doc. # 26-1] at 11 n.11, 12), but Plaintiffs respond that those are "the only habeas petitions opened in the entire state of Connecticut since March 12, 2020," in contrast with an "average of 50-60 new" habeas cases per month over the past ten years. (Pls.' Opp. at 9.)

On April 3, 2020, the Connecticut Criminal Defense Lawyers Association ("CCDLA") and certain individuals filed a complaint and motion for a temporary order of mandamus in

the Connecticut Superior Court against Governor Lamont and Commissioner Cook. Complaint, *Connecticut Criminal Defense Lawyer's Ass'n v. Lamont et al.* (hereinafter "*CCDLA*"), No. UWYCV206054309S (Conn. Super. Ct. Apr. 3, 2020). The defendants in that action moved to dismiss the complaint, asserting a variety of jurisdictional arguments. Oral argument was heard by telephone on April 15, 2020, and the motion to dismiss was granted on April 24, 2020. Order Regarding Motion to Dismiss, *CCDLA et al. v. Lamont et al.*, No. UWYCV206054309S (Conn. Super. Ct. Apr. 24, 2020).

### C.   Parties

Plaintiffs, who brought this action on April 20, 2020, are five individuals held at facilities of the Connecticut Department of Correction.

Plaintiff Tre McPherson was a "pretrial detainee at Bridgeport Correctional Center held for lack of a $5,100 bond," (Compl. [Doc. # 1] ¶ 9), but he has been released from DOC custody since the filing of this action. Plaintiff Pattikate Willliams-Void is "a pretrial detainee at York Correctional Institute held for lack of a $75,000 bond." (*Id.* ¶ 10.) "She has hypertension and has been diagnosed as pre-diabetic." (*Id.*) Plaintiff John Doe is "above the age of 70 and is a prisoner serving a sentence of incarceration," and he "has HIV and hepatitis C, and requires regular dialysis for kidney disease." (*Id.* ¶ 11.) Mr. Doe is "house[d] . . . with a cellmate." (*Id.*) Plaintiff John Roe is "above the age of 50 and is a prisoner serving a sentence of incarceration." (*Id.* ¶ 12.) Mr. Roe "has HIV" and is "house[d] . . . in an open dormitory with more than ninety other people sleeping in bunkbeds in close proximity to one another." (*Id.*) Plaintiff Thomas Caves is "a prisoner serving a sentence of incarceration at Corrigan-Radgowski Correctional Institute." (*Id.* ¶ 13.) He is "house[d] . . . with a cellmate and his cell is not cleaned." (*Id.*) Mr. Caves "shares showers, phones, and common space with more than eighty other men housed in his unit," one of whom "contracted COVID-19 and fell ill . . . [and] was simply locked in his cell, with his cellmate, for 15 days." (*Id.*)

5

Plaintiffs allege that Plaintiff John Roe "attempted to file a grievance regarding the circumstances that led to his infection with COVID-19 and subsequent custody, but was told there were no forms available and 'we don't do those' here" at Northern CI. (Pls.' Opp. at 15 (quoting Ex. 11 to Pls.' Opp (Roe Decl.) [Doc. # 34-11] ¶ X).) Plaintiffs also allege that Plaintiff John Doe "filed an initial grievance." (*Id.*) Defendants maintain that they have received no grievances from any of the named plaintiffs and that the DOC grievance procedures remain open and functional during the COVID-19 pandemic. (*See* Exs. N (Bennet Decl.), O (Cotta Decl. and Basley-Motley Decl.) to Defs.' Mot. to Dismiss [Docs. ## 26-15, 26-16].)

Plaintiffs propose "two classes that together comprise all individuals currently held in DOC facilities: the Pre-adjudication Class of those incarcerated people held while awaiting adjudication of their charges, and the Post-adjudication Class of those incarcerated people who are serving a criminal sentence." (Compl. ¶ 1.) Each proposed class contains a "medically vulnerable" subclass, made up of "all individuals 50 and older and those with medical conditions that place them at heightened risk of severe illness or death from COVID-19." (*Id.*)

Defendant Ned Lamont is the governor of the state of Connecticut. (*Id.* ¶ 14.) Governor Lamont is sued in his official capacity. (*Id.*) Defendant Rollin Cook is the commissioner of the Connecticut DOC and is also sued in his official capacity. (*Id.* ¶ 15.) "Governor Lamont and the state of Connecticut control and operate the DOC facilities through" Commissioner Cook, who "has immediate custody over" the named plaintiffs "and all other putative class members." (*Id.* ¶¶ 14-15.)

## II.  Discussion

Defendants move to dismiss this hybrid action, brought under 28 U.S.C. § 2241 and 42 U.S.C. § 1983, on the grounds that the Court lacks jurisdiction because Plaintiffs have not exhausted their remedies. Specifically, Defendants contend that Plaintiffs are barred from bringing their § 2241 habeas petition because they "have failed to exhaust available state court remedies," and that Plaintiffs are barred from asserting claims under 42 U.S.C. § 1983

because they have failed to exhaust administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). (Defs.' Mem. Supp. Mot. to Dismiss at 1).

In the alternative and in the event that the Court concludes it has jurisdiction, Defendants ask the Court to apply the *Younger* abstention doctrine and "decline to exercise jurisdiction over these claims because they implicate various state judicial orders and mittimuses, impacting pending criminal pretrial matters, including detention and bond orders, as well as the state mandamus action brought by the same counsel." (*Id.*)

The Court will address each argument in turn.

## A. Section 2241 Exhaustion

Plaintiffs challenge the "conditions of confinement at DOC facilities across the state" of Connecticut, which they assert "create a heightened and unreasonable risk of COVID-19," through a writ of habeas corpus brought pursuant to 28 U.S.C. § 2241. (Compl. ¶ 1.) As a threshold matter, the Court must determine whether § 2241 is the proper vehicle for Plaintiffs' petition, as Defendants ask the Court to "treat this as it really is: a Petition for a writ of habeas corpus by state inmates via § 2254." (Defs.' Mem. Supp. Mot. to Dismiss at 4.)[2] The Court will then consider what exhaustion requirement applies to Plaintiffs' petition and whether that requirement may be excused in this case.

The Second Circuit has set forth a framework for determining which petition a prisoner may bring in seeking habeas relief. The "ordinary vehicle" for a state prisoner is 28 U.S.C. § 2254, "under which such a prisoner may have his sentence vacated or set aside."

---

[2] As the Court will later address, this distinction is significant, because § 2254 specifically mandates that a court may not grant a petition unless the "applicant has exhausted the remedies available in the courts of the State" or "there is an absence of available State corrective process." 28 U.S.C. § 2254(b)(1)(A). In contrast, § 2241 "does not by its own terms require the exhaustion of state remedies as a prerequisite to the grant of federal habeas relief." *U.S. ex rel. Scranton v. State of N.Y.*, 532 F.2d 292, 294 (2d Cir. 1976). Instead, habeas petitions brought under § 2241 are subject to a "judicially created exhaustion requirement." *Theodoropoulos v. I.N.S.*, 358 F.3d 162, 167 (2d Cir. 2004).

*Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 632 (2d Cir. 2001) (discussing distinction between habeas petitions brought pursuant to § 2255 and those brought under § 2241). In contrast, "a writ of habeas corpus under § 2241 is available" to a prisoner "who does not challenge the legality of his sentence, but challenges instead its execution subsequent to his conviction." *Id.*; *see also Chambers v. United States*, 106 F.3d 472, 474 (2d Cir. 1997) ("A challenge to the *execution* of a sentence, however, is properly filed pursuant to Section 2241."); *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 n.5 (2d Cir. 1991) (explaining that a federal prisoner's habeas petition "seeking [to] vacate, set aside, or correct the initial sentence" is properly brought under  § 2255, where "challenges to the length, appropriateness or conditions of confinement are properly brought under 28 U.S.C. § 2241").

The Second Circuit has also offered examples of what qualifies as a challenge to the "execution" of a prisoner's sentence. It has explained that a § 2241 petition may be used to challenge "such matters as the administration of parole, computation of a prisoner's sentence by prison officials, prison disciplinary actions, prison transfers, type of detention and prison conditions." *Jiminian v. Nash*, 245 F.3d 144, 146 (2d Cir. 2001); *see also Dhinsa v. Krueger*, 917 F.3d 70, 81 (2d Cir. 2019) (explaining that a § 2241 application "provides the proper means" to "challenge the execution of a sentence, including challenges to disciplinary actions, prison conditions, or parole decisions" (internal quotation marks omitted)); *Gonzalez v. United States*, 792 F.3d 232, 238 (2d Cir. 2015) (stating that § 2241 could, theoretically, be used to attack the execution of a restitution order); *Adams v. United States*, 372 F.3d 132, 135 (2d Cir. 2004) (stating that a § 2241 petition may be used to seek relief from, among other things, "prison conditions in the facility where he is incarcerated").

Here, Plaintiffs are challenging the current health conditions of their confinement, which, they claim, have become unconstitutional because of the COVID-19 pandemic risk.

They are not attacking their underlying sentences. As such, § 2241 is the proper vehicle for their petition.[3]

Having concluded that Plaintiffs have properly brought their habeas petition under § 2241, the Court now addresses the applicable exhaustion requirement.

As previously noted, § 2241 "does not by its own terms require the exhaustion of state remedies as a prerequisite to the grant of federal habeas relief." *U.S. ex rel. Scranton*, 532 F.2d at 294. However, "[a]lthough not a statutory requirement, Section 2241 has been interpreted as requiring a petitioner to exhaust available state court or administrative remedies prior to seeking any relief thereunder in federal court." *Robinson v. Sposato*, No. CV-11-0191 SJF, 2012 WL 1965631, at *2 (E.D.N.Y. May 29, 2012) (citing *Carmona*, 43 F.3d at 632–34; *see*

---

[3] At oral argument, Defense Counsel noted that other circuits have held that prisoners may not use § 2241 to bring conditions of confinement claims. Indeed, eight of the eleven circuits that have addressed the issue have concluded that claims challenging prison conditions cannot be brought in a § 2241 habeas petition, but must instead be brought under § 1983. *Compare Wilborn v. Mansukhani*, 795 F. App'x 157, 162-63 (4th Cir. 2019) (noting that "[t]he Supreme Court has not definitively addressed whether a claim challenging the petitioner's place of confinement is cognizable in a petition for writ of habeas corpus" and holding that "conditions-of-confinement claims are not cognizable in habeas proceedings"); *Nettles v. Grounds*, 830 F.3d 922, 933–34 (9th Cir. 2016) (concluding that conditions-of-confinement claims fall outside "the core of habeas corpus" and thus must instead be brought in a civil rights claim); *Spencer v. Haynes*, 774 F.3d 467, 469–70 (8th Cir. 2014) (same), *Cardona v. Bledsoe*, 681 F.3d 533, 537 (3d Cir. 2012) (same); *Davis v. Fechtel*, 150 F.3d 486, 490 (5th Cir. 1998) (same); *McIntosh v. U.S. Parole Comm'n*, 115 F.3d 809, 811–12 (10th Cir. 1997) (same); *Graham v. Broglin*, 922 F.2d 379, 381 (7th Cir. 1991) (same); *and Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004) (same); *with Aamer v. Obama*, 742 F.3d 1023, 1036 (D.C. Cir. 2014) (holding that prisoners can bring habeas claims challenging the form of their detention); *Adams v. United States*, 372 F.3d 132, 135 (2d Cir. 2004) (stating that a § 2241 petition may be used to may seek relief from, among other things, "prison conditions in the facility where he is incarcerated"); *and Miller v. United States*, 564 F.2d 103, 105 (1st Cir. 1977) (holding conditions-of-confinement claims are cognizable under § 2241).

However, as Defense Counsel acknowledged, the Second Circuit has adopted and repeatedly reaffirmed its minority view that "[u]nder § 2241, a prisoner may challenge the *execution* of his sentence." *Roccisano v. Menifee*, 293 F.3d 51, 57 (2d Cir. 2002). This Court does not have license to disregard this binding circuit precedent.

*also U.S. ex rel. Scranton*, 532 F.2d at 294 ("[D]ecisional law has superimposed such a[n exhaustion] requirement in order to accommodate principles of federalism."); *Foster v. Murphy*, 686 F. Supp. 471, 474 (S.D.N.Y.1988) (explaining that "courts have engrafted a requirement of exhaustion" upon § 2241).

Courts in this circuit have "interpreted [§ 2241] to require a petitioner to exhaust available state court remedies before seeking relief . . . in federal court." *Henry v. United States*, No. 11-CV-391 KAM, 2014 WL 7075800, at *3 (E.D.N.Y. Dec. 12, 2014); *see also DeLee v. Conway*, No. 9:16-CV-0799 (BKS), 2016 WL 3823808, at *2 (N.D.N.Y. July 12, 2016) ("Section 2241 does not explicitly require the exhaustion of state court remedies, but courts have required exhaustion to accommodate the principles of federalism.").

To satisfy § 2241's exhaustion requirement, a petitioner must "raise all claims in state court prior to raising them in a federal habeas corpus petition," and, in doing so, "'fairly present' each claim for habeas relief in 'each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim.'" *DeLee*, 2016 WL 3823808, at *3 (quoting *Baldwin v. Reese*, 541 U.S. 27, 29 (2004)). Put otherwise, petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

Here, Plaintiffs acknowledge that they have not fully exhausted their state court remedies. Although Plaintiffs brought a parallel action in Connecticut state court, which was ultimately dismissed, *see CCDLA*, No. UWYCV206054309S (Conn. Super. Ct. Apr. 24, 2020), they have not represented that they have appealed or intend to appeal this decision. Having conceded that they have not satisfied § 2241's exhaustion requirement, Plaintiffs instead ask the Court to apply an exception it. (*See* Pls.' Opp. at 4-5.)

Because § 2241's exhaustion requirement is a judicial invention, it is "amenable to judge-made exceptions." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also McCarthy v.*

10

*Madigan*, 503 U.S. 140, 144 (1992) ("Where Congress specifically mandates, exhaustion is required. But where Congress has not clearly required exhaustion, sound judicial discretion governs." (citations omitted)); *Bastek v. Fed. Crop Ins. Corp*., 145 F.3d 90, 94 (2d Cir. 1998) ("Statutory exhaustion requirements are mandatory, and courts are not free to dispense with them. Common law (or 'judicial') exhaustion doctrine, in contrast, recognizes judicial discretion to employ a broad array of exceptions[.]").

There are generally three bases for waiver of a judicially crafted exhaustion requirement. "First, exhaustion may be unnecessary where it would be futile, either because agency decisionmakers are biased or because the agency has already determined the issue." *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019) (addressing judicially crafted exhaustion requirement applicable to Controlled Substance Act challenges). "[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile." *Id*. at 120. Second, "exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief," including situations where "the relief the agency might provide could, because of undue delay, become inadequate." *Id*. at 119-20. Third, "exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice." *Id*. at 119.

Here, Plaintiffs contend that § 2241's exhaustion requirement should be waived, because they "will suffer an irreparable injury without immediate judicial relief, and it would be futile to seek state relief." (Pls.' Opp. at 5.) They explain that they may suffer catastrophic health consequences if required to exhaust, as "[w]ithout immediate relief, Plaintiffs could contract [COVID-19] and, within days, suffer severe physical injury, illness, or even death, harm that certainly would be irreparable." (*Id.*) Plaintiffs further assert that the Connecticut state court system is not currently able to offer such immediate relief. They state that "[o]nly six [state] courts across [Connecticut] are currently operating," that these court are "open only for several hours on Mondays, Wednesdays, and Fridays," and that these court are "no

longer [conducting] any criminal hearings other than arraignments." (*Id.* at 5-6 (citing REDUCED DAYS OF OPERATION AT STATE COURTHOUSES); *see also* Ex. 2 (Dagostine E-mail) to Pls.' Opp. [Doc. # 34-2] at 2 ("For Criminal Matters, the priority 1 business functions are arraignments involving incarcerated defendants, and domestic violence arraignments. All other case[s], with limited exceptions . . . are not being heard during this time.").) Plaintiffs also provide an e-mail from the Connecticut Judiciary's Deputy Director of Criminal Matters stating that "[c]ases involving incarcerated defendants" are to be continued "out to late May and June," (Dagostine E-mail at 3), as well as an e-mail from the Deputy Chief Clerk of the Criminal Division responding to an emergency sentence modification request stating that "Sentence Modifications are not Priority 1 matters and will not be heard until courts open up for regular business," (Ex. 3 (Romano Decl.) to Pls.' Opp. [Doc. # 34-3] at 2). Additionally, Plaintiffs assert that the docketing of habeas petitions has come to a standstill. They contend the Connecticut state court system typically dockets fifty to sixty habeas petitions per month, but as of April 29, 2020, only three habeas petitions have been "opened in the entire state of Connecticut since March 12, 2020—i.e., since the pandemic began." (Pls.' Opp. at 9).[4] Plaintiffs elaborated on this point at oral argument, further noting that the deadline for responsive pleadings has been set one month from their filing, during which time a petitioner could contract COVID-19 and suffer serious and even fatal consequences. Plaintiffs conclude from this that it "remains virtually impossible for incarcerated people—particularly those who do not have already engaged, active lawyers on their longstanding cases, and even those

---

[4] Plaintiffs describe the habeas process to involve:

Mailing a petition to the (closed) Rockville courthouse; having it forwarded from Rockville to Hartford, again via mail, at which point a clerk will review it on a Wednesday or Friday between 9 a.m. and 1 p.m. and then—assuming it has been marked on the envelope as an "emergency,"—a judge may review it to determine whether a hearing should be held.

(Pls.' Opp. at 9 n.9.)

who do—to obtain relief in state court," and thus argue that exhaustion of state court remedies should be excused given the fast-moving nature of the COVID-19 pandemic. (*Id.* at 11.)

Defendants paint a different picture of the Connecticut state court system. Defendants assert that the "courts are open and are currently hearing and processing inmate requests for release via a variety of judicial mechanisms," and that "[s]everal inmates have already filed actions in state court for release based on similar claims related to COVID-19 and these claims are being acted upon." (Defs.' Mem. Supp. Mot. to Dismiss at 10.) Defendants identify one habeas action brought by Mr. Robert Day "where within seven (7) days the petitioner's habeas motion was filed, objected to, and the presiding judge . . . rendered a decision."[5] (*Id.* (citing *Robert Day #253376 v. Comm'r of Corr.*, No. CV17- 4008971-S (Conn. Super. Ct. Apr. 20, 2020)).) Defendants also draw the Court's attention to the parallel *CCDLA* class action brought in state court, noting that "very fact that the same attorneys were able to file such an action in state court completely refutes any claim that the state courts are 'closed.'" (Defs.' Mem. Supp. Mot. to Dismiss at 5.)

Considering the above, the Court concludes that § 2241's exhaustion requirement should be waived in light of the extraordinary circumstances presented by the COVID-19 pandemic. Plaintiffs have adequately demonstrated that the state court system is operating at such a diminished capacity that it may not be able to timely respond to a massive volume of emergency habeas petitions—a number potentially in the hundreds or thousands, given the size of the putative class—in the urgent manner that those petitions require.[6] As other

---

[5] Plaintiffs note that "Mr. Day, who has multiple medical conditions that would put him at risk of severe illness from COVID-19, first filed a habeas petition in July 2017," and his "emergency motion for bond pending habeas, filed April 13, was denied for failure to demonstrate likelihood of prevailing on the underlying habeas claim." (Pls.' Opp. at 10.)

[6] Plaintiffs allege, "[o]n information and belief, there are at least 11,840 people in the proposed Classes." (Compl. ¶ 76.)

courts have noted, COVID-19 is highly contagious and the "fatality rate among the riskiest population is about fifteen percent." *Medeiros v. Martin*, No. CV 20-178 WES, 2020 WL 2104897, at *1 (D.R.I. May 1, 2020); *see also Pimentel-Estrada v. Barr*, No. C20-495 RSM-BAT, 2020 WL 2092430, at *3 (W.D. Wash. Apr. 28, 2020) ("In the highest risk populations, the case fatality rate is about 15%." (internal quotation marks removed)). Given the reality of the disease, which is spreading in Connecticut prisons, and the consequence of potentially catastrophic health outcomes, the Court concludes that exhaustion of state remedies would be futile, because, under current conditions, Plaintiffs are at substantial risk of contracting the disease prior to completing the exhaustion process.

This conclusion is reached with full recognition of the Connecticut judiciary's best efforts in the face of an unprecedented global pandemic. The federal court system, too, is significantly limited in its operations due to this public health emergency. *See In re Court Operations Under the Exigent Circumstances Created by COVID-19*, UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT (Apr. 27, 2020), http://www.ctd.uscourts.gov/sites/default/files/4-27-20-COVID-19-Superseding-General-Order-Re-Court-Operations_0.pdf (ordering that all in-court and in-person civil and criminal proceeding scheduled to commence on or before June 15, 2020 are to be continued). In fact, oral arguments in this matter, normally held in a courtroom, had to be conducted via video teleconference, with many participants logging in from their homes. But given the life-and-death consequences at stake, prudence warrants allowing Plaintiffs to continue pursuing this action in federal court, whether or not they have fully availed themselves of the remedies available in the state court system.

As such, the Court concludes that Plaintiffs may seek habeas relief under § 2241 without exhausting state court remedies.

14

**B.  PLRA Exhaustion**

Plaintiffs also seek to challenge the conditions of their confinement under 42 U.S.C. § 1983, and so are subject to a mandatory statutory exhaustion requirement, which Defendants contend has not been satisfied.

A prisoner is limited in his or her ability to bring a § 1983 claim by the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104–134, 110 Stat. 1321 (1996), which expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

In contrast to the judicially-created exhaustion requirement governing § 2241 petitions, the PLRA's exhaustion requirement may not be excused under any judicially created exception doctrine. *See Ross v. Blake*, 136 S. Ct. 1850, 1855 (2016) (rejecting "an unwritten 'special circumstances' exception" to the PLRA which would have "permit[ed] some prisoners to pursue litigation even when they have failed to exhaust available administrative remedies.") The Supreme Court has been clear that the PLRA "establish[ed a] mandatory exhaustion regime[], foreclosing judicial discretion" and barring "a court . . . [from] excus[ing] a failure to exhaust, even to take . . . [special] circumstances into account." *Ross*, 136 S. Ct. at 1856-57; *see also Booth v. Churner*, 532 U.S. 731, 741 n. 6 (2001) ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise. . . . Here, we hold only that Congress has provided in § 1997e(a) that an inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues.").

15

But while the PLRA's exhaustion requirement is mandatory, 42 U.S.C. § 1997e(a)'s "edict contains one significant qualifier: the remedies must indeed be 'available' to the prisoner." *Ross*, 136 S. Ct. at 1856. The Supreme Court has illustrated three circumstances where an administrative remedy is not "available," thus absolving the prisoner of pursuing exhaustion:

> First, . . . an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. . . . Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it. . . . [F]inally, the same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.

*Id.* at 1859-60. Under this framework, there is no exception for the special circumstance of "catastrophic health consequences"; a plaintiff instead must establish that the administrative review process is so overburdened, inefficient, or hostile as to be effectively unavailable to remedy the complaint.

Plaintiffs argue that the Connecticut DOC administrative procedure is "unavailable" for a variety of reasons. They contend that the DOC grievance procedure, as promulgated in State of Connecticut Department of Correction Administrative Directive Number 9.6, operates as a "dead end" and that it is practically incapable of use because "[e]xhausting the grievance process in Connecticut takes a minimum of 75 *business* days, and up to 105 *business* days for a grievance that 'challenges Department level policy.'" (Pls.' Opp. at 18 (quoting Ex. 15 (Directive Number 9.6) to Pls.' Opp. [Doc. # 34-15] at 5-8).) Plaintiffs also note that "Connecticut's DOC does not have an emergency grievance procedure" to process urgent requests. (*Id.* at 17.) Citing the Seventh Circuit, Plaintiffs offer that "'[i]f it takes two weeks to exhaust a complaint that the complainant is in danger of being killed tomorrow, there is no 'possibility of some relief' and so nothing for the prisoner to exhaust.'" (*Id.* at 19 (quoting *Fletcher v. Menard Correctional Center*, 623 F.3d 1171, 1173 (7th Cir. 2010).)

16

Plaintiffs contend that the same logic applies where a disease may cause serious or fatal health consequences well within the timeframe for exhaustion of an administrative grievance process, which takes a minimum of at least two months.

In the alternative, Plaintiffs argue that "prison administrators [have] thwart[ed] inmates from taking advantage of a grievance process," thereby making the process unavailable. (Pls.' Opp. at 17 (quoting *Ross*, 136 S. Ct. at 1860).) They state that named Plaintiff John Roe, while under medical quarantine at Northern CI, "attempted to file a grievance regarding the circumstances that led to his infection with COVID-19 and subsequent custody, but was told there were no forms available and 'we don't do those' here," (Roe Decl. ¶ X), and note that "[c]ourts in this Circuit have found these circumstances sufficient to support a claim that the grievance procedure was unavailable." (*Id.* (citing *Smith v. City of New York*, 2013 WL 5434144, *14-16 (S.D.N.Y., Sept. 26, 2013) (holding evidence prisoner was told by prison staff, "We are not able to deal with this," and to "Wait it out. See what comes. Calm down," supported claim that grievance process was unavailable); *Scott v. Westchester Cty.*, No. 18 CV 7203, 2020 WL 364251, at *5 (S.D.N.Y. Jan. 22, 2020) (allegations that plaintiff "repeatedly requested assistance writing a grievance but was either ignored or told someone would help him" "plausibly suggest prison administrators thwarted plaintiff from taking advantage of the grievance system")).)[7] Plaintiffs argue that this attempt to exhaust administrative remedies is sufficient to excuse exhaustion for the whole class because, for purposes of a putative class action, a single plaintiff's allegation regarding exhaustion "satisfies the requirement as to all members." *Barfield v. Cook*, No. 3:18-CV-1198 (MPS), 2019 WL 3562021, at *8 (D. Conn. Aug. 6, 2019); *see also Lewis v. Washington*, 265 F. Supp. 2d 939, 942 (N.D. Ill. 2003) ("To require each inmate with the same grievance to

---

[7] Additionally, Plaintiffs' Counsel offer that another named Plaintiff, John Doe, has attested that "he has filed an initial grievance, but Defendants represent that they do not have a record of it," but that "[g]iven the expedited briefing schedule, Plaintiffs were unable to have Mr. Doe sign a declaration to this end in time for this filing[.]" (Pls.' Opp. at 15.)

exhaust their administrative remedies would be wasteful, and as long as prison officials have received a single complaint addressing each claim in a class action, they have the opportunity to resolve disputes internally and to limit judicial intervention in the management of prisons.").

Defendants maintain that the grievance process is available to Plaintiffs, as the regulations laid out in Administrative Directive 9.6 remain in effect. At oral argument, Defense Counsel acknowledged that the state's prisons are currently facing "unique challenges and struggles" because of COVID-19, but affirmed that the DOC grievance procedure is still operational and stressed that the pandemic should not be cause to "ignore jurisdictional limitations on the courts." Without disputing the point that the Connecticut DOC lacks any emergency grievance procedure, Defense Counsel noted that the 105-day grievance timeframe is an upper limit and that it "assumes the worst of people" to anticipate that the grievance process will consume the maximum amount of time. Defense Counsel also argued that Mr. Roe's declaration that he "asked the correctional officer for grievance forms and was told they didn't have any and they didn't do that here," (*see* Roe Decl. ¶ 2), proves that he did not exhaust his remedies, because Administrative Directive "9.6 tells him exactly what to do if that happens: file a piece of paper, [and] stick it in the inmate grievance box."

The Court appreciates that the Connecticut DOC grievance procedure is available and capable of offering relief in ordinary times. However, these are not ordinary times. The Connecticut DOC grievance procedure, which lacks an emergency review process, was not set up with a pandemic in mind. Although Defendants' point that not every grievance will require 105 business days to resolve is well taken, the imminent health threat that COVID-19 creates has rendered DOC's administrative process inadequate to the task of handling Plaintiffs' urgent complaints regarding their health. For example, Plaintiffs have alleged that "Class members at certain facilities do not have access to soap" and that their masks "rip easily and are not replaced." (Compl. ¶¶ 59, 62.) Because COVID-19 spreads "easily and

18

sustainably," Plaintiffs risk contracting the disease while foregoing these hygienic precautions and attempting to exhaust the DOC's administrative grievance procedure, which occurs in four stages and involves an informal resolution process, the filing of an initial formal complaint, and two rounds of appeals. (*See* Directive 9.6 at 5-8.) In this context, the DOC's administrative grievance process is thus, "practically speaking, incapable of use" for resolving COVID-19 grievances. *Ross*, 136 S. Ct. at 1859; *see also Fletcher*, 623 F.3d at 1173 ("If a prisoner has been placed in imminent danger of serious physical injury by an act that violates his constitutional rights, administrative remedies that offer no possible relief in time to prevent the imminent danger from becoming an actual harm can't be thought available."). As such, the Court concludes that administrative remedies for the relief that Plaintiffs seek are unavailable, and thus exhaustion is not required for Plaintiffs to proceed on their § 1983 claims.[8]

---

[8] Having reached this conclusion, the Court need not dwell on Plaintiffs' alternative arguments regarding John Roe and John Doe's attempts at exhaustion, but instead makes a few brief points.

First, Plaintiffs are correct that a rebuff of a Plaintiff's attempt to file a grievance falls squarely within one of the "unavailability" exceptions identified in *Ross*. *See* 136 S. Ct. at 1856 (explaining that administrative remedies are unavailable when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation"). Plaintiffs are also correct that, under the doctrine of "'vicarious exhaustion,' . . . the PLRA's exhaustion requirement is satisfied as long as at least one member of the proposed prisoner class has exhausted applicable remedies." *Barfield*, 2019 WL 3562021, at *7.

However, for the PLRA's administrative exhaustion requirement to be satisfied by vicarious exhaustion, one or more class members must "ha[ve] exhausted his administrative remedies with respect to *each claim raised by the class*." *Id.* at *8 (emphasis added and internal quotation marks omitted). Here, Mr. Roe has only stated that he "attempted to grieve [his] conditions and treatment related to COVID-19," without any further specification as to the intended content of his claims. (Roe Decl. ¶ 2.) The Court has little information as to the substance of Mr. Doe's purported administrative filing, as counsel have only represented that he submitted an "initial grievance" without any explanation of his asserted claims. Because the Court cannot ascertain whether Mr. Roe and Mr. Doe's grievances encompassed each claim raised by the putative class, the Court is unable to apply the vicarious exhaustion doctrine in this instance.

19

### C. *Younger* Abstention

Having concluded that jurisdiction over Plaintiffs' claims exists, the Court will now consider whether the *Younger* abstention doctrine applies to this case.

*Younger v. Harris*, 401 U.S. 37, 41 (1971), recognized "the national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances." Where it applies, *Younger* abstention is mandatory, and thus the federal court may not retain jurisdiction and must dismiss the claims governed by *Younger*. *See Juidice v. Vail*, 430 U.S. 327, 348 (1977).

The Supreme Court's decision in *Younger* was driven in large part by two considerations: (1) "the basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief"; and (2) "the notion of 'comity,' that is, a proper respect for state functions, . . . a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Younger*, 401 U.S. at 43-44.

Defendants argue that this Court must abstain from hearing Plaintiffs' claims because "*Younger* abstention is required when three conditions are met: (1) there is an ongoing state proceeding; (2) an important state interest is implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims" (the "*Middlesex* conditions"). (*Id.* at 16 (quoting *Diamond D Const. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002)).) *See also Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 433-34 (1982).

But as the Supreme Court explained in *Sprint Comms. Inc. v. Jacobs*, 571 U.S. 69, 81 (2013), the "three *Middlesex* conditions . . . [a]re not dispositive." Rather, those three conditions are, "instead, *additional* factors appropriately considered by the federal court

before invoking *Younger*." *Id.* The three *Middlesex* conditions are alone insufficient to warrant *Younger* abstention because if

> [d]ivorced from their quasi-criminal context, the three *Middlesex* conditions would extend *Younger* to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest. . . . That result is irreconcilable with our dominant instruction that, even in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the "exception, not the rule."

*Id.* at 81-82 (quoting *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 236 (1984)).

Thus, *Younger* abstention does not apply to all situations in which the *Middlesex* conditions are satisfied, but rather it can apply *only* in "the three 'exceptional circumstances' identified" in *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 373 (1989) ("*NOPSI*"), "but no further." *Sprint Comms.*, 571 U.S. at 82. As *NOPSI* made clear, under the *Younger* doctrine, "federal courts should not enjoin pending state" proceedings which are 1) state criminal prosecutions, 2) certain civil enforcement proceedings, or 3) civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions. *See NOPSI*, 491 U.S. at 368. Only where those prerequisites are satisfied should federal courts use the *Middlesex* conditions to determine whether abstention is warranted. *See Sprint Comms.*, 571 U.S. at 78.

Defendants suggest that the exceptional circumstances permitting *Younger* abstention exist here, and thus that the Court should proceed to consider whether the *Middlesex* conditions require abstention. Specifically, Defendants argue that *Younger* abstention is proper because Plaintiffs' claims "implicate various state judicial orders and mittimuses, impacting pending criminal pretrial matters, including detention and bond orders, as well as the state mandamus action brought by the same counsel." (Defs.' Mem. Supp. Mot. to Dismiss at 1.)

Plaintiffs respond that *Younger* abstention is "inapplicable" because this case lacks "the *sine qua non* of *Younger* abstention: a federal plaintiff seeking to enjoin a state

21

proceeding." (Pls.' Opp. at 20-21.) Plaintiffs argue that because they "have not asked this Court to enjoin any ongoing state proceeding," but rather "have asked only that the Court enjoin certain acts of the Defendants, as well as to declare that Defendants' acts violate the Constitution," *Younger* abstention is wholly inapplicable here, and the Court need not consider the *Middlesex* conditions. (*Id.* at 21.) Plaintiffs acknowledge that "[a]s a matter of practicality, a ruling from this Court may preempt a pending state court action by having preclusive effect upon it." (*Id.*) But they argue that such *interference* with a pending state court proceeding does not trigger *Younger* analysis where the relief requested would not *enjoin* a state proceeding. (*See id.*)

"*Younger* abstention requires that . . . a federal court must *abstain from enjoining* [certain] ongoing state . . . proceedings." *Williams v. Lambert*, 46 F.3d 1275, 1282 (2d Cir. 1995) (emphasis added); *see also NOPSI*, 491 U.S. at 364 (describing holding in *Younger* as "that absent extraordinary circumstances federal courts should not *enjoin pending state*" proceeding (emphasis added)); *Sprint Comms.*, 571 U.S. at 72 ("When there is a parallel, pending state criminal proceeding, federal courts must refrain from *enjoining the state prosecution*." (emphasis added)); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 601 (1975) (describing holding in *Younger* as "that federal *injunctions against*" state proceedings "could be issued only under extraordinary circumstances" (emphasis added)).

"Abstention is not in order simply because a pending state-court proceeding involves the same subject matter." *Sprint Comms.*, 571 U.S. at 72 (citing *NOPSI*, 491 U.S. at 373). "Parallel state-court proceedings do not detract from" the federal courts' "virtually unflagging" "obligation to hear and decide a case" over which it has jurisdiction. *Id.* at 77. Where *Younger* abstention is not required, "the general rule governs: The pendency of an action in a state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Id.* at 73 (internal quotation and alterations omitted).

22

In *Sprint Communications, Inc. v. Jacobs*, the Supreme Court concluded that *Younger* abstention was not warranted even where the relevant state and federal proceedings "[e]ach seek[] review of" an order of the same state administrative board and "each [action] presents the" same question, 571 U.S. at 72, because the case did not fall within any of the three exceptional circumstances outlined by *NOPSI*, *id.* at 80-82. Similarly, in *Williams v. Lambert*, the Second Circuit Court of Appeals concluded that *Younger* abstention was not warranted because the plaintiff "has not asked that any state proceeding be enjoined." 46 F.3d at 1282. Rather, if granted, the plaintiff's requested relief "would have only the effect of mooting her counterclaim [in the state proceeding] and of allowing her to initiate a separate case for modification of the support agreement." *Id.* The *Williams* court concluded that such relief "does not present the issues of state and federal comity with which *Younger* is concerned." *Id.*

Plaintiffs here ask the Court to "grant the proposed Classes' Petition for writs of habeas corpus and grant the proposed Classes' request for an injunction against Defendants." (Pls.' Mot. for TRO [Doc. # 15] at 39.) Specifically, Plaintiffs seek an order requiring Defendants to (1) identify and release all members of the medically vulnerable subclasses "absent proof of judicially-recorded findings by clear and convincing evidence that the individual poses such a serious risk of flight or danger to others that no other conditions can mitigate"; (2) "provide these individuals with educational resources on COVID-19, including instructions that they should self-isolate"; (3) submit a plan to the Court outlining certain further mitigation efforts and evaluations regarding class members remaining in DOC custody; and (4) report weekly on the medically vulnerable population of persons in DOC custody. (*Id.* at 39-40.)

Nonetheless Defendants suggest that *Younger* should apply because the relief Plaintiffs seek would "implicate" state orders or "impact[]" state criminal matters. (Defs.' Mem. Supp. Mot. to Dismiss at 1.) Similarly, during the May 4, 2020 oral argument on

23

Defendants' Motion to Dismiss, Defendants suggested that *Younger* abstention was proper because if this Court were to exercise jurisdiction over Plaintiffs' claims, it would "thwart and interfere with ongoing prosecutions" and would "knock out of the picture" the state judicial process by which individual class members might otherwise seek similar relief.[9] But Plaintiffs do not ask this Court to *order the state courts to act* to effectuate the release of the medically vulnerable subclasses. Rather, Plaintiffs ask this Court directly to *order Defendants*—the Governor and the Commissioner of the state Department of Correction—to release members of the medically vulnerable subclasses, without imposing any requirement upon the state courts to act in any particular way.

Where, as here, parallel state proceedings might be "thwart[ed]" or "knock[ed] out" by the federal relief sought simply because it would eliminate the need to seek that same relief through a state process, *Younger* abstention is not warranted. *See Sprint Comms.*, 571 U.S. at 72 ("[F]ederal courts are obligated to decide cases within the scope of federal jurisdiction. Abstention is not in order simply because a pending state-court proceeding involves the same subject matter."). In the absence of any suggestion that if it were to grant the relief Plaintiffs seek, this Court would issue an injunction against any state court or

---

[9] At oral argument, Defendants also described the relief Plaintiffs seek as "effectively . . . enjoin[ing] the state court proactively" by imposing a "mandatory injunction to race to review presentenced individuals and to act if they hadn't in such a way." But a review of Plaintiffs' Motion for Temporary Restraining Order, which seeks relief directly from this Court without any suggestion of involvement from the state courts, makes clear that Defendants mischaracterize the relief Plaintiffs seek.

proceeding,[10] *Younger* abstention is inapplicable.[11] *See Helms Realty Corp v. City of New York*, 320 F. Supp. 3d 526, 538 (S.D.N.Y. 2018) ("The mere existence of parallel and related federal and state actions does not itself justify abstention. Since Plaintiff does not in the federal action seek to enjoin or otherwise supervise the state courts, the limited Younger abstention is inapplicable.").

---

[10] Defendants' position regarding precisely which state proceedings warrant abstention lacks clarity. Defendants' Motion to Dismiss suggested that both the state mandamus action, *CCDLA*, and individual class members' state criminal proceedings require this Court to abstain under *Younger*. At oral argument, Defendants suggested that their argument for abstention is "most clear" as to the state criminal proceedings of pre-adjudication class members, but argued that abstention was also warranted as to the state criminal proceedings of post-adjudication class members even though "the waters are still murky" regarding whether all such proceedings remain "pending." Because the Court concludes that *Younger* abstention is not applicable here in light of the relief Plaintiffs seek, it need not determine whether any of those proceedings might warrant *Younger* abstention were Plaintiffs seeking to enjoin them.

[11] Defendants' argument that abstention is required under *O'Shea v. Littleton*, 414 U.S. 488 (1974), fails for similar reasons. Abstention is proper under *O'Shea* where federal plaintiffs "seek an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials," producing "an ongoing federal audit of state criminal proceedings which would indirectly accomplish the kind of interference that *Younger v. Harris* . . . and related cases sought to prevent." 414 U.S. at 500. Defendants again mischaracterize the relief Plaintiffs seek, suggesting that it would "ambush scores of state judges who are statutorily charged with reviewing individual bail decisions." (Defs.' Mem. Supp. Mot. to Dismiss at 20.) But again, Plaintiffs do not ask this Court to order state judges to act in any particular way, instead seeking direct relief from this Court against Defendants, who are not members of the state judiciary. Because the relief Plaintiffs seek would not require this Court to control, prevent, or audit current or future state court proceedings, *O'Shea* is similarly inapplicable.

**III. Conclusion**

For the foregoing reasons, Defendants' Motion to Dismiss [Doc. # 26] is DENIED. The Court will proceed to consider Plaintiffs' Motion for Temporary Restraining Order, as to which a separate schedule will be issued.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 6th day of May 2020.