# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TRE MCPHERSON, ET AL., | : | CIVIL NO. 3:20-CV-0534 (JBA) |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | |
| | : | |
| NED LAMONT, ET AL., | : | JUNE 26, 2020 |
| *Defendants.* | | |

## MODIFIED SETTLEMENT AGREEMENT AND GENERAL RELEASE

**Whereas** the parties agree that both the plaintiffs and the defendants are interested in resolving the present litigation and providing reasonable and appropriate measures for the health and safety of prisoners, staff, their families, victims, and the general public; and

**Whereas** the Centers for Disease Control and Prevention ("CDC") have promulgated, on March 23, 2020, interim guidelines for the management of coronavirus disease 2019 (COVID-19) in correctional and detention facilities[1] (the "CDC guidelines"); and

**Whereas** the Connecticut Department of Correction ("DOC") has begun the mass testing of prisoners confined in DOC facilities, a program that exceeds the current CDC guidelines; and

**Whereas** the CDC guidelines expressly state that "The guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions"; and

**Whereas** the parties acknowledge DOC's many efforts to comply with the CDC

---

[1] *See* Centers for Disease Control and Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, March 23, 2020, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

1

guidelines and, where appropriate, to obtain clarification or guidance from the Connecticut Department of Public Health ("DPH"); and

**Whereas** the parties recognize DOC's significant efforts to combat COVID-19, including, but not limited to, increasing sanitation and hygiene, testing, and releasing prisoners safely and appropriately to the community, which has resulted, in combination with prisoners having reached their end of sentence dates, in the prison population declining to numbers not seen in decades;

**Now therefore**, the parties agree to resolve their differences as follows:

### A. CDC GUIDELINES

1. DOC will continue to make best efforts to implement CDC guidelines and to adapt them based on best practices, recommendations from DPH, and based on individual facilities' physical space, staffing, population, operations, and other resources and conditions.

### B. MONITORING

2. A five person, independent Agreement Monitoring Panel ("AMP") shall be established.

3. The AMP shall be formed within four (4) weeks of the signing of this Agreement and consist of five persons with appropriate knowledge and expertise in correctional health care and managing infectious disease in a correctional setting or in the management of correctional systems.

4. The panel shall be selected as follows: two people chosen by defendants, who may be employed by the DOC, two people chosen by plaintiffs, and one person who does not currently work for the DOC, who is an expert in the management of correctional systems, and is chosen by a consensus of those persons already selected. The individuals

on the AMP (other than the DOC employees) will be paid by the State through order of the court. The total fees for the duration of the agreement shall be capped at $15,000 per panel member.

5. The AMP shall make recommendations to aid DOC in continued compliance with the CDC guidelines, as well as evolving public health guidance that may require a change to DOC's COVID-19 response. Its areas of focus shall include:

    a. mass testing strategy;

    b. Quarantining/cohorting; and

    c. Sanitation/sanitization.

6. The AMP shall devise procedures for the monitoring of this Agreement. In doing so, it shall apply professionally acceptable public health, epidemiological, and correctional healthcare standards for correctional facilities in responding to COVID-19, with the recognition that these will evolve over time.

7. Upon due notice to DOC, the AMP should be given access to DOC facilities to conduct onsite visits. Upon due notice, the AMP shall also have access to all DOC policies, procedures and records detailing its COVID-19 response, as well as access to all staff and consulting physicians and experts with respect to DOC's COVID-19 response. The individuals on the AMP must sign a confidentiality agreement prior to being provided with any documents that implicate safety and security, or medical privacy, or any other confidential documents. The confidentiality agreement shall further prohibit redissemination of such documents and public comment on their work for the AMP.

    The final reports of the AMP shall be public records as defined in Conn. Gen. Stat. § 1-200(5).[1]

8. The AMP shall provide the defendants and counsel for the parties with a monthly report, for the first three months, in a format to be agreed upon by the AMP and the parties. These may be reduced to quarterly reports upon mutual agreement of the parties and the AMP.

9. The AMP may not alter, amend or change the provisions of the Agreement.

**C. TESTING**

10. DOC agrees to continue to conduct mass testing of all prisoners incarcerated in correctional facilities, to the extent such tests remain available to the DOC, public health officials from DPH in consultation with DOC's Chief Medical Officer agree that this testing strategy is appropriate and necessary, and subject to the informed agreement and consent of the person being tested for active COVID-19 infection, until it has completed mass testing in all of its correctional facilities at least once. For purposes of this agreement, the term "mass testing" shall mean a test as described in Paragraph 11 below that is offered on an opt-out basis to all prisoners housed in a correctional institution on a single day or series of days that are close in time. People who recently tested positive (i.e. within the last 14 days) may be excluded from being offered mass testing.

11. DOC may use any widely accepted, medically sanctioned COVID-19 viral testing method for these purposes.

12. Unless otherwise recommended by the AMP, DOC will quarantine people newly admitted to a correctional facility for 14 days. In this context, "quarantine" shall refer

---

[1] The Agreement has been modified by this writing, on June 26, 2020, by deleting the previous last sentence in paragraph 7, and by mutual written agreement pursuant to paragraph 27, the above stated language is substituted.

to keeping these individuals separate from the general population in a unit where they are monitored for COVID-19 symptoms and tested if they develop any such symptoms.

13. Those who test positive for COVID-19 infection will be isolated as medically appropriate. Those who test positive for COVID-19 infection and are symptomatic will be isolated as medically appropriate and shall be checked twice per day for temperature, respiratory rate, heart rate, and blood oxygen saturation levels; and have blood pressure taken once per day. The parties acknowledge that this exceeds the community standard of medical care.

14. In accordance with CDC Guidelines, placement in medical monitoring, medical isolation and medical quarantine units shall not be considered punitive isolation. Regarding prisoners who have been medically isolated and subsequently cleared of COVID-19 according to CDC Guidelines and thus released from medical isolation, DOC will continue to make best efforts to return such prisoners to their pre-medical isolation facility unless there are safety and security concerns, or health concerns with this return. DOC will also make best efforts to reinstate such prisoners who previously held jobs or were in programs to these assignments, recognizing that this may not always be possible due to safety and security concerns, health concerns, available space, and other correctional management issues. DOC will continue to make best efforts to communicate to prisoners this policy when moving prisoners to medical isolation.

15. DOC will make best efforts to encourage all staff members to get regular COVID-19 viral testing. Recognizing the need for DOC and individual DOC facilities to remain flexible and adaptable to developing health and security concerns, DOC will continue to make best efforts to screen staff and any others entering DOC facilities consistent

with CDC guidelines.

16. Defendants agree to report to Plaintiffs' counsel, every month, the total cumulative number of prisoners tested since the start of the pandemic by facility and the results of those tests. The first such report shall be required on the first business day of the month that follows the effective date of this settlement agreement.

### D. SANITATION

17. DOC will distribute soap to each person housed in a DOC facility ("Facility") once a week without asking, and upon request, within 24 hours, provided that the person does not already have 2 bars of soap in their possession.

18. All common areas of Facilities, including but not limited to bathrooms, dayrooms, and showers, shall be cleaned no less frequently than twice per shift on first and second shift for bathrooms, dayrooms, and showers. This is intended to ensure a uniform minimum level of cleaning systemwide. This may be suspended for reasons consistent with Paragraph 47 below.

19. Prisoners will be provided (1) sufficient disinfectant cleaning agents not diluted in excess of manufacturers' specifications, and (2) equipment, for the purpose of cleaning their cells, cubicles, or sleeping areas, no less frequently than twice per week. This may be suspended for reasons consistent with Paragraph 47 below.

20. All people in DOC custody shall be allowed to shower—in running water—no less than once every other day, regardless of COVID-19 symptoms, test results, or housing. This may be suspended for reasons consistent with Paragraph 47 below, or for maintenance issues.

21. DOC will provide cleaning supplies to allow all prisoners in its custody in correctional facilities to wipe down phones before they use them.

22. DOC will provide a minimum of two cloth or other barrier masks per person, and allow for one mask to be exchanged each week for a new mask (or upon request, if a mask becomes torn or otherwise damaged). This is contingent on the DOC being able to continue the production of cloth or barrier masks within its facilities; this ability to produce masks could be interrupted or ceased due to various unforeseen circumstances, including lack of incarcerated workers, lack of correctional staff, lack of supplies due to supply chain issues, lockdowns, riots, or other emergency circumstances. Prisoners will be allowed to wear their masks for work assignments, and will be provided with gloves for those assignments as needed.

23. Staff in correctional facilities will be required to wear masks when social distancing is not possible. They may be exempted from this only if medically necessary.

### E. DISCRETIONARY RELEASE OF PRISONERS

24. Defendant Cook[2] shall continue to examine his statutory powers to release prisoners to the community and shall determine whether to exercise them on a case-by-case basis. Nothing in this Settlement Agreement shall be interpreted to alter, limit, or otherwise change Defendant Cook's statutory discretion over decisions regarding the release of people to the community. Prisoners being considered shall be prioritized for consideration for community release if they are 65 and older or if they have a medical score of 4 or 5.

25. Defendants shall make best efforts to effectuate the staffing resources necessary to maximize prompt and comprehensive consideration of discretionary releases. and Counsel for the Plaintiffs, on a monthly basis, as follows: (l) the number of individuals reviewed for discretionary release; (2) the number of individuals granted discretionary release; and (3) the number of individuals denied discretionary release.

---

[2] References to Defendant Cook are intended to include members of his staff.

26. For the duration of this Agreement, Counsel for the Defendants shall report to the Court

**F.  MODIFICATION OF THE AGREEMENT**

27. This Agreement may be modified only by the mutual written agreement of all parties. The Court shall be notified in writing of all such modifications but need not approve such modifications.

**G.  TERMINATION OF THE AGREEMENT**

28. The parties intend that this Agreement will remain in place until December 31, 2020, provided that upon the mutual consent of the parties, it may be extended. The Agreement may also be terminated by mutual consent of the parties.

29. Upon termination, without the need for any further order of any state or federal court, all jurisdiction of any court to enforce this Agreement shall end. In the event any motions or proceedings are pending on or after December 31, 2020, the Court shall be bound to dismiss any such motions or proceedings.

**H. GENERAL RELEASE OF CLAIMS**

30. The named plaintiffs, individually and on behalf of their heirs, beneficiaries, successors and assigns, in consideration of the benefits of this Agreement, release and forever discharge the defendants, Ned Lamont, Governor, State of Connecticut, and Rollin Cook, Commissioner of the Department of Correction, the State of Connecticut, all agencies of the State of Connecticut, all present and former officers, employees and agents of the State of Connecticut, (including all current and former

employees of the State of Connecticut, Department of Correction and the University of Connecticut Health Center), in both their official and individual capacities, their heirs, successors and assigns, from all actions, causes of action, suits, claims, or controversies arising from acts or omissions alleged in the Complaint. Said liability includes such actions as may have been or may in the future be brought in the federal courts, the courts of the State of Connecticut, any state or federal administrative agency, or before the Claims Commissioner pursuant to Conn. Gen. Stat.§ 4-141, et seq.  Furthermore, all class members as defined in paragraph 35 of this Agreement, individually and on behalf of the Class, their heirs, beneficiaries, successors and assigns, in consideration of the benefits of this Agreement, release and forever discharge the defendants, Ned Lamont, Governor, State of Connecticut, and Rollin Cook, Commissioner of the Department of Correction, the State of Connecticut, all agencies of the State of Connecticut, all present and former officers, employees and agents of the State of Connecticut, (including all current and former employees of the State of Connecticut, Department of Correction and the University of Connecticut Health Center), in both their official and individual capacities, their heirs, successors and assigns, from all actions, causes of action, suits, claims, or controversies for any and all forms of non-monetary relief arising from acts or omissions alleged in the Complaint, or from acts or omissions that could have been litigated by the class in this action. Said liability includes such actions as may have been or may in the future be brought in the federal courts, the courts of the State of Connecticut, any state or federal administrative agency, or before the Claims Commissioner pursuant to Conn. Gen. Stat.§ 4-141, et seq. <u>Notwithstanding the</u>

<u>prior sentence,</u> this release does not include criminal matters, meaning motions for sentence modifications or bond modifications. This release does not apply to the ability of class members to seek and/or qualify for discretionary release due to COVID-19 under Defendants' discretionary authority or to seek release due to COVID-19 in criminal proceedings within the courts of the State of Connecticut. <u>This release does not apply to any habeas corpus petition seeking any relief due to the COVID 19 pandemic that is pending as of the date of this Agreement.</u>  However, this release does apply to any and all class members' habeas corpus cases seeking any relief due to the COVID 19 pandemic which may be brought during the time this Agreement is in effect.   In addition, this release applies to any motions seeking any relief due to the COVID 19 pandemic which may be filed in a pending habeas corpus petition during the time this Agreement is in effect.

### I.  NO ADMISSION OF LIABILITY

31. The Parties represent and warrant to each other that the parties specifically understand and agree that this Agreement is a settlement and compromise of their differences to resolve any and all claims that were raised in this action and is a compromise of disputed claims without any adjudication of the rights, claims and defenses of the parties.

32. The existence of this Agreement shall not be construed as an admission of liability or of the truth of the allegations, claims, or contentions of any party. There are no covenants, promises, undertakings, or understandings between the parties outside of this Agreement except as specifically set forth herein.

33. This Agreement is not a consent decree and shall not be incorporated into any

judgment of the Court. To the contrary, this is a settlement agreement which the parties respectfully submit is a fair, reasonable and adequate resolution of this case.

34. The State agrees not to contest this Settlement Agreement as non-compliant with 18 U.S.C. § 3626.

### J.   CLASS CERTIFICATION AND STIPULATED DISMISSAL

35. The plaintiffs shall file a consent motion for certification of the plaintiff class within five days of this agreement being executed. The class shall be defined as "all persons who were incarcerated in a DOC facility from March 1, 2020, or are incarcerated, or in the future will be so incarcerated, until the termination date of this Agreement, December 31, 2020."

36. Within three days of the consent motion for class certification being granted, Plaintiffs and Defendants shall jointly sign and file a Fed. R. Civ. P. 41 Stipulated Dismissal of this action, with prejudice and without costs, together with their motion for an Order to Give Notice, and for a fairness hearing, pursuant to Fed. R. Civ. P. 23(e). On the date counsel for the Plaintiffs sign this Agreement, Plaintiffs shall also withdraw *CCDLA v. Lamont,* DOCKET NO. UWY CV-20-6054309-S (April 23, 2020); appeal pending, SC 20470 *Connecticut Criminal Defense Lawyers Association Et Al. v. Ned Lamont, Et Al.*, without costs to any party.

37. Throughout the duration of the Agreement, the parties agree to resolve disputes, and plaintiffs may seek to enforce the Agreement, only pursuant to the procedures outlined in Section J of this Agreement ("Dispute Resolution"). The parties understand and agree that, if approved, and the Court consents, the Court will maintain jurisdiction of this action throughout the duration of the Agreement to resolve any disputes which cannot

be amicably resolved between the parties pursuant to the Dispute Resolution procedures set forth in Section J. If the parties are unable to resolve any such disputes with the assistance of the Settlement Judge, despite the Stipulated Dismissal, the Court may retain jurisdiction to enforce the provisions of the Agreement and the Plaintiffs may seek specific performance of the Agreement.

38. The parties also agree that, if the Court approves this Agreement, after Notice to the class, and a fairness hearing pursuant to Fed. R. Civ. P. Rule 23(e), the Court will order a dismissal with prejudice pursuant to Fed. R. Civ. P. Rule 41 (a). The Court will not incorporate this Agreement into any Order of Dismissal, but will nevertheless remain available to the parties to resolve disputes, and if necessary, to order specific performance, after all of the procedures of Section J have been exhausted.

**K. DISPUTE RESOLUTION**

39. The parties agree to attempt an informal and private dispute resolution mediation with the Honorable William I. Garfinkel, United States Magistrate Judge ("Settlement Judge") to resolve any disputes that may arise arising under this Agreement.

40. If, while this Agreement is in effect, Plaintiffs' Counsel have reasonable grounds to believe that there is a systemic pattern or practice of non-compliance with this Agreement in one or more DOC Facilities, or if DOC proposes or enacts revisions or changes to its COVID-19 policies and procedures that are materially inconsistent with the Agreement and the CDC guidelines, and to the detriment of the class, Plaintiffs' Counsel will provide the DOC with a written detailed notice of potential noncompliance, setting forth the factual basis for such claim. This notice will identify, with particularity, the basis of the claim that the DOC is not in compliance; why such

12

facts constitute a systemic pattern or practice of non-compliance; and the specific material provision of the Agreement or CDC guidelines that is implicated.

41. Within twenty calendar days of receipt of the notification, the DOC shall provide a good faith written response to the Plaintiffs' notification with a full factual explanation as to why the DOC believes it is in compliance with the specified material provisions, an explanation of the DOC's plans to achieve full compliance with the specified material provisions, or an explanation of the bona fide medical, security, or other reasons for the alleged non-compliance.

42. It is understood between the parties that certain unforeseeable events or conditions, including but not limited to long-term lockdowns in the DOC, and changes to established treatment practices and the standard of care for treatment of COVID-19 infection, may prevent compliance with this Agreement. If so, the DOC shall notify Plaintiffs' counsel of the event or condition, and the parties shall enter into good-faith discussions to resolve the issues.

43. If the parties are unable to resolve the dispute within ten calendar days of DOC's response, the parties shall notify the Settlement Judge. The Settlement Judge may, in the Court's discretion, establish such mediation procedures the Court deems appropriate.

44. Plaintiffs' Counsel may seek intervention from the Court only after all efforts for resolving the dispute with the assistance of the Settlement Judge have been unsuccessful. They may do so by filing a motion for specific performance of the material provision identified. The Court may, after appropriate notice, filing of moving and opposing papers, submission of evidence and an evidentiary hearing, order specific performance of the material provision specified in the notice upon a showing that the

DOC is in substantial and systemic non-compliance with that material provision.

45. Plaintiffs agree they shall not file a motion for contempt. The Court may not entertain a motion for contempt and the Court may not grant any remedial relief in the nature of a contempt of court finding against Defendants. If Plaintiffs prevail on their claim of non-compliance, the sole remedy shall be specific performance of this Agreement.

46. The plaintiffs agree not to seek any attorneys' fees and/or costs for any time spent in any portion of dispute resolution, including, but not limited to, the drafting and sending of the notice of noncompliance, reviewing DOC's response, dispute resolution with the Settlement Judge, or any motion filed with the court for specific performance of the Agreement.

## L.  GENERAL PROVISIONS

47. The provisions of this Agreement may be suspended or modified in part or in entirety at a specific DOC facility only if the defendants or their designees determine that a "genuine emergency" exists at that DOC facility. Genuine emergency means any special circumstances under which it is reasonable to conclude that there is any actual or potential threat to the security of that DOC facility, or to the safety of the staff, prisoners or other persons within such facility. If a "genuine emergency" lasts longer than twenty-four hours, or occurs more than once in a one-week period, defendants shall report to plaintiffs' counsel, within forty-eight hours except for good cause, the date of the emergency, the nature of the emergency, and what provisions of this Agreement have been temporarily suspended.

## M. ATTORNEYS' FEES

48. The defendants will pay to counsel for the plaintiff class the sum of $40,000.00, all in full and final settlement of this action. This sum shall include all claims of any kind for monetary payments of any kind for attorneys' fees, costs and expenses related to this litigation of any kind that could be claimed in this action, either now or in the future, including but not limited to attorneys' fees, costs and expenses, from the beginning of the world to the end of time.

49. Plaintiffs' counsel further agrees not to seek any prospective fees and/or costs for any time spent in any future work on this case of any kind, including, but not limited to the portion related to dispute resolution.

        **PLAINTIFFS,**
        TRE MCPHERSON, PATTIKATE WILLIAMS-VOID,
        THOMAS CAVES, MR. ROE, AND MR. DOE
        AND ON BEHALF OF THE PUTATIVE CLASS

BY:____/s/ Dan Barrett_____
    Dan Barrett
    ACLU Foundation of Connecticut
    75 Asylum Avenue
    Hartford, CT  06105
    Tel:  (860) 471-8471

BY:____/s/ Elana Bildner_____
    Elana Bildner
    ACLU Foundation of Connecticut
    75 Asylum Avenue
    Hartford, CT  06105
    Tel:  (860) 471-8471

BY:____/s/ Will W. Sachse_____
    Will W. Sachse
    Dechert LLP
    Cira Centre
    2929 Arch Street
    Philadelphia, PA  19130
    Tel: (215) 994-2496

DEFENDANTS
NED LAMONT, *et al*,

WILLIAM TONG
ATTORNEY GENERAL

BY:   /s/ Terrence M. O'Neill
    Terrence M. O'Neill
    Assistant Attorney General
    110 Sherman Street
    Hartford, CT  06105
    Federal Bar #ct10835
    E-Mail: Terrence.oneill@ct.gov
    Tel: (860) 808-5450
    Fax: (860) 808-5591

BY:   /s/ *James W. Donohue*
    James W. Donohue
    Assistant Attorney General
    110 Sherman Street
    Hartford, CT  06105
    Federal Bar #ct28566
    E-Mail:  james.donohue@ct.gov
    Tel: (860) 808-5450
    Fax: (860) 808-5591

BY:   _____
    James M. Belforti
    Assistant Attorney General
    110 Sherman Street
    Hartford, CT  06105
    Tel:  (860) 808-5450
    Fax:  (860) 808-5591
    Federal Bar No. ct30449
    E-Mail:  james.belforti@ct.gov

BY: /s/ *Steven R. Strom*
    Steven R. Strom
    Assistant Attorney General
    110 Sherman Street
    Hartford, CT 06105
    Tel.:  (860) 808-5450
    Fax:  (860) 808-5591
    Federal Bar #ct01211
    E-Mail:  steven.strom@ct.gov

16