SCANNED at MU CF
and Emailed
7/10/2020 . ST . 12 pages
date   initials   No.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| TRE MCPHERSON, ET AL., | CIVIL NO. 3:20-CV-534 (JBA) |
| V. | |
| NED LAMONT, ET AL. | JULY 3, 2020 |

## NOTICE OF OBJECTION TO PROFFERED SETTLEMENT AGREEMENT

Pursuant to Rule 23 (e)(5) of the Federal Rules of Civil Procedure, Joseph Halladay, the undersigned and unnamed member of the class in the above captioned case ("undersigned" or "class member"), hereby objects and takes exception to the proffered settlement agreement.

## I. INTRODUCTION

On April 20, 2020, the Plaintiffs, by and through attorneys from the American Civil Liberties Union ("ACLU") amongst others ("class counsel" collectively), commenced the current action challenging the adequacy of sanitation measures, and the Connecticut Department of Correction ("CTDOC") efforts to reduce prisoners' risk of exposure and/or contraction of the Coronavirus Disease 19 (COVID-19).

The Plaintiff's averred that:

(1) "Defendants-Respondents are unable to sufficiently comply with public health guidelines to prevent an outbreak of COVID-19 [and] continuing to detain [persons in pretrial custody] under conditions of confinement that are inconsistent with COVID-19-specific guidance from public health experts is not rationally related to, and excessive in relation to [a legitimate, non-punitive governmental] purpose...violat[ing] [their] rights...under the Fourteenth Amendment." Complaint, Doc. No. 1, ¶¶ 83-84;

(2) "Defendants-Respondents' actions and inactions result in the

confinement of [persons in pretrial custody] in facilities where they do not adequately test for, treat, or prevent COVID-19 outbreaks, which violates Plaintiff's rights to treatment and adequate medical care...under the Fourteenth Amendment." Complaint, Doc No. 1, ¶¶ 86-87; and

(3) "DOC facilities, as currently operated, are unable to comply with public health guidelines to prevent an outbreak of COVID-19, and Defendants-Respondents have not and cannot provide for the safety of [incarcerated individuals]. ...Defendants-Respondents have not taken appropriate steps to test for, treat and prevent further COVID-19 outbreaks, and...are unable to protect the Medically Vulnerable Post-adjudication Subclass from serious harm caused by COVID-19, in violation of their constitutional obligation to provide humane conditions of confinement...under the Eighth Amendment." Complaint, Doc No. 1 ¶¶ 89-90.

Accordingly, the Plaintiff's sought eight separate and distinct requests for relief (Id., ¶ 91, 1-8).

On June 23, 2020, the undersigned received a "NOTICE TO THE CLASS OF SETTLEMENT AGREEMENT", dated June 17, 2020 ("Notice"). As asserted in the Notice, "[o]n June 6, 2020..., the parties reached a Settlement Agreement[, and] [o]n June 12, 2020, the Court certified a class of plaintiffs...." The undersigned has been identified as "a member of the class" (Notice, §I). Accordingly, the undersigned forwarded a correspondence to class counsel, also on June 23, 2020, requesting a copy of the proffered settlement agreement in its entirety. On July 2, 2020, the undersigned class member received a copy of the "MODIFIED SETTLEMENT AGREEMENT AND GENERAL RELEASE", dated June 26, 2020 ("Agreement"), to which the undersigned hereby objects and takes exception to for the following reasons:

II. OBJECTION

A. The Proffered Agreement Unlawfully And Illegally Waives All Class Members' Right To Seek Future Redress.

The Complaint's "THIRD CLAIM FOR RELIEF", articulated in ¶¶ 88-90, is overly broad and generally states a claim of "Unconstitutional Conditions of Confinement in Violation of the Eighth Amendment to the U.S. Constitution". Under the provisions of the Agreement, "all class members...individually and on behalf of the Class...in consideration of the benefits of this Agreement, release and forever discharge the defendants...in both their official and individual capacities...from all actions, causes of action, suits, claims, or controversies for any and all forms of non-monetary relief arising from acts or omissions alleged in the Complaint, or from acts or omissions that could have been litigated by the class in this action. Said liability includes such actions as may have been or may in the future be brought in the federal courts, the courts of the State of Connecticut, any state or federal administrative agency, or before the Claims Commissioner pursuant to Conn. Gen. Stat.§ 4-141, et seq." (See, Agreement, § H, ¶ 30.)

The undersigned class member strongly objects and takes exception to this term of the Agreement, in that (1) this provision unlawfully and unfairly waives the undersigned's rights to seek future redress; and (2) as articulated fully in § II.B., below, the undersigned suffered individual harm and is already pursuing a separate action.

Moreover, class counsel agrees to waive all class members' rights "in consideration of the benefits of this Agreement". (Id.) Whereas, the undersigned does not consider there to be any "benefits" stemming from this Agreement their waiver is unsubstantiated. To say that the entire prison population would "benefit" from the CTDOC fulfilling their obligations under

-3-

the constitution is apparent. However, to waive each individual prisoner's right to file claims to enforce such constitutional mandates, the only redress prisoners have, is insolent.

The undersigned has never given, nor does he give class counsel the authority to waive the undersigned's rights under the law. This objection is filed to safeguard and preserve the undersigned's individual rights under the law, and to serve as an attestation that the undersigned does not, in any way, relinquish his legal rights to class counsel, or in lieu of any perceived "benefit" under this Agreement.

### B. The Undersigned Class Member Has Suffered Individual Harm And Is Pursuing A Separate Action For Damages.

The undersigned class member has suffered individual harm and is currently pursuing a separate action. Although it arises from different facts and circumstances, the undersigned's suit will state a claim of unconstitutional conditions of confinement in violation of the Eighth Amendment to the U.S. Constitution, as it relates to some of the named defendants' deliberate indifference to a substantial risk of exposure to COVID-19. The undersigned's claim for relief will be identical to the Plaintiff's "THIRD CLAIM FOR RELIEF", as articulated in their Complaint ¶¶ 88-90. In accordance with the proffered Agreement, the doctrines of res judicata/collateral estoppel may bar the undersigned's claim and/or certain and specific relief(s) arising therefrom (see, § II.A., above).[1]

The undersigned's individual cause of action stems from an incident that occurred at the facility in which he is housed, on and around April 15, 2020. This incident predates the commencement of the Plaintiff's class action. In that the undersigned has to comply with the provisions of the

---

[1] Although the undersigned class member may still be able to sue for monetary relief, the undersigned anticipates his individual action will also request non-monetary relief.

-4-

Prison Litigation Reform Act ("PLRA"), and is currently in the process of exhausting his administrative remedies, he is not yet able to file suit. Furthermore, the undersigned contacted class counsel on two separate occasions in order to both apprise them of the facts and circumstances that give rise to the undersigned's cause of action and to seek assistance. First, the undersigned's Power of Attorney contacted class counsel, on behalf of the undersigned, via electronic mail. Shortly thereafter, the undersigned forwarded a copy of his correspondence to the prison's warden ("attempt at an informal resolution"), which outlined all the details of what transpired. To date, the undersigned class member has not received any response from class counsel.

Whereas, class counsel has not responded to the undersigned's correspondences, the undersigned was never given notice, or an option to opt-out of the class settlement, not even a copy of the complaint, and being that the undersigned has suffered individual harm, which has not been rectified by this class settlement, and the undersigned is currently pursuing a separate action for damages, the undersigned objects to this Agreement accordingly.

### C. The Proffered Settlement Agreement Is Unfair, Unreasonable, And Inadequate.

1. The provisions of the Agreement that relates to the "DISCRETIONARY RELEASE OF PRISONERS"(Agreement §E.), is inadequate and unreasonable.

The Complaint filed in this case recognizes "a subclass of persons who by reason of age of medical condition, are particularly vulnerable to injury or death from COVID-19" (Complaint ¶¶ 71 & 72, "Medically Vulnerable Subclasses", Pre-and-Post adjudication, respectively). "The Medically Vulnerable Subclasses include all people 50 or older who are in custody at DOC facilities and all people in custody at DOC facilities who have been diagnosed with [specified medical conditions]" (Id. ¶ 73). The Plaintiffs

-5-

sought "immediate release of all members of the Medically Vulnerable Subclasses" (Id. ¶ 5). However the Agreement only allows for "consideration for community release [for prisoners] if they are 65 and older or if they have a medical score of 4 or 5" (Agreement ¶ 24). This compromise abandons a significant portion of the Medically Vulnerable Subclasses. Most of the specified medical conditions, outlined in the Complaint, would not classify a prisoner as a medical level 4 or 5. Whereas prisoners who suffer from such underlying conditions would be excluded from "consideration for discretionary release" (along with **all** prisoners 50-64 years old). Class counsel, correctly, asserts that these individuals "face serious risks of life-threatening illness due to their age and/or underlying medical conditions" (Complaint ¶ 3), yet they agree to disallow the very same individuals from even being "considered for discretionary release" and to remain at a "substantial risk of severe illness or death...." (Id. ¶ 1)[2]

The only individuals that the CTDOC is actually "considering for discretionary release" are "individuals with terminal illnesses who are so debilitated or incapacitated by such condition, disease or syndrome as to be physically incapable of presenting a danger to society" (Medical Parole), and/or "individuals who are so physically or mentally debilitated, incapacitated or infirm as to be physically incapable of presenting a danger to society" (Compassionate Parole). The aforementioned release mechanisms have been on the books for decades and are insufficient, in that they do not take

---

[2] As noted in the Plaintiff's Complaint "the first person in DOC custody to die from COVID-19...was over 60...." (at ¶ 42) While his medical score is not stated, if it wasn't a 4 or 5 he wouldn't have been "considered for discretionary release". Either way COVID-19 turned his two year sentence into a death sentence. By severely limiting prisoners that should be granted early release, due to their age and/or medical conditions, more prison terms will be converted into death sentences, due to COVID-19. It is also important to note that the State of Connecticut abolished it's use of capitol punishment several years ago.

into account the "significantly higher risk of severe disease and death if [prisoners] contract COVID-19." (Complaint ¶ 1) While the "Info Sheets" posted to advise the prison population of the criteria for both medical parole and compassionate parole have revision dates well into the current pandemic (4.8.2020; 4.17.2020, medical parole and compassionate parole, respectively), neither have any mention of COVID-19. This supports the fact that the CTDOC is not planning on releasing any inmates regardless of whether they are 65 or older, or have a medical score of 4 or 5, a sentiment echoed by Governor Lamont. (See, Complaint ¶ 39, "Governor Lamont refused to consider releasing anyone in state custody..." citing, Kelan Lyons, Lamont Says No Prison Releases Because of COVID-19 Despite Pressure From Advocates, CONN. MIRROR (Mar. 24, 2020), https://cutt.ly/Jt3C8v8, at note 71.)

Moreover, it is important to note that, while the Agreement establishes an "independent Agreement Monitoring Panel" (AMP), there is no provision "to confirm that Defendants - Respondents properly identify and release members of the Medically Vulnerable Subclasses". "Plaintiffs' [Complaint] ask[ed] the Court to appoint a public - health expert" to carry out this responsibility (see, Complaint ¶ 4), however the Agreement leaves it up to the "Defendants [to] make best efforts" and to provide "Counsel for the Plaintiff's (1) the number of individuals reviewed for discretionary release; (2) the number of individuals granted discretionary release; and (3) the number of individuals denied discretionary release" (Agreement ¶ 25). There is no component "to confirm that the Defendants - Respondents properly identify and release members of the Medically Vulnerable Subclasses", nor is there any established criteria to determine whether an individual should be granted/denied early release. Wherefore the provisions of the agreement that relates to the discretionary release of prisoners is inadequate and

-7-

unreasonable and the undersigned class member[3] objects accordingly.

> 2. The Agreement is unfair and unreasonable due to the disparity in the treatment of prisoners and CTDOC employees.

The current class action was brought forth to "prevent or minimize the spread of the virus for those confined in DOC facilities" (Complaint ¶ 1). As noted in the Complaint "hundreds of thousands of correctional officers and correctional healthcare workers enter these facilities everyday...." (at ¶ 56). It is unequivocal that, if there is an outbreak of COVID-19 in a CTDOC facility, somebody would've had to bring the contagion into the facility. Since there has been no visits for several months, other than new commits and/or transfers in and out of the facility, the most likely source of transmission would be CTDOC employees. Once the contagion is present in the facility, the virus will spread exponetially. The Agreement does little, to nothing "to prevent or minimize" the transmission of the virus from CTDOC employees.

Although the Agreement states that "Staff in correctional facilities will be required to wear masks when social distancing is not possible". (at ¶ 23), all CTDOC employees are not complying with the current recommendations to wear a mask. However, all inmates must wear a mask at all times or will face disciplinary action. If the CTDOC employees are not currently following recommended guidelines, how can we expect them to comply with the provision of the Agreement? The Agreement omits any indication of - how this provision will be enforced?; how will prisoners be protected from retaliatory measures from staff?; Etc.. The undersigned has personally witnessed numerous CTDOC employees not wearing masks while socializing with inmates.

---

[3] The undersigned class member is **not** currently a member of the Medically Vulnerable Subclass.

"DOC staff are further vectors of the virus...[in that] they may be asymptomatic but still contagious. This presents a daily risk of coronavirus infection in DOC facilities. [Although] DOC is taking staff members' temperature upon their entrance to the facilities, but the high rates of asymptomatic transmission means that monitoring fever is inadequate to identify all who may be infected and thereby reduce the risk of transmission." (Footnote omitted) Complaint ¶ 56.

Under this Agreement "DOC will make best efforts to **encourage** all staff members to get regular COVID-19 viral testing." (Emphasis supplied.) Agreement ¶15. But CTDOC will "conduct mass testing of **all** prisoners incarcerated in correctional facilities...." (Emphasis supplied.) Agreement ¶10. Eventhough the Agreement states that testing is "subject to the informed agreement and consent of the person being tested..." (Id.), what is not being conveyed to the Court is that if a prisoner chooses to "opt-out", he is "presumed positive" for COVID-19, transfered to a seperate unit (with any other prisoners who actually tested positive), is "quarantined" for 14 days and "may" lose his housing assignment, job assignment, etc.. "Encouraging" a person to be tested who is (1) more likely to be a carrier of the virus; and (2) is endangering a vast amount of people on a daily basis, by entering a correctional facility not knowing if they are a carrier of the virus, while **forcing** those they endanger to be tested, is not only ineffective, but draconian.

Additionally, the Agreement implements "quarantine" and "medical isolation" for prisoners, but there is no mention of the same measures being taken against staff. The undersigned has first-hand knowledge of the disparity in the CTDOC's implementation of these measures. The undersigned was placed in the "restrictive housing unit" under the guise of "quarantine"

-9-

after an individual who transferred to the facility in which the undersigned is housed, tested positive for COVID-19. Although the undersigned was never in direct contact with the infected individual, the undersigned was placed in restrictive housing and was treated as if he was placed there for punitive reasons. Furthermore, staff members who were in direct contact with the infected individual, over a period of several days, were still at the facility working.[4] Finally, the Agreement does not have any requirement to report the statistical data relating to how many staff members tested, how many were positive, etc.. Whereas there is a vast disparity between the treatment of prisoners and the treatment of staff members, this Agreement is unfair, unreasonable and inadequate and the undersigned objects accordingly.

3. Class counsel has abandoned several significant requisitions.

Throughout the Complaint Class counsel contends that "Northern Correctional Institution ("Northern"), a "supermax" prison [is] not intended or designed to serve as a medical correctional facility". (Complaint ¶ 1) "Further, the transfer of COVID-19-positive members of the Classes to Northern is only worsening the COVID-19 crisis in DOC facilities." (Id. ¶ 47) Northern's conditions of confinement are singularly oppressive." (Id. ¶ 48) "Solitary confinement at Northern is not the same as the medical isolation recommended by the CDC. ...Defendants-Respondents are punishing these individuals and depriving them of standard of living conditions simply because they have fallen ill." (Footnote omitted.) (Id. ¶ 50) However the Agreement has no mention of Northern, transfers to and from, and/or the adequacy of the facility to house COVID-19 positive prisoners. Class counsel gives CTDOC significant leeway as it relates to the CTDOC's compliance with CDC guidelines, social-distancing, etc.. There is no mention of the adequacy

---

[4] See, § II.B., above.

of the ventilation systems in the CTDOC facilities, nor how the CTDOC is transporting seven inmates and two correctional officers in a van to medical appointments outside the facilities.

## III. CONCLUSION

Based upon all the reasons stated herein, the Agreement reached in this class action is unfair, unreasonable and inadequate. Additionally Class counsel is very liberal when it comes to waiving the class members' rights. The undersigned class member hereby objects and take exception to the proffered settlement agreement.

Respectfully Submitted this 8th day of July, 2020, by

_____
Joseph Halladay
Unnamed class member
Inmate No. 365018

## CERTIFICATION OF SERVICE

I hereby certify that on July 8, 2020, a copy of the foregoing "Notice Of Objection To Proffered Settlement Agreement" was filed electronically and "courtesy" copies were mailed to: "Class counsel" Dan Barrett and Elana Bildner, ACLU Foundation of Connecticut, 765 Asylum Avenue, Hartford, Ct. 06105, and Office of the Attorney General, 110 Sherman Street, Hartford, Ct. 06105. Notice of this filing will be sent by e-mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Courts CM/ECF System.

By: *Joseph Halladay*
Joseph Halladay
Unnamed Class Member
Inmate No. 365018
MacDougall C.I.
1153 East Street South
Suffield, Ct. 06080