Memorandum in Opposition to the ratification of CIVIL NO. 3:20-CV-0534 (JBA)

Prisoner would preface his opposition to the District Court ratifying CIVIL NO. 3:20-CV-0534 (JBA) by stating that his 28 year observation, as a prisoner, of the Connecticut Department of Corrections' (hereinafter DOC) dysfunction would render its compliance with the term of the Settlement Agreement a legal impossibility.

The extent of its dysfunction and corruption should have, years ago, qualified it for years of scrutiny from the Justice Department, under a consent decree, in order to improve and/or correct its behaviour.

In his 28 years, as a prisoner, he has witnessed the gradual degradation in correctional standards on account of the lack of political and judicial will to hold the Commissioner of Corrections and his myriad designees, accountable to those standards.

—1—

And because of having been victimized by that degradation in standards, prisoner is well qualified to speak to the issue of the DOC's refusal to provide and maintain appropriate levels of sanitation.

Prisoner will seek to articulate his reasons for his opposition to the ratification of CIVIL No. 3:20-CV-0534 (JBA) in as clear and logical manner as possible.

First, is the structure and legal sufficiency of the pleading. It is axiomatic that attorneys for, both, the plaintiffs and defendants, must need be candid and truthful in their representations to the court. No one who has litigated for or against the DOC can attest to the truthfulness of stipulations 1, 3, 5 and 6 of the pleading, and the factual contentions found in them have no evidentiary support. That being the case, it would be in violation of Rule 11 of the Federal Rules of Civil Procedures and subject to a motion for sanctions.

Second, is messengers Barrett, Bildner and Sachse's failure to joinder the DOC's various labor unions as party defendants.

Unlike Richard Roe or John Doe, unions and their leaderships are parties to legal proceedings whose names are known.

Since the early 90's when then commissioner, Mr. Larry Meachum was forced to resign, based upon a no vote of confidence, urged upon the membership by the union, no commissioner has been able to independently implement changes which in any way held correctional staff accountable for the performance of the job for which the Connecticut taxpayer has paid or in any way inconveniences correctional staff.

This state of affairs applied whether the commissioner in question rose through the ranks of the DOC or like the present commissioner was brought from outside Connecticut or outside the CT DOC ranks.

A commissioner brought from outside Connecticut, but, without the political will and support of the governor cannot implement changes anymore than can a commissioner who rose through the ranks, but, who is toeing the party line (union).

Ridiculous as it may sound; that labor should be telling, both, the governor and the commissioner how prisons in Connecticut are to be operated, it is the unions who are in fact operating the prisons, albeit, by proxy.

Therefore, it is for the court to determine whether in equity and good conscience the settlement agreement should proceed among the parties before it or should be dismissed absent joinder of the DOC unions.

Third, assuming arguendo that someone develops the courage and will to actually provide sanitation and sanitizing soaps and chemicals. Before it can achieve its intended result someone (monitoring panel?) must first prevent said products ending in the trunks of staff's automobiles, such as correctional officers; Bugbee, Saunders, Kelly, S., Domian and Goncalves before it can be distributed to the inmate population. Second, once it actually reaches the inmate population someone (monitoring panel?) must insure equal and undiluted distribution to each and every inmate, which means no inmate should be in possession or in the position of distributing the product, as this

−4−

would definitely guarantee unequal and diluted distribution.

Fourth, the composition of the monitoring panel does not envisage having the inmate(s) perspective on whether or not the DOC is in compliance with the terms of the Settlement Agreement at any one facility. Inmates are in a better position to detect non-compliance.

Nor is there any mechanism for inmates to report to the monitoring panel in regards any instance of non-compliance.

Fifth, the due notice requirement to the DOC, before conducting on site visits, is troubling as it allows the DOC to hide areas or access to inmates with something to say about the DOC's non-compliance.

Sixth, Settlement Agreement speaks of mass testing on an opt-out basis, however, prisoners who have opted-out have been punished by being quarantined. Inmates who have been quarantined claim they have been abandoned in quarantine unit without any testing.

The claim that the DOC will make best efforts to re-instate prisoners to

-5-

jobs/programs is patently false. There is too much fudge factor involved in the DOC's claim to re-instate. Either you make a commitment to re-instate or you don't, and for the DOC it is easier not to re-instate.

Similarly, the DOC's alleged best efforts to encourage staff members to get regular Covid-19 viral testing is also an example of waffling. The testing for staff or anyone entering a DOC facility should be mandatory, inasmuch as it is staff/visitors who are importing disease into correctional facilities.

Prisoners are locked down with no external movement so that they could not possibly be vectors for the propagation of disease, it is only after they are infected by staff/visitors that they become vectors.

Seventh, the claim that all common areas of facilities shall be cleaned no less than twice per shift on first and second shifts for bathrooms, dayrooms and showers is another potent lie.

These areas were not properly cleaned before the pandemic and they are certainly not cleaned during the pandemic

The DOC has refused to provide cleaning supplies that are not already diluted beyond manufacturers specifications.

The result of this refusal is that shower walls and ceilings are encrusted with mold and rust. The shower stalls themselves, although stainless steel, are in fact incubators for the mold and rust spores inasmuch as they were never vented and the calcium deposits, exacerbated by the improper cleaning, give the mold a foothold on which to colonize.

The moist conditions and heat provide the ideal environment for mold colony growth. A prisoner bathing in this environment exposes the open pores of his body to absorb the mold and rust spores. This is precisely how prisoner was condemned to systemic bouts of contact dermatitis.

Moreover, not only, has the DOC refused to provide the proper cleaning supplies, but, it has also failed to train prisoners in the use of cleaning compounds, all the while expecting them to undertake these important and necessary tasks at .75/day !!

If prisoners are not being provided cleaning supplies to clean common areas neither are they provided any antiseptic cleaning agents to clean their cells.

Eighth, as regards the discretionary release of prisoners no criteria for release has been specified or the basis for considering release. Many questions attend this dangling carrot, not least of which are;

    1- Whether prisoners meeting the age or medical score requirement are from end of sentence group of prisoners or any other group irrespective of term of sentence or basis for conviction, and;

    2. Whether a prisoner meeting the age and medical requirements make a request for release.

In summation, the general release of claims far exceeds any alleged benefits and/or promises accruing from this self-serving settlement agreement and for that reason prisoner opposes its ratification by the Court

CC: Honorabet B Arterton  
Hartford Courant  
File

Submitted to CT ACLU  
on July 5, 2020  
by Diego M. Vos II  218550

